# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| COLTON SCHMIDT, individually and on behalf of others similarly situated; REGGIE NORTHRUP, individually and on behalf of others similarly situated, | §<br>§<br>§<br>§<br>§ |
| Plaintiffs, | §<br>§ |
| v. | § CIVIL ACTION NO. 5:19-cv-01080-FB<br>§ |
| AAF PLAYERS, LLC, a Delaware Limited Liability Company, d/b/a The Alliance of American Football; THOMAS DUNDON, an individual; CHARLES "CHARLIE" EBERSOL, an individual; LEGENDARY FIELD EXHIBITIONS, LLC, a Delaware Limited Liability Company; EBERSOL SPORTS MEDIA GROUP, INC., a Delaware Corporation; and DOES 1 – 200 inclusive, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |
| Defendants. | §<br>§ |

## DEFENDANT THOMAS G. DUNDON'S BRIEF IN SUPPORT OF
## DEFENDANT THOMAS G. DUNDON'S MOTION TO DISMISS

Dated: September 20, 2019

Respectfully submitted,

**BELL NUNNALLY & MARTIN, LLP**

*/s/ Brent D. Hockaday*
Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Alana K. Ackels
Texas Bar No. 24066760
aackels@bellnunnally.com
Brent D. Hockaday
Texas Bar No. 24071295
bhockaday@bellnunnally.com
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
214.740.1400 (Telephone)
214.740.1499 (Facsimile)

**ATTORNEYS FOR DEFENDANT
THOMAS G. DUNDON**

## CERTIFICATE OF SERVICE

I certify that on September 20, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties requesting electronic notification in this case.

*/s/ Brent D. Hockaday*
Brent D. Hockaday

## TABLE OF CONTENTS

**PAGE**

I. SUMMARY ................................................................................................................. 1

II. PERTINENT PROCEDURAL FACTS AND BACKGROUND ................................. 3

  A. Plaintiffs Assert Conclusory Allegations to Support California State Causes of Action Against Dundon That Are Not Plausible. ................................................................. 3

  B. Dundon Removed to Federal Court and the Northern District of California Transferred this Case to this Court. ................................................................................................... 5

III. ARGUMENTS AND AUTHORITIES........................................................................ 5

  A. Legal Standard........................................................................................................... 5

  B. Plaintiffs Fail to State Any Claims for Relief Against Dundon. ............................... 7

  C. Even Considering the Conclusory Factual Allegations, Plaintiffs Failed to State Any Claims for Relief Against Dundon. .......................................................................... 8

    1. Plaintiffs failed to state a claim against Dundon for promissory estoppel. ................... 8

      a. Plaintiffs improperly pleaded breach of contract and promissory estoppel as alternative legal theories of recovery...................................................................... 8

      b. Even if Plaintiffs could pursue both claims under the same reliance on "promise of payment," they failed to state a claim for promissory estoppel. .......................... 11

        1. Plaintiffs failed to allege Dundon made a clear and unambiguous promise. ........................................................................................................... 11

        2. Plaintiffs failed to allege they relied on any promise of Dundon to their detriment. .......................................................................................................... 13

    2. Plaintiffs fail to state a claim against Dundon for violations of the California Labor Code..................................................................................................................... 14

    3. Plaintiffs fail to state a claim for fraud or "false promise" against Dundon............... 15

    4. Plaintiffs fail to state a claim against Dundon for inducing breach of contract. ......... 19

PRAYER................................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Aceves v. U.S. Bank, N.A.,*
    192 Cal. App. 4th 218, 225 (2011) ............................................................... 10, 11, 12, 15

*Advanced Choices, Inc. v. State Dept. of Health Servs.,*
    182 Cal. App. 4th 1661, 1672 (2010) ........................................................... 10

*Ashcroft v. Iqbal,*
    556 U.S. 662, 677 (2009)............................................................... 5, 6, 7, 14, 17

*Associated Builders, Inc. v. Ala. Power Co.,*
    505 F.2d 97, 100 (5th Cir. 1974) ................................................................. 7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 570 (2007)............................................................... 5, 6, 7, 14, 17

*Benchmark Elecs., Inc. v. J.M. Huber Corp.,*
    343 F.3d 719, 723–24 (5th Cir. 2003) ........................................................ 16

*Bustamante v. Intuit, Inc.,*
    141 Cal. App. 4th 199, 209 (2006) ............................................................ 8, 11

*Carter v. Target Corp.,*
    541 F. App'x 413, 416 (5th Cir. 2013) ...................................................... 4, 6, 7

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496, 498–99 (5th Cir. 2000) ....................................................... 4

*Dryden v. Tri–Valley Growers,*
    65 Cal. App. 3d 990, 995 (1977) ............................................................... 18, 19

*Educ. Mgmt. Servs., LLC v. Tracey,*
    102 F. Supp. 3d 906, 913 (W.D. Tex. 2015) ............................................. 16

*Forcier v. Microsoft Corp.,*
    123 F. Supp. 2d 520, 532 (N.D. Cal. 2000) .............................................. 18

*Garcia v. World Savings, FSB,*
    183 Cal. App. 4th 1031, 1045 (2010) ...................................................................... 8, 11

*Granadino v. Wells Fargo Bank, N.A.,*
    236 Cal. App. 4th ....................................................................................... 10, 11, 12

*Healy v. Brewster,*
    59 Cal. 2d 455, 463–64 (1963) ............................................................................. 8, 9

*In re Katrina Canal Breaches Litig.,*
    495 F.3d 191, 205 (5th Cir. 2007) ............................................................................. 6

*Jenni Rivera Enters., LLC v. Latin World Entm't Holdings, Inc.,*
    36 Cal. App. 5th 766, 795 (2019) ...................................................................... 18, 19

*Kemp v. IBM Corp.,*
    2010 WL 4698490 .................................................................................................. 13

*Kruse v. Bank of America,*
    202 Cal. App. 3d 38, 54 (1988) .............................................................................. 12

*Lazar v. Superior Court,*
    12 Cal. 4th 631, 638 (1996) .................................................................................... 15

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,*
    594 F.3d 383, 387 (5th Cir. 2010) ............................................................................. 4

*Lovelace v. Software Spectrum, Inc.,*
    78 F.3d 1015, 1017 (5th Cir. 1996) .................................................................... 16, 17

*Maldonado v. City of Pearsall, Tex.,*
    977 F. Supp. 2d 646, 649 (W.D. Tex. 2013) ............................................................. 6

*Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit,*
    369 F.3d 464, 467 (5th Cir. 2004) ............................................................................. 6

*McCorvey v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, No. 5:16-CV-631-DAE,
    2016 WL 8904949, at *2 n.1 (W.D. Tex. Dec. 21, 2016) ............................................ 4

*Plotkin v. IP Axess Inc.,*
    407 F.3d 690, 696 (5th Cir. 2005) ........................................................................ 7, 15

*Prachasaisoradej v. Ralphs Grocery Co.,*
    42 Cal. 4th ................................................................................................ 13

*Redfearn v. Trader Joe's Co.,*
    20 Cal. App. 5th 989, 997 (2018) ............................................................. 18

*Sciacca v. Apple, Inc.,*
    362 F. Supp. 3d 787, 794 (N.D. Cal. 2019) ............................................. 16

*Smith v. Level 3 Commc'ns Inc.,* No. C 14-05036 WHA,
    2014 WL 7463803, at *3 (N.D. Cal., Dec. 30, 2014) ................................ 14

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.,*
    365 F.3d 353, 360 (5th Cir. 2004 ........................................................ 7, 15

*Swartz v. KPMG LLP,*
    476 F.3d 756, 764 (9th Cir. 2007) ........................................................... 16

*Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,*
    975 F.2d 1134, 1139 (5th Cir. 1992) ....................................................... 16

*Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.,*
    245 Cal. App. 4th 821, 837 (2016) .......................................................... 15

*Tuchman v. DSC Commc'ns Corp.,*
    14 F.3d 1060, 1067 (5th Cir. 1994) ........................................................... 6

*Walker v. KFC Corp.,*
    728 F.2d 1215, 1219 (9th Cir. 1984) ..................................................... 8, 10

Wal-Mart Stores, Inc.,
    *No. C 08-5221 SI, 2013 WL 1701581, at *5 n.4 (N.D. Cal. Apr. 18, 2013)* .................. 14

*Youngman v. Nev. Irr. Dist.,*
    70 Cal. 2d 240, 249 (1969) .................................................................... 8, 9

Case s#19-cv-0109/35/19    Document 365 Filed 09/25/19    age 7 of 21

**Rules**

FED. R. CIV. P. 8(a)(2) ............................................................................................. 5, 6, 14

FED. R. CIV. P. 9(b) ..................................................................................................... 15, 16

Rule 12(b)(6) ........................................................................................................... 2, 4, 6, 15

# I.   SUMMARY

The Court should dismiss all claims against Defendant Thomas G. Dundon ("Dundon") because Plaintiffs Colton Schmidt and Reggie Northrup, each individually and on behalf of others similarly situated (collectively, "Plaintiffs") fail to plead a plausible claim for relief.  This case arises from the bankruptcy of the now defunct Alliance of American Football league.  When the league folded, the entity defendants in this lawsuit filed bankruptcy.

In this lawsuit, Plaintiffs group Dundon with these entities in their claims for relief under California state law.  Plaintiffs assert the following causes of action against Dundon:  promissory estoppel, failure to pay wages under the California Labor Code, fraud, a non-existent "false promise," and inducing breach of contract. Like the claims themselves, the universe of factual allegations pertaining to Dundon are boilerplate and conclusory.  Plaintiffs rely upon conjecture almost exclusively, prefacing most of their allegations against Dundon "on information and belief."

Even assuming the Court considered these contentions, they fail to state a claim for relief for any of Plaintiffs' claims against Dundon.  Foremost, Plaintiffs tie none of the factual allegations to the elements of any cause of action pending against Dundon. That is because Plaintiffs' entire theory of recovery against Dundon is practically impossible.

Plaintiffs assert that Dundon promised to contribute $250 million to the league and made statements during a radio interview in North Carolina that the league would be viable well into the future because of an investment. Plaintiffs speculate that this investment and these alleged statements were false and those actions induced them to play in the league as players to their detriment because they risked their health and forewent other opportunities. But Plaintiffs assert no allegations that they knew about the alleged investment or statements. Even if they did, these allegations are nonsensical on their face because Plaintiffs entered Standard Player Agreements ("SPA") to play in the league as players *before* Dundon's alleged investments, promises, contributions, or interview. As part of their respective SPAs, individual Plaintiffs agreed to play in the league as players in exchange for compensation. Consequently, the allegations as pleaded make it impossible for Dundon to have caused Plaintiffs to lose compensation by "tricking" or "misleading" them into playing in the league because they already contracted to play *for three years* and, indeed, began playing in the league.

In sum, the allegations against Dundon fall far below the pleading standards under the Federal Rules of Civil Procedure, and this case should be dismissed against him under Rule 12(b)(6).

## II.     PERTINENT PROCEDURAL FACTS AND BACKGROUND

**A.     Plaintiffs Assert Conclusory Allegations to Support California State Causes of Action Against Dundon That Are Not Plausible.**

1.     On April 10, 2019, Plaintiffs commenced this litigation when they filed the Complaint in the Superior Court of California in San Francisco County, California.  ECF No. 1-1.

2.     Plaintiffs sued Defendants Dundon, Charles Ebersol (in his individual capacity), AAF Players, LLC, AAF Properties, LLC, Ebersol Sports Media Group, Inc., and Legendary Field Exhibitions, LLC (collectively with Dundon, "Defendants").  *Id.*

3.     The universe of non-venue and non-jurisdictional factual allegations or references to Dundon specifically cover a less than two-month period running between February 9, 2019, and April 2, 2019.  *Id.*, ¶¶ 30–39.

4.     In the Complaint, Plaintiffs accuse Dundon of the following based "[o]n information and belief:"

- Committing a $250 million line of credit to the "AAF" on February 19, 2019[1];

- Because of the purported financial commitment, Dundon "became chairman of the board and had full control over the league's future;" and

---

[1]  Plaintiffs fail to identify the specific AAF entity(ies) to which they refer in their factual allegations against Dundon.

- Having "final decision-making authority on all league operations." *Id.*, ¶ 30.

5.   Plaintiffs' non-speculative, yet conclusory accusations against Dundon include the following:

- Participating in an interview on February 19, 2019, and stating "[m]y money is in the bank" and that he had "enough money to run this league for a long time, and we're good for many years to come with what I just did;" and

- Accusing Dundon of suspending league operations.  *Id.*, ¶¶ 33-34, 39.

6.   Absent from these allegations is any connection between Dundon and an ownership interest in AAF Players, LLC, the entity with which Plaintiffs contracted. *Compare id.*, ¶¶ 30–39 with ¶¶ 22–25, 47–55 and Exhibit A, attached hereto and incorporated herein by reference.[2]

---

[2] *See* ECF No. 23-2, pp. 40–62, the SPA that forms the basis of Plaintiffs' breach of contract claim. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (reasoning at the Rule 12(b)(6) stage, a court may consider: (1) the complaint; (2) any documents attached to the complaint; and (3) "any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."); *see also McCorvey v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, No. 5:16-CV-631-DAE, 2016 WL 8904949, at *2 n.1 (W.D. Tex. Dec. 21, 2016) (quoting *Carter v. Target Corp.*, 541 F. App'x 413, 416 (5th Cir. 2013)) ("[A] court's 12(b)(6) inquiry is not limited to the complaint and its attachments where it is well-established that 'documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim.'"). The court's consideration of these documents does not convert the 12(b)(6) motion to a motion for summary judgment. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (citation omitted)

7.      Instead, Plaintiffs assert—on information and belief:  "Dundon became 'AAF's' chairman and its primary financial backer" and Dundon "purchased a majority stake in AAF" and "sought ownership rights in Ebersol Sports Media Group, Inc. and Legendary Field Exhibitions, LLC."  ECF No. 1–1, ¶¶ 32, 36.

**B.      Dundon Removed to Federal Court and the Northern District of California Transferred this Case to this Court.**

8.      Dundon timely removed this case to the United States District Court for the Northern District of California, San Francisco Division.  ECF No. 1.

9.      Immediately upon removal, Dundon moved to dismiss this case for lack of personal jurisdiction.  ECF No. 6.  Alternatively, Dundon moved to transfer venue to this Court.  ECF No. 7.

10.     On September 6, 2019, the Honorable Charles R. Breyer granted Dundon's Motion to Transfer Venue and transferred the case to this Court.

### III.      ARGUMENTS AND AUTHORITIES

**A.      Legal Standard**

The Federal Rules of Civil Procedure require Plaintiffs to plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). A complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

---

(noting that documents attached to a motion to dismiss are considered part of the pleadings if the plaintiff refers to the documents in the complaint and the documents are central to the plaintiff's claim).

U.S. 544, 570 (2007). When the plaintiff fails to do so, the Court may dismiss the action for failing to state a claim for relief. FED. R. CIV. P. 12(b)(6); *see also Twombly*, 550 U.S. at 570 (When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."); *accord Iqbal*, 556 U.S. at 678.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (alteration in original) (quoting FED. R. CIV. P. 8(a)(2)). Thus, to survive a motion to dismiss, the "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the Court to evaluate the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). The pleadings, however, must contain "'specific facts, not mere conclusory allegations.'" *Maldonado v. City of Pearsall, Tex.*, 977 F. Supp. 2d 646, 649

(W.D. Tex. 2013) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1060, 1067 (5th Cir. 1994)). Pleadings offering only "labels and conclusions," "formulaic recitation[s] of elements of a cause of action," or "'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557); *see also Carter v. Target Corp.*, 541 F. App'x 413, 416 (5th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) ("[T]he Court need not accept legal conclusions as true. 'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"); *Carter*, 541 F. App'x at 417 (quoting *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)) ("'[C]onclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint.'").

**B.      Plaintiffs Plead Conclusory Allegations That Fail to State Any Claims for Relief Against Dundon.**

As an initial matter, Plaintiffs fail to state a claim for any of the causes of action they asserted against Dundon. *See* ECF No. 1-1, ¶¶ 64–76, 81–104. Plaintiffs fail to identify any specific action Dundon undertook to give rise to any of these causes of action. *Id*. Instead, Plaintiffs group Dundon with the remaining Defendants or some variation thereof and make conclusory allegations that attempt to recite the elements of each cause of action. *Compare id*. *with Iqbal*, 556 U.S. at 678; *Twombly*, 550 U. S. at 555.

Accordingly, Plaintiffs failed to meet the pleading standards, and the Court should dismiss their claims against Dundon. FED. R. CIV. P. 8(a)(2); s*ee also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 360 (5th Cir. 2004)) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

## C. Even Considering the Conclusory Factual Allegations, Plaintiffs Failed to State Any Claims for Relief Against Dundon.

### 1. Plaintiffs fail to state a claim against Dundon for promissory estoppel.

#### a. Plaintiffs improperly plead breach of contract and promissory estoppel as alternative legal theories of recovery.

Under California law, promissory estoppel binds a promisor "when he should reasonably expect a substantial change of positon, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." *Youngman v. Nev. Irr. Dist.*, 70 Cal. 2d 240, 249 (1969). Critically, "promissory estoppel is an **additional method** developed by the courts to enforce promises that do not meet the consideration requirement of a contract. If bargained for consideration exists, then the promises can be enforced as part of a contract and promissory estoppel is unnecessary." *Walker v. KFC Corp.*, 728 F.2d 1215, 1219 (9th Cir. 1984) (emphasis added); *see also Youngman*, 70 Cal. 2d at 249–50 (citing *Healy v. Brewster*, 59 Cal. 2d 455, 463–64 (1963)) (reasoning the plaintiffs could not pursue a promissory estoppel claim because the evidence showed bargained reliance); *see also Garcia v. World Savings, FSB*, 183 Cal. App.

4th 1031, 1045 (2010) (quoting *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209

(2006)) (internal quotation marks omitted) ("It is only where a supposed contract does

not provide a basis for determining what obligations the parties have agreed to, and

hence does not make possible a determination of whether those agreed obligations have

been breached, [that] there is no contract.").

The *Walker* decision is instructive here. 728 F.2d at 1219–20. That case involved

disputes relating to franchise agreements under California law. *Id*. at 1216–17. The trial

court allowed the jury to make findings on breach of contract and promissory estoppel

theories of recovery, finding KFC liable under the later. *Id*. at 1217. The Ninth Circuit

reversed the decision because promissory estoppel was inapplicable since every

"promise" KFC made was bargained for and supported by consideration under the

franchise agreements. *Id.* at 1223. The Ninth Circuit held:

> To satisfy California law requirements for invoking the doctrine of
> promissory estoppel as spelled out in *Youngman* and *Healy*,
> plaintiffs are forced into the position of arguing that they
> performed to their detriment in reliance upon promises made
> outside the written agreements, and that the performance was not
> bargained for. In light of the fact that plaintiffs' claim of
> detrimental reliance is founded on the very acts which induced
> KFC to enter into the written agreements, we find plaintiffs'
> argument that their performance in leasing space and opening
> Zantigo restaurants was not bargained for to be totally
> unpersuasive. To say that in making promises to promote Zantigo
> restaurants on a national basis, including national television
> advertising, and to provide equipment financing for franchisees,
> KFC was not bargaining with franchisees to induce them to open
> Zantigo restaurants is to ignore business reality. What was the

bargain if not that the franchisor would provide benefits to the franchisee if the franchisee assumed the responsibility for operating individual Zantigo restaurants. That was, in a word, the deal. The performance by plaintiffs was bargained-for and the fact that some of the promises that induced that performance were made outside the written agreements does not change the analysis. As Walker himself testified he was induced to enter into the franchise relationship by KFC promises allegedly made outside the written agreements as well as by those made in writing. We see no principled basis for distinguishing this case from *Youngman*. In *Youngman*, the plaintiff alleged that he was orally promised an annual merit increase in pay. The California Supreme Court held that the complaint stated a cause of action for breach of contract, but not promissory estoppel, because the plaintiff's performance was requested and bargained for at the time the promise was made.

*Id*. at 1219–20.

Like the plaintiffs in *Walker*, Plaintiffs attempt to pursue a breach of contract claim against AAF Players, LLC and a promissory estoppel claim against Dundon (and all Defendants) under the same purported reliance. *Compare* ECF No. 1-1, ¶¶ 33–39 with ¶¶ 47–55, 64-69. To support their breach of contract claim, Plaintiffs allege they bargained their services as players in exchange for payment under the SPA. *Id*., ¶¶ 47–55; Exh. A. To support their promissory estoppel claim, Plaintiffs allege they relied on Dundon's alleged investment and statements during an interview, which translated into the same promise of payment in exchange for services Plaintiffs performed as players for the league. *See id*., ¶¶ 64-69.

        **b.**      *Even if Plaintiffs could pursue both claims under the same reliance on "promise of payment," they failed to state a claim for promissory estoppel.*

To establish a claim for promissory estoppel under California law, Plaintiffs must show: "'(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.'" *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 225 (2011) (quoting *Advanced Choices, Inc. v. State Dept. of Health Servs.*, 182 Cal. App. 4th 1661, 1672 (2010)); *Granadino v. Wells Fargo Bank, N.A.*, 236 Cal. App. 4th 411, 416 (2015) (quoting *Aceves*, 192 Cal. App. 4th at 225).

        1.    <u>Plaintiffs fail to allege Dundon made a clear and unambiguous promise.</u>

The "promise" is an indispensable element of promissory estoppel in California. The promise required must be clear and unambiguous in its terms. *Aceves*, 192 Cal. App. 4th at 226; *Granadino*, 236 Cal. App. 4th at 417. Promissory estoppel "cannot be invoked and must be held inapplicable in the absence of a showing that a promise had been made upon which the complaint party relied to his prejudice . . . ." *Id.* (internal quotation omitted). "To be enforceable, a promise need only be 'definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.'" *Garcia,*

183 Cal. App. 4th at (2010) (alteration in original) (quoting *Bustamante*, 141 Cal. App. 4th at 209).

In the Complaint, Plaintiffs fail to allege any clear or unambiguous promise, much less one Plaintiffs relied upon to their detriment. The only specific allegations against Dundon that could be construed as promises are his commitment to provide the "AAF" with a line of credit and the statements Plaintiffs accuse Dundon of making during an interview. ECF No. 1-1, ¶¶ 33-34, 65.

Foremost, there is no connection, evidence, or allegation that Plaintiffs actually heard or knew of these "promises." Regardless, assuming *arguendo* Plaintiffs' allegations are true, Dundon's purported actions are not clear and unambiguous promises to do anything with regard to the players. *See id.* To the contrary, Plaintiff Reggie Northrup alleges he entered his SPA with Defendant AAF Players, LLC on *October 15, 2018*. *Id.*, ¶ 22 (emphasis added). Plaintiff Colton Schmidt states he entered his SPA with Defendant AAF Players, LLC on *January 8, 2019*. *Id.*, ¶ 23 (emphasis added). Plaintiffs allege all players entered the same contract, and that they began playing in the league on *February 9, 2019*. *Id.*, ¶¶ 28, 43. Plaintiffs then claimed Dundon made his line-of-credit commitment and participated in the interview on *February 19, 2019*. *Id.*, ¶¶ 30, 33 (emphasis added). In Sum, the "clear and unambiguous promises" Plaintiffs alleged Dundon made to entice them to join the AAF did not occur until *after* Plaintiffs joined the AAF by entering the SPAs and after they began performing services

as players.  Therefore, Plaintiffs fail to allege any facts that demonstrate any sort of clear or unambiguous promise by Dundon.

> 2.  Plaintiffs fail to allege they relied on any promise of Dundon to their detriment.

Under California law, "'a party plaintiff's misguided belief or guileless action in relying on a statement on which no reasonable person would rely is not justifiable reliance . . . .'" *Aceves*, 192 Cal. App. 4th at 227 (citing *Kruse v. Bank of America*, 202 Cal. App. 3d 38, 54 (1988)).  "A mere 'hopeful expectation[ ] cannot be equated with the necessary justifiable reliance.'" *Granadino*, 236 Cal. App. 4th at 418 (quoting *Aceves*, 192 Cal. App. 4th at 227).

Even if the Court construed the allegations of the statements made during the interview as a cognizable "promise," Plaintiffs failed to plead a conceivable situation where they could have or did "reasonably" rely upon it—to their detriment or otherwise.  As addressed above, Plaintiffs have a timing conundrum.  Plaintiffs alleged the interview occurred on February 19, 2019—*ten days after* Plaintiffs began league play and *months after* they entered their contracts with AAF Players, LLC.  *Compare* ECF No. 1-1, ¶¶ 22-29 with ¶¶ 33-34 (emphasis added). Detrimental reliance must be the result of a promise to give rise to a cognizable promissory estoppel claim, not the converse. It is impossible for Plaintiffs to have detrimentally relied upon any interview

by playing in a league that they already agreed to play in—and, indeed, were playing in—before that alleged interview occurred. *See id.*

### 2. Plaintiffs fail to state a claim against Dundon for violations of the California Labor Code.

Plaintiffs also fail to state a claim for relief for unpaid wages at termination because Plaintiffs never alleged Dundon was their employer under California law. "An employee's 'wages' or 'earnings' are the amount the ***employer*** has offered or promised to pay, or has paid pursuant to such an offer or promise, as compensation for that employee's labor." *Kemp v. IBM Corp.,* 2010 WL 4698490, at *5 (N.D. Cal. 2010) (emphasis added) (citing *Prachasaisoradej v. Ralphs Grocery Co.*, 42 Cal. 4th 217, 228 (2007)). Nonetheless, they could not. Pursuant to the SPA, AAF Players employed Plaintiffs, ***not*** Dundon. *See* Exh. A, p. 43, section 1 ("During the Contract Period, **the Alliance shall employ Player** as a skilled professional football player **and compensate Player** as set forth in Sections C and D of the SPA and below." (emphasis added)).

Notwithstanding their failure to allege Dundon was their employer, Plaintiffs also fail to allege facts sufficient to support a claim for failure to pay final wages at separation. Plaintiffs must allege specific facts showing Dundon *willfully* failed to timely pay final wages to state a claim for waiting time penalties under section 203 of the California Labor Code. *See Smith v. Level 3 Commc'ns Inc.*, No. C 14-05036 WHA, 2014 WL 7463803, at *3 (N.D. Cal., Dec. 30, 2014) ("To state a plausible claim under

Sections 201 and 203, a plaintiff must allege sufficient detail to plausibly show that the employer willfully and intentionally withheld wages."). Here, the Complaint alleges nothing more than a formulaic recitation of the statutory language and conclusory language of willfulness, which is impermissible under the standards set forth in *Twombly/Iqbal. See* ECF No. 1-1, ¶¶ 70-76; *Brown v. Wal-Mart Stores, Inc.*, No. C 08-5221 SI, 2013 WL 1701581, at *5 n.4 (N.D. Cal. Apr. 18, 2013) ("conclusory allegations of willfulness, without further factual support, are insufficient."). Accordingly, the Court should dismiss Plaintiffs' claim for waiting time penalties because it fails to satisfy the pleading requirements of Rule 8.

### 3. Plaintiffs fail to state a claim for fraud or "false promise" against Dundon.

As an initial matter, California does not recognize an independent cause of action for "false promise." Nevertheless, Plaintiffs asserted the same boilerplate, conclusory allegations that fail to identify any specific acts of Dundon, which warrant dismissal. *See* ECF No. 1-1, ¶¶ 91–96; *see also Plotkin*, 407 F.3d at 696 (citing *Southland*, 365 F.3d at 360) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

With regard to the common law fraud claim, California law contain requirements "similar to the elements of promissory estoppel, with the additional requirements that a false promise be made and that the promisor know of the falsity when making the

promise." *Aceves*, 192 Cal. App. 4th at 231. Plaintiffs must show "'(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" *Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 837 (2016); *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

In addition, Rule 9(b) of the Federal Rules of Civil Procedure requires litigants "alleging fraud or mistake . . . to state with particularity the circumstances constituting fraud or mistake." Court's ruling on a Rule 12(b)(6) motion to dismiss fraud claims must determine whether plaintiffs meet the heightened pleading requirements.[3] FED. R. CIV. P. 9(b); *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723–24 (5th Cir. 2003). "'At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby.'" *Educ. Mgmt. Servs., LLC v. Tracey*, 102 F. Supp. 3d 906, 913 (W.D. Tex. 2015) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)); *Sciacca v. Apple, Inc.*, 362 F. Supp. 3d 787, 794 (N.D. Cal. 2019) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)) ("Thus, claims

---

[3] California demands the same high standards when determining common law fraud claims. *Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 837–838 (2016) (quoting *Lazar v. Superior Court*, 12 Cal. 4th 631, 645 (1996)) ("'In California, fraud must be pled specifically; general and conclusory allegations do not suffice. Thus the policy of liberal construction of the pleadings ... will not ordinarily be invoked to sustain a pleading defective in any material respect.'"). California courts require pleadings to show "*facts* which show how, when, where, to whom, and by what means the representations were tendered." *Id.* (internal quotation omitted).

sounding in fraud must allege 'an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.' . . . The plaintiff must also plead facts explaining why the statement was false when it was made."). Failure to comply with this requirement leads to dismissal for failure to state a claim upon which relief can be granted. *See Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

Here, Plaintiffs' fraud claim—and to the extent the court construes the "false promise" claim as an extension of the fraud claim—against Dundon falls far below the pleading standards needed to pursue such recourse. Absent from their contentions are any specifics as to what misrepresentation Dundon made giving rise to the claim. *See* ECF No. 1-1, ¶ 82 ("'Defendants' [not Dundon specifically] concealed and suppressed a material fact about their intentions for the long-term viability of the Alliance of American Football."). This is conclusory and fails to contend anything regarding the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations" or "why the statement was false when it was made." *See Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U. S. at 555, 557) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"); *see also Lovelace*, 78 F.3d at 1017.

Even if the court construed a statement from the alleged interview as the "misrepresentation," there are no factual allegations that Dundon knew the statement to be false or intended to defraud. *See* ECF No. 1-1, ¶¶ 33-34. The additional factual support—"the true motivation of Defendant Dundon was to acquire the smartphone application intellectual property that could be used for gambling on player performance in fantasy football and real time proposition bets, all tied to player compensation based upon performance"—does not address or explain how the alleged radio interview constituted a "misrepresentation," "false promise," or anything that Plaintiffs relied upon to their detriment.

What is more, and as addressed in detail *supra*, it is impossible for that alleged interview or any action Plaintiffs allege by Dundon to have "induced reliance" that was justifiable or harmed Plaintiffs. The detrimental reliance Plaintiffs alleged was providing their services as players to the "AAF" and "subjecting themselves to serious risk of physical harm or damage to their health" and "forego[ing] other financial opportunities." ECF No. 1-1, ¶ 86. As Plaintiffs alleged in the same paragraph—they already contracted to provide those services **before** this alleged interview. *Compare id.,* ¶¶ 33-34, 86 with ¶¶ 22–29, 43. It is impossible for Dundon to have damaged Plaintiffs by inducing detrimental reliance in the form of performing services when the Plaintiffs already contracted to perform.

Finally, Plaintiffs' claim for damages is speculative—"[o]n further information and belief, Defendants failed to pay Plaintiffs and the respective Class Members after the initial game." *Id.*, ¶ 87.

### 4. Plaintiffs fail to state a claim against Dundon for inducing breach of contract.

To establish a claim for interference with a breach of contract, Plaintiffs must show "'(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" *Jenni Rivera Enters., LLC v. Latin World Entm't Holdings, Inc.*, 36 Cal. App. 5th 766, 795 (2019) (quoting *Redfearn v. Trader Joe's Co.*, 20 Cal. App. 5th 989, 997 (2018)). To plead interference with a contract, Plaintiffs "must allege *inter alia* the alleged breach of contract 'was caused by defendant's unjustified or wrongful conduct.'" *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 532 (N.D. Cal. 2000) (quoting *Dryden v. Tri–Valley Growers*, 65 Cal. App. 3d 990, 995 (1977)). "It has been repeatedly held that a plaintiff, seeking to hold one liable for unjustifiably inducing another to breach a contract, must allege that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof." *Id.* (quoting *Dryden*, 65 Cal. App. 3d at 997).

Foremost, Plaintiffs' fraud allegations undercut any potential inducing breach of contract claim against Dundon. To wit: Plaintiffs alleged Defendants knew, but failed to inform Plaintiffs that the league was insolvent *from the outset*. ECF No. 1-1, ¶¶ 1(b), 86 (emphasis added). And had Plaintiffs known about this insolvency—from the *outset*—they never would have played in the league. *Id*. In other words, Plaintiffs' allegations establish that the SPAs they entered into with AAF Players, LLC could never have been performed regardless of Dundon's actions. Accordingly, it is impossible for Dundon's alleged actions to have caused any breach between Plaintiffs and AAF Players, LLC much less resulting damage. *Compare id. with Jenni Rivera*, 36 Cal. App. 5th at 795.

Further, the Complaint failed to allege Dundon had knowledge of any specific SPA or that he attempted or succeeded in "disrupting" the contractual relationships between AAF Players, LLC and any individual Plaintiffs. *Compare* ECF No. 1-1, ¶¶ 97-104 with *Jenni Rivera*, 36 Cal. App. 5th at 795. Finally, Plaintiffs' claim for damages is conclusory and circular—"Defendants' [not Dundon] acts harmed Plaintiffs and Class Members, and Defendants' conduct substantially caused Plaintiffs' and Class Members harm." *Compare* ECF No. 1-1, ¶ 103 with *Jenni Rivera*, 36 Cal. App. 5th at 795.

## PRAYER

For the foregoing reasons, Defendant Thomas G. Dundon asks the Court enter an Order dismissing all claims from the Complaint, and for all other such relief, in law or equity, to which he is entitled.

19-50900-cag Claim#214 Filed 07/16/19 Main Document   Page 39 of 61



## ALLIANCE
### OF AMERICAN FOOTBALL

### STANDARD PLAYER AGREEMENT

**THIS AGREEMENT** is made and entered into by and between AAF Players, LLC, a Delaware limited liability company, d/b/a The Alliance of American Football (the "<u>Alliance</u>"), and ▮▮▮▮▮▮▮▮ ("<u>Player</u>") (this "<u>Agreement</u>" or "<u>Standard Player Agreement</u>" or "<u>SPA</u>") with regard to the use by the Alliance of Player's personal services and expertise as a professional football player and Player's Likeness on, and in connection with, the Embodiments, Promotional Rights and Non-Commercial License (as defined below).

By executing this Agreement, Player expressly agrees to be bound by (i) all terms and conditions set forth in this SPA; (ii) all terms and conditions set forth in the Standard Terms and Conditions of the SPA as set forth in the attached <u>Exhibit A</u>, which is incorporated herein by this reference (as may be amended, altered or modified from time to time, "<u>Exhibit A</u>") (collectively, the SPA and <u>Exhibit A</u> shall be referred to herein as the "<u>SPA</u>," the "<u>Standard Player Agreement</u>" or the "<u>Agreement</u>") and (iii) the terms and conditions of employment applicable to Alliance players (as may be amended, altered or modified from time to time, the "<u>Football Administration Manual</u>").  The terms and conditions of the Football Administration Manual shall prevail over any conflicting term or condition in this Agreement, provided that the SPA, <u>Exhibit A</u> and the Football Administration Manual shall be construed in such a manner as to effectuate the intent of the Alliance to effectively manage and administer a professional football league, including the Alliance's commercial interests therein and provided, further, that the parties to this Agreement may agree upon terms over and above the minimum requirements established in the Football Administration Manual. All capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in <u>Exhibit A</u> or the Football Administration Manual, as applicable.

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in the SPA and any other addenda, schedules, and exhibits hereto (which are all incorporated in this Agreement by this reference), the parties agree as follows:

A. **CONTRACT PERIOD:** The term of this Agreement shall commence on the last date set forth on the signature page below (the "<u>Effective Date</u>") and shall end three (3) years after the Effective Date on the final day of the applicable League Year (as defined in the Football Administration Manual) (the "<u>Contract Period</u>").

B. **GRANT OF PROMOTIONAL RIGHTS:** Player hereby acknowledges and confirms his grant to the Alliance of the right to use Player's Likeness on and in connection with the Embodiments, Promotional Rights and the Non-Commercial License as such terms are defined and set forth herein.

C. **BASE COMPENSATION:** Subject to the Effective Date, the Payment Period (as defined in the Football Administration Manual), and Player's compliance with the terms and conditions of employment set forth in the Football Administration Manual, the Alliance



EXHIBIT

A

shall pay Player an annual base compensation in the amount set forth opposite the contract year indicated below (subject to any withholdings and other applicable payroll deductions required by law, "Base Compensation") in ten (10) equal payments during the applicable regular season:

| League Year | Base Compensation |
|---|---|
| 2019 | $70,000 |
| 2020 | $80,000 |
| 2021 | $100,000 |

Notwithstanding the foregoing, Player shall receive a per diem payment for each day that Player participates in a day of Designated Team Activities ("DTA") as designated by the Alliance or the team to which Player is allocated by Alliance. The amount of per diem payments shall be equal to the amount set forth in the Football Administration Manual. Where applicable, the Alliance may, in its sole discretion, provide meal, lodging and transportation for Player in connection with Player's participation in any DTA and as an offset to the amounts set forth in the Football Administration Manual.

D.    **BONUSES:** In addition to Base Compensation, the Alliance may elect to pay Player the following bonuses as set forth in the Football Administration Manual:

1.    Player will be eligible to receive a performance bonus if Player satisfies certain statistical or performance targets as established and awarded by Player's Alliance team;

2.    Player will be eligible to receive a post-secondary education tuition stipend for each year that Player completes with the Alliance (in accordance with the applicable Alliance program); and

3.    Player may be eligible to receive additional bonuses, as determined and established in the sole discretion of the Alliance, which will be determined by, among other things, Player's personal performance and the performance of the Alliance.

This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart). Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from or be represented by persons of his own selection.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Alliance of American Football Standard Player Agreement as of the last date set forth below.

**AAF PLAYERS, LLC**

By: *JK McKay*

Name: JK McKay

Its: Head of Football Operations

**PLAYER**

Name: ▮▮▮▮▮▮

Signature: ▮▮▮▮▮▮▮▮▮▮

Date of Birth: ▮▮▮▮

Street Address: ▮▮▮▮▮▮

City, State or Province, Zip Code and Country: ▮▮▮▮▮▮, United States

U.S. Social Security # or Canadian Social Insurance: ▮▮▮▮

Telephone: ▮▮▮▮

Email: ▮▮▮▮▮▮▮

Date:        01-16-19

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name: ▮▮▮▮▮▮

Street Address: ▮▮▮▮▮▮▮

City, State or Province, Zip Code and Country: ▮▮▮▮▮▮, United States

Telephone: ▮▮▮▮▮

Email: ▮▮▮▮▮

Date:        01-16-19



ALLIANCE
OF AMERICAN FOOTBALL

## EXHIBIT A

### STANDARD TERMS AND CONDITIONS TO THE
### ALLIANCE OF AMERICAN FOOTBALL STANDARD PLAYER AGREEMENT

These Standard Terms and Conditions (these "Terms and Conditions") are hereby incorporated into the Alliance of American Football Standard Player Agreement (the "SPA") and are subject to the rules, regulations and policies of the Alliance as set forth in the "Football Administration Manual" (which may be amended from time to time). The terms and conditions of the Football Administration Manual shall prevail over any conflicting term or provision of the SPA, provided that the SPA and the Football Administration Manual shall be construed in such a manner as to effectuate the intent of the Alliance to effectively manage and administer a professional football league, including the Alliance's commercial interests therein, and provided, further, that the parties to the SPA may agree upon terms over and above the minimum requirements established in the Football Administration Manual. All capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the SPA or the Football Administration Manual, as applicable.

1.      Compensation and Player Category. During the Contract Period, the Alliance shall employ Player as a skilled professional football player and the Alliance shall compensate Player as set forth in Sections C and D of the SPA and below. Player acknowledges that the Alliance has no responsibility to render tax advice and assumes no responsibility with respect to Player's tax obligations.

(a)      Unless otherwise agreed to in writing, if the SPA is executed (or Player is activated) after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation becoming due and payable after he is activated. If the SPA is terminated after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation having become due and payable up to the time of termination.

(b)      Prior to and following the Contract Period, Player will not be employed by the Alliance and will not be covered by workers' compensation insurance or by any other insurance or employee benefit of the Alliance (including health insurance).

2.      Player Obligations. In addition to complying with the obligations set forth in the Football Administration Manual, at all times during the Contract Period, Player shall:

(a)      give his best efforts and loyalty to the Alliance and conduct himself on and off the field with appropriate recognition and acknowledgment of the fact that the success of professional sports organizations is dependent upon the public's respect for those associated with the game and upon the public's confidence in the integrity of Alliance games. Player will report promptly for and participate fully in all Alliance mandatory mini-camp(s), preseason training camp(s), all Alliance and Alliance team meetings and practice sessions and all pre-season, regular season and post-season football games scheduled for or by the Alliance. If invited, Player will practice for and play in any all-star football game sponsored by the Alliance;

(b)    not play football or attempt to play any type of football (i.e., indoor or outdoor, regardless of the surface) for any team, league or association of teams other than the team to which Player is allocated by the Alliance, except with the prior written consent of the Alliance, which may be given or withheld in the Alliance's sole and absolute discretion;

(c)    be in default or in violation of his obligations under the SPA or the Football Administration Manual if Player, without the prior written consent of the Alliance, fails or refuses to report to an Alliance team as allocated by the Alliance or fails to practice with or play for an Alliance team to which he has been allocated or leaves such Alliance team for any reason, other than Player's injury (as certified by Alliance physicians) or death;

(d)    maintain a high level of physical and mental conditioning and competitive skills, not engage in alcohol abuse, not use prohibited substances or any other substances in contravention of the law or the Alliance policies applicable to Player and generally develop and maintain a physical and mental readiness necessary to play for the Alliance. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Alliance or fails to make the required full and complete disclosure and good faith responses to any Alliance physician, then the Alliance may terminate the SPA;

(e)    authorize and hereby authorizes and consents to the Alliance and all Alliance physicians to use and disclose such Player's complete health information (whether obtained by Alliance physicians or provided by other Player physicians) for use in physical condition assessments, determination and treatment of injuries and insurance purposes;

(f)    serve as a spokesman for the Alliance and the team to which Player is allocated by the Alliance when reasonably requested and only as directed, by the Alliance, to do so;

(g)    comport and conduct himself at all times, both on and off the field, to a high standard of honesty, fair play and sportsmanship and in a manner befitting his position as a representative of the Alliance and the team to which Player is allocated by the Alliance and be in compliance with all applicable laws;

(h)    refrain from conduct which is, or may be, detrimental to the best interest of the Alliance or Alliance teams, reputation, character or standing of the Alliance, Alliance teams or any of its affiliates or conduct that undermines the public's confidence in the Alliance and its games; and

(i)    submit to testing for performance-enhancing substances and participate in mental health screening and treatment in accordance with the Alliance policies.

3.    <u>Conditions to Effectiveness of Agreement</u>. If performance of this Agreement or of any obligation hereunder by the Alliance is prevented or substantially restricted or interfered with by reason of an event of "Force Majeure" (defined below) or by reason of a material business interruption, the Alliance, upon giving notice to the Player, shall be excused from such performance to the extent of and for the duration of such prevention, restriction or interference. The Alliance shall use its reasonable efforts to avoid or remove such causes of nonperformance and shall continue performance hereunder whenever such causes are removed. "<u>Force Majeure</u>" means fire, earthquake, flood, or other casualty or accident; strikes or labor disputes; war, civil strife or other violence; any law, any change in law, order,

proclamation, regulation, ordinance, action, demand, action or requirement of any government agency or utility; or any other act or condition beyond the reasonable control of the Alliance.

4.  Exclusive Compensation. Player shall not be permitted to receive any payments or other benefits from any team or team operator or any other entity or person related to or affiliated with the Alliance, in exchange for the services provided by Player under the SPA (or any other agreement entered into between Player and the Alliance). In the event that Player receives any payments or other benefits (except for per diem payments, travel-related expenses, approved lodging and meal expenses or other payments that are approved in writing by the Alliance) from any team or team operator or any other entity or person related to or affiliated with the Alliance, Player shall promptly disclose such payments or benefits to the Alliance or the team to which Player has been allocated by the Alliance. In the event of any dispute under this Section 4, Player shall have the burden to show that such payment or benefit (i) was not received in exchange for the services provided by Player under the SPA, or the Football Administration Manual; and (ii) represents fair market value for the services provided for such payment.

5.  Representations and Warranties.

(a)  Player represents and warrants as follows:

(i)  that he is not obligated to play football in or for any other league, association of teams or team during the Contract Period other than the Alliance;

(ii)  that by executing the SPA, Player grants to the Alliance the exclusive right to his services as a professional football player, including, but not limited to, playing professional football, practicing and training to play professional football and such other rights and services typically attendant to a person playing professional football (all of which are collectively referred to as "Playing Rights"), the Non-Commercial License, the Promotional Rights (as defined below) and Player's Likeness (as defined below) and no third party has any competing rights therein and neither Player nor any third party will attempt to assert any rights therein against the Alliance;

(iii)  that he is free to enter into the SPA and that his doing so does not violate any other agreement to which he may be a party;

(iv)  that he does not and will not, either directly or indirectly, own any stock or hold any other ownership or financial interest in any Alliance team or any other entity related to or affiliated with the Alliance;

(v)  that by executing the SPA, he understands and accepts that he may be waiving any remaining eligibility to play collegiate sports and any related college scholarship or grant (not including any scholarship or grant provided by the Alliance, unless otherwise set forth in the SPA);

(vi)  that he knows of no physical or mental conditions that could impair his ability to play skilled professional football during the Contract Period and has not knowingly concealed any such conditions;

(vii)  that he shall maintain himself in excellent physical condition; and

(viii)    that he has not breached any previous standard player agreement or any other agreements between Player and the Alliance, in particular but without limitation, in connection with the provisions governing the use of the Playing Rights, the Player's Likeness and the Promotional Rights.

(b)    The Alliance represents and warrants that it is free to enter into the SPA and that doing so does not violate any other agreement to which it is party.

(c)    The warranting party will indemnify, defend and hold the other party harmless of and from any claims, actions, demands, losses, costs, expenses, liabilities, penalties and damages in the event its representations and warranties set forth in this Section are in any way materially inaccurate and the warrantee will use reasonable efforts to mitigate any loss suffered by it.

6.    Video/Digital Images, Pictures, Likenesses and Promotions.

(a)    During the Contract Period, the Alliance shall have the right to create or have created Embodiments, individually and/or as part of a group, at or in connection with any training, games (including Player features for game broadcasts or other publication regardless of platform or format) and/or on and in connection with the Promotional Rights. Player shall be available during the Contract Period, individually or with other players, to have Embodiments created at such reasonable times and places as the Alliance or the team to which Player is allocated by the Alliance shall designate. The Alliance shall have Promotional Rights with respect to any Embodiments created under the SPA or the Football Administration Manual. All rights, including, but not limited to, copyright, in any such Embodiments shall belong to the Alliance throughout the world and Player assigns such rights to Alliance together with all causes of action and enforcement mechanisms, rights and procedures. All rights in the Embodiments created under the SPA and all Promotional Rights with respect to such Embodiments shall be exclusive, irrevocable and survive the termination of the Contract Period (and without regard to the circumstances in which the SPA expires or is terminated).

(b)    Grant of Non-Commercial Licensing Rights. Player hereby grants to the Alliance the authority to use Player's Likeness ("Non-Commercial License") for any and all uses or purposes that promote the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other media or formats whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms, and Player hereby acknowledges that the Non-Commercial License includes the right and authority for the Alliance to use and authorize affiliates and business partners to use the Non-Commercial License solely for the purposes described herein. Player will cooperate with any such media and will participate upon request in reasonable activities to promote the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league. Player will not contest the rights of the Alliance and Alliance teams to use Player's Likeness and the Playing Rights in connection with the telecast, broadcast or other transmission of Alliance football games or any other related content or the right of the Alliance to use Player's Likeness to

produce, sell, market, advertise or distribute football game film footage or any other related content for the promotion of the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league.  The Alliance may also use such broadcasts, telecasts or transmissions of footage in social media, digital gaming and Alliance digital platforms and in any and all media now or hereafter known.

7.  Definitions.  For purposes of the SPA and the Football Administration Manual and such other Alliance rules, regulations and policies applicable to Player, the definitions set forth below apply:

(a)  "Embodiment" means any communication or depiction of any Likeness of Player, alone or together with other players' Likenesses, which is recognizable or identifiable, whether live, fixed in any tangible form, reproduced or simulated, still or moving, in audio, visual, audiovisual and other forms of media and no matter how stored, transmitted, distributed or otherwise communicated to others, by any means or media now or hereafter known.

(b)  "Likeness" means a player's:

(i)  picture, image, photograph, portrait or performance (whether such picture, image, photograph, portrait or performance is still, motion, video, digital, high definition or any other medium now known or hereafter developed);

(ii)  name or nickname;

(iii)  signature or facsimile thereof;

(iv)  voice;

(v)  identifiable attributes or any colorable imitation or adaptation thereof;

(vi)  to the extent that he has rights therein, biometric data, regardless of how such biometric data is collected, transmitted, obtained or stored; and

(vii)  to the extent that he has rights therein, biographical information.

(c)  "Promotional Rights" shall mean the right to promote, advertise and otherwise disseminate, by any means or media now or hereafter known, any Embodiments, created during the Contract Period, for the promotion, marketing, sale or advertising of the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league, and the right to grant to third parties the right to use Player's Likeness to create and use any Embodiments to promote, market, advertise, sell, by any means or media now or hereafter known, the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league.

8.  Player's Unique Skill and Breach of Agreement; Dispute Resolution.

(a)      Player represents that he has extraordinary and unique skill and ability as a football player, that the services to be rendered by him under the SPA cannot be replaced or the loss thereof adequately compensated for in money damages and that any breach or violation by Player of the SPA or the Football Administration Manual (as the case may be) will cause irreparable injury to the Alliance and to its assignees. In addition, Player understands and acknowledges that refusing or failing to report to training, games or commercial appearances (with respect to the Promotional Rights or Non-Commercial License) for any reason without the prior written approval of the Alliance constitutes a breach or a violation of the SPA or the Football Administration Manual (as the case may be) and is extremely disruptive to the operation of the Alliance. Therefore, in the event that the Alliance believes Player is, during the Contract Period, refusing or failing to report for any reason or playing, attempting or threatening to play, or negotiating for the purpose of playing for any other person, firm, corporation, professional football team, association, league or organization, without the prior written consent of the Alliance, then the Alliance and its assignees shall have the right to seek equitable relief or otherwise resolve the dispute through the Grievance Procedures set forth and defined in the Football Administration Manual.

(b)      Player understands that he is competing with other players for a position on an Alliance team roster within the applicable player roster limits. If at any time, in the sole judgment of the Alliance, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions in the Alliance (a "Skill Termination"), or if Player engages in or has engaged in conduct that is detrimental to the best interests of the Alliance or the public's confidence in the integrity of Alliance games, or may otherwise impair, the reputation, character or standing of the Alliance (as determined by the Alliance in its sole discretion) (a "Morality Termination"), then the Alliance may immediately terminate this Agreement with no further payment obligations to Player. Further, if Player is terminated by the Alliance for a Morality Termination, the Player's remaining annual salary for that Alliance regular season shall be escrowed until such time as the charges or claims that resulted in Player's Morality Termination are fully and finally adjudicated. If such charges are adjudicated as false or improper, then the escrowed amount shall be paid to Player. If such charges result in Player's conviction or such claims are adjudicated as proper, the Alliance shall permanently retain the escrowed amount and Player waives any and all rights to such escrowed amount.

(c)      Except as otherwise provided herein with respect to injunctive relief, all disputes arising out of, relating to and in connection with the SPA, or otherwise relating to Player's employment by the Alliance, shall be resolved exclusively and solely through the Grievance Procedures set forth in the Football Administration Manual.

(i)      All decisions issued pursuant to the Grievance Procedures shall be final, unappealable and binding on the parties and may be immediately entered as a judgment in any court of competent jurisdiction.

(ii)      Player and the Alliance understand that once a decision has been rendered pursuant to the Grievance Procedures set forth in the Football Administration Manual, such decision may be immediately taken to any court having jurisdiction for the purpose of confirming a judgment and seeking appropriate enforcement and relief, including obtaining such equitable relief as may be appropriate, including but not limited to a decree enjoining Player from any further breach or violation of the SPA or the Football Administration Manual (as the case may be) or any other agreement or commitment to provide exclusive rights or services to the Alliance or Alliance Properties, including from

playing football for any other person, firm, corporation or organization during the Contract Period, all without the Alliance posting a bond or other security or proving actual damages.

9.     Teams as Alliance Agents. Instructions given or requests made by the Alliance to Player pursuant to the SPA or the Football Administration Manual may be made by the team to which Player has been allocated by the Alliance and for such purposes such Alliance team shall be acting as an authorized agent of the Alliance, acting through its General Manager or Head Coach or their designees. The scope of the authority of teams to act as agent of the Alliance shall be as set forth in the Alliance's rules, policies and regulations governing the relationship between the Alliance teams and the Alliance. In relation to those instructions and/or requests specifically contemplated by the SPA or the Football Administration Manual to be directed to Player by a team, Player shall be entitled to assume that the team has the authority to act on the Alliance's behalf.

10.     Injury. If Player is injured in the performance of his services under the SPA and promptly reports such injury to an Alliance or Alliance team physician, then Player will receive such medical and hospital care during the Contract Period as an Alliance physician may deem necessary and, if during the regular season Player is physically unable to perform the services required of him by the SPA because of such football-related injury, as determined by the Alliance or Alliance team physician in such physician's sole and absolute professional judgment, Player will continue to receive his Base Compensation for the period he is physically unable to perform during the season of injury only and for no subsequent period covered by the SPA. If Player's injury in the performance of his services under the SPA results in his death, the unpaid balance of his Base Compensation for the season of injury only will be paid to his stated beneficiary or, in the absence of a stated beneficiary, to his estate.

11.     Workers' Compensation. Any compensation paid to Player under the SPA, for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial or permanent partial disability will be deemed an advance payment of workers' compensation benefits due to Player and the Alliance will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

12.     General Provisions.

(a)     Interpretation of Terms. The terms of the SPA and the Football Administration Manual shall be interpreted to give maximum effect to the Alliance's intent (and Player's acknowledgment thereof) to establish, through the SPA, the Football Administration Manual and other rules, regulations, policies and practices applicable to Player and players, a framework within which to manage effectively and administer a professional sports league. The language of the SPA shall be construed neutrally and without regard for which party drafted such language. If any provision of the SPA is determined to be invalid or unenforceable, the remaining provisions of the SPA, as applicable, shall be enforced in accordance with their terms. Player acknowledges that by executing the SPA, he understands that he is bound by the terms of the SPA, the Football Administration Manual and such other player-related policies as may be adopted and implemented from time to time by the Alliance, all of which shall be adopted with notice to Player and made available to Player on the Alliance website or by any other digital storage that is accessible to Player.

(b)     Termination. The rights of termination set forth in the SPA and/ or the Football Administration Manual will be in addition to any other rights of termination

allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under the SPA, will automatically terminate the SPA.

(c)    Rules. Player will comply with and be bound by all Alliance rules, regulations, policies and employment practices applicable to Player and players in the Alliance in effect (or as amended) during the Contract Period.

(d)    Integrity of Game. Player recognizes the detriment to the Alliance and professional football that would result from impairment of public confidence in the integrity of the game, in the honest and orderly conduct of Alliance games, or in the integrity and good character of the Alliance players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix any Alliance game; fails to promptly report a bribe offer or an attempt to throw or fix any Alliance game; bets on any Alliance game; knowingly associates with gamblers or unauthorized gambling activity; or is guilty of any other form of conduct judged by the Alliance to be detrimental to the best interests of the Alliance, to the public's confidence in the integrity of the game, or the best interest of the game of professional football in general, then, subject to the Alliance's sole and absolute discretion, the Alliance shall have the right to issue appropriate discipline including banning Player from playing in the Alliance indefinitely and to terminate the SPA.

(e)    Extension. If Player becomes a member of the Armed Forces of the United States or any other country, accepts a contractual offer to join a non-Alliance team with the Alliance's prior written consent, retires from professional football as an active player or otherwise fails or refuses to perform his services under the SPA, then the SPA will be tolled between the date of Player's induction into the Armed Forces, his acceptance of a non-Alliance contract, his retirement or his failure or refusal to perform and the later date of his return to professional football with the Alliance. During the period the SPA is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football with the Alliance, the Contract Period will be extended for a period equal to the number of seasons (or portion of a season) remaining at the time the SPA was tolled. The Alliance's right of renewal, if any, contained in the SPA will remain in effect until the end of any such extension of the Contract Period.

(f)    Assignment. The Alliance may assign the SPA and Player's services thereunder to any successor to the Alliance or to any other team in the Alliance. Player will report to his assigned Alliance team promptly upon being informed of any such assignment and will faithfully perform his services under the SPA. Player may not assign the SPA without the prior written consent of the Alliance.

(g)    Notice. Any notice, request, approval or consent under the SPA or the Football Administration Manual will be sufficiently given if in writing and delivered in person, emailed or mailed (certified or first class) by one party to the other at the addresses set forth on the signature page to the SPA or to such other address as the recipient may subsequently have furnished in writing to the sender.

(h)    Other Agreements. The SPA, and the Authorized Alternative League Release, set forth the entire agreements between the parties regarding the subject matter of this Agreement and cannot be modified or supplemented orally.

      (i)     <u>Law</u>. The SPA is made under and shall be governed by the laws of the State of Delaware.

*[Remainder of Page Intentionally Left Blank]*



## STANDARD COMMERCIAL LICENSE AGREEMENT

      **THIS LICENSE AGREEMENT** is made and entered into by and between <u>Alliance Properties</u>, LLC, a Delaware limited liability company ("<u>Alliance Properties</u>"), and ▮▮▮▮▮ ("<u>Player</u>") (the "<u>Agreement</u>") with regard to the use by Alliance Properties of Player's Likeness on, and in connection with, the Commercial License (as such terms are defined below).

      In consideration of the mutual promises, rights, obligations, terms and conditions set forth in this Agreement, the parties agree as follows:

      1.     <u>Term, Termination and Extension</u>.

      (a)     <u>Term</u>. Subject to the termination provision(s) of this Agreement, the term of this Agreement shall commence on the last date set forth on the signature page below (the "<u>Effective Date</u>") and shall continue for three (3) years from the Effective Date (the "<u>Term</u>").

      (b)     <u>Termination</u>. Notwithstanding the foregoing, if Player's Standard Player Agreement with AAF Players, LLC (the "<u>Alliance</u>") (the "<u>SPA</u>") is terminated due to a Skill Termination or a Morality Termination (as those terms are defined in Player's SPA), this Agreement may be terminated by Alliance Properties, at which time, subject to Section 2 of this Agreement, Player shall have no further rights with respect to the Player Participation Pool (as defined below). The rights of termination set forth in this Agreement will be in addition to any other rights of termination allowed to either party by law. Termination will be effective upon the giving of written notice, except that Player's death will automatically terminate this Agreement.

      (c)     <u>Extension</u>. The Term shall be extended for another three (3) years upon execution by Player of a new SPA during the Term of this Agreement. If Player's SPA is terminated due to Player's acceptance of a contract with an Authorized Alternative League (as defined in Player's SPA) (an "<u>Authorized Alternative League Termination</u>"), the remaining Term of this Agreement shall be extended to include the conclusion of the next subsequent Alliance League Year (as defined in the Football Administration Manual) immediately following the date on which the Term of this Agreement would have otherwise expired.

      2.     <u>Grant of Commercial Licensing Rights</u>. Player hereby grants to Alliance Properties worldwide, exclusive rights in and to Player's Likeness pursuant to the terms set forth herein (the grant of the worldwide, exclusive rights in and to Player's Likeness as set

forth herein, the "Commercial License"). Player acknowledges that this grant of the worldwide, exclusive rights in and to Player's Likeness is essential to the formation of the Player Participation Pool, a new potential source of compensation for all players in the Alliance, and commercial programs associated therewith. Player hereby acknowledges that the rights he is granting to Alliance Properties under the Commercial License shall include, but are not limited to, the irrevocable and exclusive worldwide right, in any and all media now or hereafter known, including, but not limited to, newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other media or formats whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms, to use, assign or license the Likeness (including the right to use or license Player's Likeness in connection with the Likenesses of other players, former players and other persons affiliated with the Alliance of American Football (the "League")) in combination with the use of any or all League team names, logos, trademarks, trade dress, uniforms or other form of intellectual property, for any commercial purpose, including but not limited to: (1) in any form of trade or consumer promotion; in the sale, distribution, promotion, marketing or advertising of any good, of any consumer product, or of any service; such rights shall also include the use of Player's Likeness in all collateral materials, point of sale materials, and/or packaging associated with the rights set forth herein, (2) in any form of, or in connection with, products licensed by Alliance Properties, and (3) on and in connection with any sponsorship or endorsement of the League by third parties. Player understands and agrees that at the conclusion of the Contract Period (as set forth in Player's SPA), Alliance Properties shall continue to have the right to use the Commercial License, subject to Player's continuing eligibility to participate in the Player Participation Pool (as defined below). Player acknowledges that Alliance Properties may grant, sub-license or assign the Commercial License without Player's further approval or consent. Player also understands and agrees that this Commercial License authorizes Alliance Properties to use his Likeness in connection with corporate sponsorships and Alliance Properties shall have the right to represent Player and commit Player, subject to Player's reasonable availability and approval, to make appearances and provide other personal services on behalf of Alliance Properties and in connection with corporate sponsorships and the general promotion of the Alliance, provided that Player shall be eligible to receive additional compensation for such appearances and other personal services through the Player Participation Pool.

    3.    Embodiments.  During the Term, Alliance Properties shall have the right to create or have created Embodiments, individually and/or as part of a group, at or in connection with any training, games (including Player features for game broadcasts or other publication regardless of platform or format). Player shall be available during the Term, individually or with other players, to have Embodiments created at such reasonable times and places as the Alliance shall designate. All rights, including, but not limited to, copyright, in any such Embodiments, shall belong to Alliance Properties throughout the world and Player assigns such rights to Alliance Properties together with all causes of action and enforcement mechanisms, rights and procedures. All rights in the Embodiments shall be exclusive and irrevocable, and survive the termination of the Term.

    4.    Exception to Grant Commercial Licensing Rights to Authorized Alternative League.  Notwithstanding anything herein to the contrary, upon Player's written request, Alliance Properties may grant Player written permission to grant use of Player's Likeness to an Authorized Alternative League, provided: (1) such Authorized Alternative League has teams playing in no fewer than 25 professional football markets; and (2) Player presents

Alliance Properties with suitable evidence of a contract offer from a team in such Authorized Alternative League and, within three (3) days of its complete execution, Player provides Alliance Properties with a copy of the fully executed contract to play in such Authorized Alternative League.

5.　　Restriction from Granting Commercial Licensing Rights to Competitive Alternative League. Player shall not:

(a)　　permit a professional football league (or any person or entity associated therewith) that plays its regular season games primarily in or between the months of February through July ("Competitive Alternative League") to use Player's Likeness for any reason during the Term of this Agreement and for the duration of the next subsequent Alliance League Year following the Term of this Agreement, or

(b)　　provide any personal services to a Competitive Alternative League during the Term of this Agreement and for the duration of the next subsequent Alliance League Year following the Term of this Agreement.

6.　　Player Participation Pool and Commercial Advances. As consideration for Player's grant of the Commercial License, if Player is added to the regular season roster of a League team, Player will be eligible to receive a fractional share of the Player Participation Pool in proportion to use of Player's Likeness to the total overall usage of all players' Likenesses in all programs, promotional activities, sales and licenses that are subject to the Player Participation Pool. As additional consideration for the grant of the Commercial License, Player shall receive, as an advance against all payments that Player may earn or which may otherwise become due to Player under the Player Participation Pool: (i) One Hundred Dollars ($100.00) if Player is added to the training camp roster of the League or a League team ("Training Camp Commercial Advance") and (ii), as an advance against all payments that Player may earn or which may otherwise become due to Player under the Player Participation Pool, an additional Nine Hundred Dollars ($900.00) if Player is added to the regular season roster of a League team ("Regular Season Commercial Advance"). Notwithstanding the foregoing, in the event that Player is not on a regular season roster and has not earned an amount equal to or greater than the Training Camp Commercial Advance and/or the Regular Season Commercial Advance, as applicable, Alliance Properties will not seek to recoup any unearned portion of the Training Camp Commercial Advance or the Regular Season Commercial Advance, as applicable.

(a)　　Standard Player Agreement. Player understands that nothing in Player's grant of the Commercial License above negates any of the Alliance's rights under the SPA or in the Football Administration Manual.

(b)　　Protection and Enforcement of Commercial License. Player hereby authorizes Alliance Properties to take all actions necessary to protect and enforce rights granted in the Commercial License. Player further consents to Alliance Properties joining him as a party in any proceeding to prosecute or defend any claims relating to the Commercial License so long as Alliance Properties pays for the reasonable costs (including reasonable attorney's fees) of prosecuting and/or defending Player's interests in such an action; *provided, however*, that Alliance Properties shall not be required to pay such costs (including reasonable attorney's fees) if such joinder is in connection with Player's obligation (set forth in Section 6(e)) to indemnify Alliance Properties.

(c)     Further Assurances.  Player shall take such additional steps as Alliance Properties may reasonably request in connection with the Commercial License, including but not limited to the execution of additional documents that may be necessary for Alliance Properties to implement, confirm or enforce its rights under the Commercial License.

(d)     Acknowledgments.  Player acknowledges that the consideration stated herein, including the Training Camp Commercial Advance, the Regular Season Commercial Advance and payments from the Player Participation Pool, if earned, constitutes the entire and adequate consideration for the Commercial License.  Player further acknowledges that nothing in the Commercial License is intended to confer upon him any rights in the Embodiments created by or on behalf of Alliance Properties or its sponsors or licensees and nothing in the Commercial License is intended to obligate Alliance Properties, or its respective sponsors or licensees, to use Player's Likeness for any purpose.  For purposes of clarity, Player acknowledges that Alliance Properties has established, as and for additional consideration for the Commercial License, a pool of funds to compensate Player and players for the Commercial License and for participating in commercial, endorsement, and fan engagement activities, and such consideration shall be paid in accordance with Alliance Properties' policies (the "Player Participation Pool"), which may be amended from time to time to effectuate its intent to encourage Player and players to participate in commercial, promotional endorsement, and fan engagement activities.

(e)     Indemnification.  Player represents and warrants that he has not entered into any other agreements concerning his Likeness that would in any way conflict with Alliance Properties' rights (or those of its licensees or assignees) under the Commercial License.  Player shall indemnify and hold Alliance Properties (and its affiliates, licensees, and assignees) harmless from any claims, actions, demands, losses, costs, liabilities, penalties and damages arising out of his entering into agreements that conflict or interfere with the rights granted to Alliance Properties (or its respective licensees or assignees) under the Commercial License or his breach of this Agreement.

7.     Covenants.  Player shall:

(a)     not use the name or logo of any League team or Alliance Properties or any related entity for any purpose unless he shall have received the prior written consent and approval of Alliance Properties (which may be withheld in Alliance Properties' sole and absolute discretion);

(b)     not use or make any endorsements or commercial appearances, sponsor any products or consent to any third party using Player's name, picture or Likeness in which (1) he appears, either alone or with others, in any League team uniform, in any attire which closely resembles or is substantially similar to any League team uniform, is likely to confuse the public as to the affiliation of Alliance Properties or any League teams or in any attire bearing or displaying the marks and/or logos of any League teams; (2) he appears together with two (2) or more players or former players in the League in which Player and the other players, either directly or indirectly, identify themselves as players or former players in the League, regardless of their attire; or (3) he either directly or indirectly identifies himself as a player or former player in the League, unless he has received the prior written consent and approval of Alliance Properties (which may be withheld in Alliance Properties' sole and absolute discretion);

(c)     at all League team games, practices, training camps, clinics or other

events sponsored or arranged by Alliance Properties or any League teams and at all Player appearances, wear and/or display only such footwear, clothing, equipment and other items as are endorsed by Alliance Properties or the team to which Player is allocated by the League (and shall promptly obey and comply with any and all other guidelines and directives hereinafter issued by Alliance Properties regarding apparel and/or equipment, permitted or not permitted to be worn or utilized by players for such League team); and

(d)      not display any logo upon or endorse, or agree to display any logo upon or endorse, any item of on-field equipment which is not produced by an official equipment supplier of the League.

8.      Definitions.  For purposes of this Agreement and such other League rules, regulations and policies applicable to Player, the definitions set forth below apply.

(a)      "Embodiment" means any communication or depiction of any Likeness of Player, alone or together with other players' Likenesses, which is recognizable or identifiable, whether live, or fixed in any tangible form, reproduced or simulated, still or moving, in audio, visual, audiovisual and other forms of media and no matter how stored, transmitted, distributed or otherwise communicated to others, by any means or media now or hereafter known.

(b)      "Likeness" means a player's:

(i)      picture, image, photograph, portrait or performance (whether such picture, image, photograph, portrait or performance is still, motion, video, digital, high definition or any other medium now known or hereafter developed);

(ii)      name or nickname;

(iii)      signature or facsimile thereof;

(iv)      voice;

(v)      identifiable attributes or any colorable imitation or adaptation thereof;

(vi)      to the extent that he has rights therein, biometric data, regardless of how such biometric data is collected, transmitted, obtained or stored; and

(vii)      to the extent that he has rights therein, biographical information.

9.      General Provisions.

(a)      Interpretation of Terms.  The language of this Agreement shall be construed neutrally and without regard for which party drafted such language.  If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement, as applicable, shall be enforced in accordance with their terms.

(b)      Assignment.  Alliance Properties may assign this Agreement and Player's obligations thereunder to any successor to Alliance Properties.  Player may not assign this Agreement without the prior written consent of Alliance Properties.

     (c)    Notice. Any notice, request, approval or consent under this Agreement will be sufficiently given if in writing and delivered in person, emailed or mailed (certified or first class) by one party to the other at the addresses set forth on the signature page to this Agreement or to such other address as the recipient may subsequently have furnished in writing to the sender.

     (d)    Other Agreements. This Agreement, sets forth the entire agreement between Player and Alliance Properties and cannot be modified or supplemented orally. Player and Alliance Properties each represent that no other agreement, oral or written, except as specifically incorporated in this Agreement, exists between them.

     (e)    Amendment and Modification. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

     (f)    Disputes.

     (i)    Injunctive Relief. Player acknowledges that this grant of the worldwide, exclusive rights in and to Player's Likeness is essential to the formation of the Player Participation Pool, a new potential source of compensation for all players in the League, and commercial programs associated with the Player Participation Pool. Player acknowledges that his grant of the Commercial License in and to Player's Likeness is unique and has significant intangible and intrinsic value to Alliance Properties. Player acknowledges that Player's breach of the provisions of this Agreement will irreparably harm Alliance Properties and substantially interfere with and impair the effective administration of the Player Participation Pool and the commercial programs associated therewith to the substantial detriment to Alliance Properties and, among other things, other players who participate in the Player Participation Pool, and that any injury suffered by Alliance Properties as a result of Player's breach of the terms and conditions of this Commercial License cannot be adequately remedied with monetary damages. Accordingly, Player and Alliance Properties agree that irreparable damage would occur from any breach or threatened breach of any provision of this Agreement and that to prevent any breach or threatened breach of any provision of this Agreement, Player and Alliance Properties shall be entitled to equitable relief, including a temporary restraining order, preliminary injunction and such other injunctive or equitable relief, including specific performance, in addition to any other remedy to which they are entitled at law or in equity, all without Alliance Properties posting a bond or other security or proving actual damages.

     (ii)    Other Disputes. Except as otherwise provided herein with respect to injunctive relief in Section 9(f)(i), all other disputes arising out of, relating to and in connection with this Agreement shall be resolved exclusively and solely through the Grievance Procedures set forth in the League's Football Administration Manual.

     (A)    All decisions issued pursuant to the Grievance Procedures shall be final, unappealable and binding on the parties and may be immediately entered as a judgment in any court of competent jurisdiction.

     (B)    Player and Alliance Properties understand that once a decision has been rendered pursuant to the Grievance Procedures set forth in the Football Administration Manual, such decision may be immediately taken to any court having jurisdiction for the purpose of confirming a judgment and seeking appropriate enforcement and relief, including obtaining such equitable relief as may be appropriate, including but not

limited to a decree enjoining Player from any further breach or violation of this Agreement, all without Alliance Properties posting a bond or other security or proving actual damages.

   (g)   Law. This Agreement is made under and shall be governed by the laws of the State of Delaware.

   (h)   Counterparts. This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart). Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from or be represented by persons of his own selection.

*[Signature Page Follows]*

   IN WITNESS WHEREOF, the undersigned have executed this Standard Commercial License Agreement as of the last date set forth below.

**ALLIANCE PROPERTIES, LLC**

By: JK McKay

Name:  JK McKay

Its:  Head of Football Operations

**PLAYER**

Name:

Signature:

Date of Birth:

Street Address:

City, State or Province, Zip Code and Country:                       United states

U.S. Social Security # or Canadian Social Insurance:

Telephone:

Email:

Date:        01/16/19

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:                     ███████████

Street Address:           ████████████████

City, State or Province, Zip Code and Country:  ████████████  , UNITED STATES

Telephone:                ████████

Email:                    ████████

Date:                     01-16-19



## AUTHORIZED ALTERNATIVE LEAGUE RELEASE

**THIS AGREEMENT** is made and entered into by and between AAF Players, LLC, a Delaware limited liability company, d/b/a The Alliance of American Football (the "<u>Alliance</u>"), and ██████████ ("<u>Player</u>")

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in this Agreement, the parties agree as follows:

Player is a party to a Standard Player Agreement ("<u>SPA</u>") with the Alliance and Player has requested Alliance consent to terminate his SPA to sign a contract to play in an Authorized Alternative League (i.e., a professional football league that plays all its games, except such league's championship game, in or between August through January and which has teams playing in no fewer than 25 of the top 40 Designated Market Areas in the United States of America). Player represents that he has met the conditions set forth in the SPA, and that prior to making his request for termination of his SPA, Player received a bona fide offer from the Authorized Alternative League.

Player acknowledges that the Alliance has (1) made a significant investment in Player's development; (2) provided a valuable forum for player to showcase his skills and (3) made a significant investment in the development and operation of the Alliance. Player also acknowledges that the termination of the SPA is not required of Alliance and further that Alliance has provided Player with other good and valuable consideration, the sufficiency and receipt of which is also hereby acknowledged by player.

Player agrees that, in exchange for the Alliance's termination of the SPA and for the other good and valuable consideration, receipt of which Player hereby acknowledges, he shall not, for a period of eighteen (18) months from the initial date on which he is no longer under contract with an Authorized Alternative League (the "<u>Competitive Alternative League Exclusion</u>"), execute a contract with, or play football for any team, professional football

19-50900-cag Claim#214 Filed 07/16/19 Main Document Page 58 of 61

league, or association of teams that plays its regular season games in or between the months of February through July ("Competitive Alternative League"), or provide any other personal services to a Competitive Alternative League. Following the expiration of the Competitive Alternative League Exclusion, Player agrees that Alliance shall have an additional thirty (30) day exclusive period to tender and sign a new SPA with Player ("Exclusive Tender and Signing Period") at the then prevailing compensation rate for Player, based on his years of service to Alliance and that during the Exclusive Tender and Signing Period, Player may not solicit or accept an offer to play football in a Competitive Alternative League.

Parties agree that irreparable damage would occur from any breach or threatened breach of any provision of this Agreement and that to prevent any breach or threatened breach of any provision of this Agreement, Player and Alliance shall be entitled to equitable relief, including a temporary restraining order, preliminary injunction and such other injunctive or equitable relief, including specific performance, in addition to any other remedy to which they are entitled at law or in equity, all without the Alliance posting a bond or other security or proving actual damages.

The language of this Agreement shall be construed neutrally and without regard for which party drafted such language. If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement, as applicable, shall be enforced in accordance with their terms.

The Alliance may assign this Agreement and Player's obligations thereunder to any successor to the Alliance. Player may not assign this Agreement without the prior written consent of the Alliance.

This Agreement, along with the SPA, sets forth the agreements between the parties regarding the subject matter of this Agreement and cannot be modified or supplemented orally.

This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

This Agreement is made under and shall be governed by the laws of the State of Delaware.

This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart). Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from and be represented by persons of his own selection and acknowledges that he has read, understands, and agrees to the rights and responsibilities created by this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed and agreed to this Authorized Alternative League Release as to form and content as of the last date set forth below.

**AAF PLAYERS, LLC**

By: _JK McKay_

Name:  JK McKay

Its:  Head of Football Operations

**PLAYER**

Name:

Signature:

Date of Birth:

Street Address:

City, State or Province, Zip Code and Country: ⬛⬛⬛, United states

U.S. Social Security # or Canadian Social Insurance: ⬛⬛⬛

Telephone:

Email:

Date:        01-16-19

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:

Street Address:

City, State or Province, Zip Code and Country: ⬛⬛⬛ UNITED STATES

Telephone:

Email:

Date:        01-16-19

## AUTHORIZATION TO RELEASE INFORMATION

I, ⬛⬛⬛ hereby request and authorize the release of any and all medical records

pertaining to my treatment and care as outlined herein and pursuant to Section 2(e) of the Standard Player Agreement between AAF Players, LLC and me. I understand that these records may contain privileged information including psychiatric and substance abuse evaluations, and I expressly authorize the release of all such records. I further expressly waive the protection of confidentiality by law.

PATIENT/ATHLETE NAME:
SOCIAL SECURITY #
Date of Birth:
PHONE NUMBER:

Pursuant to this **Authorization to Release Medical Information**, I hereby request and authorize:

**Alliance of American Football**
Sports Medicine Department

To obtain my medical records from :

ContactName:N/a
Affiliation (Pick one of the Four Options- "Physician", "Agency", "School/University" or "Pro Team"): N/a
Mailing Address: N/a
Telephone No.: N/a
Fax No.: N/a
Email: N/a

All information I hereby authorize to be obtained from this individual/agency will be held strictly confidential and cannot be released by the recipient without written consent. I understand that this authorization shall remain in effect for the period necessary to complete all transactions on accounts related to the services provided to me. I understand that unless otherwise limited by state or federal regulations and except to the extent that action has been taken which was based on my consent, I may withdraw this consent at any time. It is understood and agreed that the information to be disclosed is from records which may be protected by Health Insurance Portability and Accountability Act (HIPAA) which prohibits making any further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by law.

Signature of Patient/Athlete; or parent/Guardian of a minor child

*[Signature Page to Authorized Alternative League Release]*



Signatures

| For: | | For: | AAF |
| Name: | Player | Name: | JK McKay |
| Title: | | Title: | |

Signed on 2019-01-16 23:31:59 GMT

*JK McKay*

Signed on 2019-01-16 23:33:56 GMT

