| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-50900-CAG-7** |
| **LEGENDARY FIELD** | § | |
| **EXHIBITIONS, LLC, ET AL,** | § | |
| | § | **CHAPTER 7** |
| DEBTORS. | § | |
| | § | |
| | § | |
| | § | |
| **COLTON SCHMIDT, INDIVIDUALLY** | § | |
| **AND ON BEHALF OF OTHERS** | § | |
| **SIMLARLY SITUATED; AND REGGIE** | § | |
| **NORTHRUP, INDIVIDUALLY AND ON** | § | |
| **BEHALF OF OTHERS SIMILARLY** | § | |
| **SITUATED,** | § | |
| | § | |
| **PLAINTIFFS,** | § | **ADV. PROC. NO. 19-05053** |
| | § | |
| **AAF PLAYERS, LLC, THOMAS DUNDON,** | § | |
| **CHARLES "CHARLIE" EBERSOL,** | § | |
| **LEGENDARY FIELD EXHIBITIONS,** | § | |
| **LLC, AAF PROPERTIES, LLC, EBERSOL** | § | |
| **SPORTS MEDIA GROUP, INC., AND** | § | |
| **DOES 1 THROUGH 200, INCLUSIVE** | § | |
| | § | |
| **DEFENDANTS.** | § | |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiffs Colton Schmidt and Reggie Northrup, on behalf of themselves and all others similarly situated, and demanding trial by jury, complain and allege upon information and belief:

## PARTIES

### Plaintiffs

1.      Plaintiff Colton Schmidt ("Plaintiff Schmidt") is, and at all relevant times has been, a citizen and resident of the County of Los Angeles, State of California. Plaintiff Schmidt was a player in the now-defunct football league commonly known as the Alliance of American Football

("AAF") owned and operated by the Defendants herein.

2.      Plaintiff Reggie Northrup, ("Plaintiff Northrup") is, and at all relevant times has been, a citizen and resident of the County of Orange, State of Florida.  Plaintiff Northrup was also a player in the AAF.

**Defendants**

3.      Defendant AAF Players, LLC ("AAF Players") is, and at all times has been, a Delaware limited liability company with a principal business address of 10866 Wilshire Boulevard, Suite 300, Los Angeles, California 90024. This entity entered into the standard-form contracts with Plaintiff Schmidt, Plaintiff Northrup, and Class Members. AAF Players filed for Chapter 7 bankruptcy relief on April 17, 2019, and Randolph N. Osherow is serving as the duly-appointed Chapter 7 trustee.

4.      Defendant Thomas Dundon ("Dundon") is, and at all relevant times has been, a citizen and resident of Dallas, Texas.  Dundon is being sued in his individual capacity.

5.      Defendant Charles "Charlie" Ebersol ("Ebersol") is, and at all relevant times has been, a citizen and resident of Los Angeles County, California.  Ebersol is being sued in his individual capacity.

6.      Defendant Legendary Field Exhibitions, LLC ("Legendary") is, and at all times has been, a Delaware limited liability company with a principal business address of 149 New Montgomery Street, San Francisco, California 94105. Legendary is, upon information and belief, a holding company for the AAF and operates and/or controls the AAF's assets and various subsidiaries. Legendary filed for Chapter 7 bankruptcy relief on April 17, 2019, and Randolph N. Osherow is serving as the duly-appointed Chapter 7 trustee.

7.      Defendant AAF Properties, LLC ("AAF Properties") is, and at all times has been, a Delaware limited liability company and has a principal business address of 149 New Montgomery Street, San Francisco, California 94105. AAF Properties is, upon information and belief, a holding company for the AAF's assets, including the AAF mobile app, and serves as an operating entity for the AAF's gaming platform. AAF Properties filed for Chapter 7 bankruptcy

relief on April 17, 2019, and Randolph N. Osherow is the duly-appointed Chapter 7 trustee.

8.     Defendant Ebersol Sports Media Group, Inc. ("ESMG") is, and at all times has been, a Delaware company with its principal place of business at 10866 Wilshire Boulevard, Suite 300, Los Angeles, California. On information and belief, ESMG is a predecessor entity to the AAF, and/or a holding company for Ebersol's and later Dundon's ownership interest in the AAF. ESMG filed for Chapter 7 bankruptcy on April 17, 2019, and Randolph N. Osherow is the duly-appointed Chapter 7 trustee.

9.     Plaintiffs are informed and believe, and thereupon allege, that all times mentioned herein, each of the Defendants, including DOES 1 through 200, was the agent, servant, employee, joint venture, subsidiary, investor, partner and/or representative of every other Defendant, and in doing the things hereinafter alleged was acting within the course and scope of such agency, employment, service, joint venture and/or representation and directed, aided and abetted, authorized and/or ratified each and every act of wrongful conduct hereinafter alleged.

10.    The true names and/or capacities, whether individual, corporate, associate or otherwise of Defendants, DOES 1 through 200, inclusive, are unknown to Plaintiffs at this time, and therefore Plaintiffs sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereupon allege that each of the Defendants fictitiously named herein as a DOE is legally responsible in some actionable manner, for the events and happenings hereinafter referred to, and thereby legally caused the damages to Plaintiffs as hereinafter alleged. Plaintiffs will ask leave of court to amend this Complaint to insert the true names and/or capacities of such fictitiously named Defendants once they are ascertained.

11.    At all times herein mentioned, each of the Defendants was at some point in time the co-tortfeasor of each of the other defendants, acting as the agent, co-conspirator, principal, servant, and/or alter ego of the other.

/ / /

/ / /

/ / /

## JURISDICTION AND VENUE

12.　　Plaintiffs bring this action individually and as a class action, pursuant to the Class Action Fairness Act ("CAFA") as incorporated in 28 U.S.C. § 1332(d), on behalf of all persons who contracted with AAF Players or were involved with the AAF as a player.[1]

13.　　This Court has jurisdiction over this action pursuant to 28 U.S.C. § 157.[2]

14.　　The unlawful acts alleged herein occurred in this District and others, thus venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## CLASS ACTION ALLEGATIONS

15.　　Plaintiffs bring this class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7023 of the Federal Rules of Bankruptcy Procedure, on behalf of a class of all similarly situated persons who were players in the AAF.  Plaintiffs propose the following class definition (the "Class"), subject to refinement: all persons who contracted with AAF Players, LLC or were involved with the AAF as a player. Specifically excluded from the Class are: the Defendants herein; officers and directors of Defendants; any entity in which any Defendant has a controlling interest; the affiliates, legal representatives, attorneys, heirs, or assigns of any Defendant; any federal, state or local governmental entity; and any judge, justice, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

16.　　This action has been brought and may properly be maintained as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7023 of the Federal Rules of Bankruptcy Procedure, because there is a well-

---

[1] Plaintiffs originally filed this action in California state court (Case No. CGC-19-575169) on April 10, 2019. Dundon removed the case to the United States District Court for the Northern District of California ("Cal. District Court") (Case No. 3:19-CV-03666-CRB) on June 24, 2019 pursuant to 28 U.S.C. §§ 1332; 1441; 1446; 1453; 1711, *et seq.*; and 28 U.S.C. §§ 1334 and 1452.

[2] Defendant Dundon moved for a transfer of venue pursuant to 28 U.S.C. § 1404(a) and 28 U.S.C. § 1404(a). The Cal. District Court transferred the case to the United States District Court for the Western District of Texas ("W. Tex. District Court") on September 6, 2019 but did not identify the basis for transfer in its text order. The W. Tex. District Court referred the case to this Court on September 23, 2019. *See* L.R. 1001(e); In re Blackwell ex rel. Estate of I.G. Servs., 267 B.R. 724, 727 n. 1 (Bankr. W.D. Tex. 2001). Plaintiffs, however, do not consent to entry of final orders and a final judgment by this Bankruptcy Court in this action. Plaintiffs' Statement Regarding Consent is on file with the Court in this proceeding.

defined community of interest in the litigation and the proposed class is easily ascertainable:

    a. **<u>Numerosity:</u>** The Class is so numerous that the individual joinder of all members is impracticable under the circumstances. While the exact number of members of the Class is unknown to Plaintiffs at this time, the proposed Class exceeds over 400 individuals. On information and belief, the class members and their identities can be identified from the Defendants' books and records. The Class is believed to be more than sufficient to satisfy the numerosity requirement of this Court. AAF consisted of eight centrally operated teams. All players of these teams are members of the Class.

    b. **<u>Common Questions of Law and Fact Predominate:</u>** Common questions of law and fact exist as to all Class members and predominate over questions that affect only individual Class members. These common questions of law and fact include, without limitation:

        i. Whether Defendants breached their contracts with the respective Class members;

        ii. Whether Defendants breached the implied covenant of good faith and fair dealing;

        iii. Whether Defendants are liable to Class members based on promissory estoppel;

        iv. Whether Defendants violated California Business and Professions Code, section 17200;

        v. Whether Defendants committed fraud;

        vi. Whether Defendants are liable for promissory fraud made to Class members;

        vii. The effect upon and the extent of injuries sustained by Class members and the appropriate type and/or measure of damages;

        viii. The appropriate nature of Class-wide equitable relief.

c. **Typicality:** Plaintiffs' claims are typical of the claims of the Class members. Plaintiffs and all Class members sustained injuries and damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were caused directly by Defendants' wrongful conduct in violation of law as alleged herein.

d. **Adequacy:** Plaintiffs are members of the Class and will fairly and adequately protect the interests of the Class. Plaintiffs are adequate representatives of the Class as they have no interests adverse to the interests of absent Class members. Each representative was a contracted player in the AAF or contracted with AAF Players. Plaintiffs have retained the undersigned counsel, which have substantial experience and success in the prosecution of complex actions and mass torts.

e. **Superiority:** A class action is superior to other means for the fair and efficient adjudication of this controversy. Individual joinder of all members of the Class is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The damages suffered by each individual Class member are the same throughout. The expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. The cost to the court system of adjudication of such individualized litigation would be substantial. Individualized litigation would also present the potential for inconsistent or contradictory judgments that would be dispositive of the interests of other members not parties to the individual adjudications and would substantially impair or impede their ability to protect

their interests.

17.     Plaintiffs are unaware of any difficulties likely to be encountered in the management of this action that would preclude its maintenance as a class action. The trial of this class action will be manageable because the claims and defenses will be subject to class-wide proof.

18.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## GENERAL ALLEGATIONS

19.     As early as May 2017, Ebersol formed a joint venture or partnership agreement to launch the AAF, a new professional football league with Ebersol as CEO of AAF.

20.     On March 20, 2018, Ebersol publicly announced the creation of the AAF. From the outset, in an effort to induce Plaintiffs and Class members to sign with the AAF, Ebersol held out the AAF league as a legitimate league that would provide a potential path to a successful career as a future National Football League player.

    a.    On March 20, 2018, Ebersol stated that all investors in the AAF understood that the AAF required patience and wisdom to succeed: "[I]f you are not committed seven to ten years, you are not taking this seriously."

    b.    On March 20, 2018, Ebersol stated that the AAF wanted to find partners who understood that in order to build the league into a successful and viable business, long-term and patient investment strategy was necessary. The AAF wanted investors committed to the long-term health of the league and wanted to present itself as stable and secure.

    c.    On March 20, 2018, Ebersol stated, "[W]e are not reinventing football. We want to reinvent the experience . . . to a large degree what we think this is, is a very sober business model, long term plan that over the course of many years is going to build into something worthwhile. We are not trying to boil the entire ocean in the first day."

21.     In reality, the AAF was started by Ebersol to be a technology business, not as a developmental football league.

22.     From the inception of the league, Ebersol, through the AAF, planned to launch a fully integrated fantasy experience that allowed viewers to play while watching. For viewers in states with legalized online wagering, the application would have allowed viewers to make real-time simultaneous in-game bets. The gambling application would have also allowed the viewer to watch a game on an app while betting on the same game on the same screen.

23.     In order to provide the most accurate and nanosecond efficient calculations of odds, the AAF required all players to wear sensors on the field of play during the season. After the data was taken from the field, the data was to be analyzed, and new odds could be immediately set. Gamblers would then be able to bet on things such as: 1) a quarterback's greater chance of throwing an interception based on a certain amount of ball speed on his throws; 2) speed on the field; and 3) the speed of the ball.

24.     As early as 2018, Ebersol did not intend to use the AAF as a developmental football league; rather, Ebersol planned to license the data technology to other sports leagues, sports betting outlets, and non-sports businesses. However, to prove that his technology could work, Ebersol needed Plaintiffs and Class Members to test its efficiency.

25.     On September 10, 2018, the AAF granted MGM a security interest in the league's innovative gambling software application technology and its data. MGM became the exclusive in-game gambling partner of the league.

26.     The deal between the AAF and MGM was the first in which any sports organization had sold its exclusive in-game betting rights to a sportsbook. However, the application and the league's partnership with MGM was a petri dish for other sports leagues and bookmakers to observe.

27.     In an ESPN article entitled, "Alliance of American Football will have enhanced in-game betting," written by Darren Rovell on September 10, 2018, Scott Butera, the director of interactive gaming at MGM Resorts International, said he can imagine the tech the AAF is creating

to one day be used by other sports leagues and bookmakers: "[I]t's why we didn't just sponsor it, we invested in it."

28.     With a deal with MGM in hand, Ebersol had secured the backing and partnership of a gambling behemoth. However, the technology app was still just a concept, an unproven one that needed further development.

29.     As early as September 2018, in an effort to induce Plaintiffs and Class members to sign with the AAF, Ebersol and the AAF made representations to Plaintiffs and Class members that the mobile application would allow the league to pay potential individual AAF players whose prop bets are bet on more frequently more than the individual players could earn from their base salary. In the same September 10, 2018 ESPN article referenced above, Ebersol stated, "[I]n our system, there's really a limitless cap on what a player can make, money from the amount of bets placed on them is one of the ways."

30.     On October 15, 2018, Plaintiff Northrup, relying on Ebersol and the AAF's material representations, entered into a three-year term contract with AAF Players, LLC (based upon the Standard Player Agreement (hereinafter the "Form Contract"). Each player in the Class signed the exact same Form Contract. Plaintiff Northrup agreed to be bound by all terms set forth in the Form Contract. In consideration of the mutual promises, rights, obligations, and terms, AAF Players agreed to pay Plaintiff Northrup in ten equal payments totaling the following per year:

a.     $70,000 in the league year of 2019;

b.     $80,000 in the league year of 2020; and

c.     $100,000 in the league year of 2021.

31.     On January 8, 2019, Plaintiff Schmidt, relying on Ebersol and the AAF's material representations, entered into a three-year term contract with AAF Players LLC based upon the Form Contract. Plaintiff Schmidt agreed to be bound by all terms set forth in the Form Contract. In consideration of the mutual promises, rights, obligations, and terms, AAF Players, LLC agreed to pay Plaintiff Schmidt in ten equal payments totaling the following per year:

a.     $70,000 in the league year of 2019;

b.     $80,000 in the league year of 2020; and

c.     $100,000 in the league year of 2021.

32.     According to the terms of the Form Contract, and the Form Contracts signed by Plaintiffs, Plaintiffs were to "not play football or attempt to play any type of football for any team, league or association of teams other than the team to which Player is allocated by the Alliance, except with the prior written consent of the Alliance."

33.     Due to this clause, Class members were unable to sign future contracts with the National Football League, nor were they able to sign with any alternative football league during their time with the AAF.

34.     Each player in the Class signed the same standard Form Contract as Plaintiff Northrup and Plaintiff Schmidt. Each player owed AAF Players the same significant, material conditions, covenants, and obligations under the terms of the Form Contract.

35.     AAF Players owed each player in the Class the same significant, material conditions, covenants, and obligations under the terms of the Form Contract.

36.     On information and belief, Plaintiffs never received the Football Administration Manual referenced in the Form Contract. On further information and belief, Defendants provided no Class Member with the referenced Football Administration Manual. If Defendants provide a copy of the Football Administration Manual and proof of service of the Football Administration Manual, Plaintiffs will suspend litigation to follow the grievance procedures purportedly set forth in that manual to the extent bankruptcy proceedings do not preempt the same.

37.     In January 2019, the AAF held mandatory training camp for all teams in San Antonio, Texas. During training camp, the AAF held a league-wide meeting with Plaintiffs and other Class members to discuss the upcoming season and the long-term viability of AAF. Plaintiff Schmidt and Plaintiff Northrup attended said meeting.

/ / /

38.    During the January 2019 league-wide training camp meeting, Ebersol promised, guaranteed and represented to Plaintiffs and other Class members that the AAF had enough money to survive the initial three-year length of their contracts.

39.    During that same meeting, Ebersol stated to Class members that the AAF was all about the players. Ebersol continued that the AAF was created to provide Class members an opportunity to reach the National Football League.

40.    During said meeting, Ebersol proclaimed to Plaintiffs and other Class members that the "National Football League had invested two hundred million dollars ($200,000,000) into the AAF." Ebersol further asked Plaintiffs and other Class Members to keep the "news" of the NFL's investment a secret.

41.    In the same meeting, Ebersol once again promised Plaintiffs and other Class members they would receive additional revenue from the number of bets placed on them via the league's gambling application through a system he now called "tokens."

42.    In reality, when Ebersol made said statements, the AAF: 1) was never about the players; 2) was never about providing Plaintiffs and other Class members an opportunity to showcase their talents; 3) never had a two hundred million dollar ($200,000,000) commitment from the NFL; and 4) did not have the ability to secure the length of the contracts with Plaintiffs or the other Class members.

43.    Ebersol's statements were expressed in a manner implying a factual basis for the NFL's investment and the league's ability to fulfill the contracts with Plaintiffs and the other Class members, when in fact no factual basis for either claim existed.

44.    Due to his position with the AAF, Ebersol had reason to know the statements were in fact false.

45.    Despite making such representations to Plaintiffs and other Class members regarding the former, Ebersol and the AAF knew the true purpose of the league was always a technology business whose prized asset was the back-end technology for which the players would serve as human lab rats.

46.     A few weeks later, in an interview with the news publication Variety, one day before the AAF season was scheduled to start, Ebersol confirmed, "[O]ur business started as a technology business."

47.     In the same article, Ebersol admitted that the AAF's and his plans were to license the data tech to other sports leagues, sports betting outlets, and non-sports businesses after using Putative Class Members as a proof of concept. At no point had Defendant Ebersol ever informed Plaintiffs or other Class members that the AAF was a technology business.

48.     On February 9, 2019, the AAF debuted as the highest rated sports program in primetime on CBS, with additional broadcast partnerships with the NFL Network and Turner Sports adding millions more viewers. Over 6 million people watched the AAF games in its inaugural weekend according to the representations of the AAF itself.

49.     On February 14, 2019, following the league's successful debut, Ebersol gave an interview to the widely distributed news publication "USA Today" for an article entitled "Pro football league AAF is using technology that may revolutionize pro sports and gambling."

50.     In the article, Ebersol astonishingly admitted the league's and Ebersol's true purpose as follows, "[T]he real place where we make revenue is in the back-end technology and how it can be sold to other partners…A lot of what this business is about is being an iceberg. You see about 10 percent of what the company is above water publicly."

51.     After the conclusion of the first week of the AAF season, the AAF failed to pay the Plaintiffs and other Class members the first of the ten (10) equal payments due to them pursuant to the terms of the Form Contract.

52.     From on or about February 12 to February 18, representatives and agents of the AAF disseminated information through in-person communications and written messages to the Plaintiffs and other Class members that the league was not in financial jeopardy. Instead, Plaintiffs and other Class members were told there had been a glitch switching to a new payroll administrator and that the payment for the previous games would be made shortly.

/ / /

53.     Despite boasting brashly about the AAF's immediate successful debut, behind the scenes, the AAF was encountering significant cash-flows issues between February 9 and February 19, 2019.

54.     On or about February 9 and February 19, 2019, Ebersol needed to infuse the AAF with cash to meet the league's commitment to Plaintiffs and other Class members or else the league was in serious jeopardy of folding.

55.     On or about February 14, 2019, Ebersol and Dundon agreed to a deal wherein Dundon committed to providing the AAF a multi-million-dollar line of credit to ensure AAF operations could continue following the missed payroll owed to the Plaintiffs and the other Class members.

56.     On February 14, 2019, Dundun knew that the AAF was experiencing significant cash-flow problems. Further, Dundon knew that if the AAF failed to make payments to Plaintiffs and other Class Members per the terms of the Form Contracts, the league would fold imminently.

57.     On February 14, 2019, when Dundon agreed to provide the AAF with a multi-million-dollar line of credit, he did not intend to acquire the AAF as a development football league.

58.     At the time Dundon made his investment, Dundon knew that the AAF was a technology business and not a legitimate football league. Further, at the time Dundon made his investment, Dundon had knowledge of Ebersol's fraudulent scheme being perpetuated on Plaintiffs and the other Class members.

59.     At the time Dundon made his investment, Dundon sought ownership rights in Defendant ESMG's and Defendant Legendary's innovative gambling software application technology and data for, among other things its potential applicability to Dundon's NHL team.

60.     At the time Dundon made his investment, Dundon's investment in the AAF was not for the benefit of the AAF nor for the profits he might have derived from the operation of a legitimate football league. Rather, Dundon was after the AAF merely as pretext. Dundon sought ownership of the AAF, the technology business.

/ / /

61.     Dundon's true motive for purchasing the AAF was to acquire Ebersol's smartphone application intellectual property that could be used for gambling on player performance in fantasy football and real-time proposition bets, all tied to player compensation based upon performance.

62.     With his investment in the AAF, Dundon engaged in, co-conspired, and aided and abetted Ebersol's fraudulent scheme of masking the AAF as a developmental football league when in reality it was always a technology business established to use players as lab rats to test the technology.

63.     With his investment in the AAF, Dundon gave Ebersol substantial assistance of furthering the narrative that the AAF was a developmental football league when in reality it was always a technology business, established to use players as lab rats to test the technology.

64.     Because of his financial commitment, Dundon became chairman of the AAF board and had control of the league's future. Dundon's alleged commitment to fund the league for years to come was endorsed by Dundon and widely disseminated in the national media in sources Dundon intended to and/or were reasonably likely to reach the players, including in articles on ESPN, the Washington Post, and ProFootballTalk.

65.     Upon his investment, Dundon became the AAF's primary financial backer and gained final decision-making authority on all league operations because the AAF owned and centrally operated all eight AAF teams and employed each team's players, coaches, and staff directly. On information and belief, Dundon was not an initial investor in the AAF.

66.     Despite Dundon becoming the AAF's primary financial backer and final decision-making authority on all league operations, Ebersol had continued access to league operations and to Class Members. Following Dundon's investment, Ebersol continued to be an integral part of AAF operations.

67.     On or about February 16, 2019 to February 19, 2019, Plaintiffs and other Class members decided that they would not continue playing football in the AAF, absent (1) payment for the previous games and (2) an understanding that there was enough capital to cover the entire term of Class members' contracts. Throughout the entire AAF, there was widespread knowledge

of such threat.

68.     On or about February 18, 2019, AAF Players, through Ebersol, had breached the Form Contracts by failing to pay Plaintiffs and other Class members. On or about February 18, 2019, Plaintiffs and other Class members had not been paid by the AAF for the first two weeks of games.

69.     Dundon, with knowledge of AAF's failure to meet its payroll obligations, went on a media tour intending to reach and influence Plaintiffs that the league would be viable for the long-term. During multiple media appearances, Dundon continually made knowingly false promises that he, personally, had provided the AAF a permanent financial solution.

70.     Dundon's media campaign included a widely disseminated February 19, 2019 post-investment interview on a radio station in North Carolina that was later disseminated through the national media channels that Dundon knew or should have known would reach the players. Dundon's statements were made with the reasonable expectation that the statements would be heard by Plaintiffs and the other Class members.

71.     In his February 19 interview, Dundon intended to reach and influence Plaintiffs' and other Class members' fears regarding the long-term viability of the league. Dundon represented to Plaintiffs and other Class Members through the wide-spread coverage of his statements that so long as the players continued to work for the AAF, they would get paid, stating, "[M]y investment will keep this thing years to years to come…it's not a viability issue." Dundon assured many years of ongoing league operations: "[The AAF] didn't have a permanent solution like I provided. That's enough money to run this league for a long time, we're good for many years to come with what I just did."[3]

72.     During that same interview on February 19, 2019, post-investment, Dundon intending to reach and influence Plaintiffs' and other Class members decision to continue playing in the AAF, continued to make representations that "[t]here's a difference between commitments

---

[3] Dundon interview with Adam & Joe on 99.9 FM "the Fan" in Raleigh, NC (Station Owner - Capitol Broadcasting Company).

and funding. They had the commitments to last a long time, but maybe not the money in the bank. My money is in my bank. I'm sure of it. The amount of money they (AAF) needed for Thursday wasn't an amount of money that would have taken the league down. You could make me feel really good… but the truth is, they had other people, they were talking."[4]

73.     Defendant Dundon made these statements with the knowledge and understanding that Plaintiffs and other Class members would hear them.

74.     Dundon's statements regarding his "money is in the bank" and providing the league with a "permanent solution" were expressed in a manner implying a factual basis which did not exist.

75.     Dundon was in a position to know the truth regarding his statements that his "money is in the bank" and that he provided the AAF with a "permanent solution."[5]

76.     Dundon represented both statements as facts. Dundon's representations were made recklessly without regard for the representations' truth in order to influence Plaintiff's and Class Members' to continue playing additional weeks in the AAF, further testing the viability of the AAF's technology.

77.     Dundon's comments were misrepresentations/concealed material facts and were designed to induce Plaintiffs and other Class members to detrimentally alter their position regarding their employment with the AAF in furtherance of Dundon's and Ebersol's scheme to keep the players in the league long enough to have proof of concept.

78.     Despite having superior knowledge and special information regarding whether or not "his money was in the bank" or he provided the league "a permanent solution," the image Dundon presented to Plaintiffs and other Class members was far from the truth. At no point prior to the league abruptly folding did Dundon let Plaintiffs or other Class Members know that his money was not in the bank or that he never intended to provide the league with a permanent

---

[4] Dundon interview with Adam & Joe on 99.9 FM "the Fan" in Raleigh, NC (Station Owner - Capitol Broadcasting Company).

[5] Dundon interview with Adam & Joe on 99.9 FM "the Fan" in Raleigh, NC (Station Owner - Capitol Broadcasting Company).

solution. Instead, Dundon furthered the narrative that the AAF was a legitimate, stable developmental football league, when all the while, he knew his true purpose was to increase the value of the AAF's technology (for his own benefit) through proof of concept the players were providing.

79.     Dundon's investment and his post-investment comments regarding his long-term commitment were widely discussed throughout the AAF by representatives and agents of the AAF. Each team had a different protocol to address Plaintiffs and other Class members regarding Dundon's investment, but no matter the protocol, the message spread by the AAF at Dundon and Ebersol's direction was clear: the missed payroll payment would never happen again and that the league was financially secure.

80.     Dundon's investment and his post-investment comments were widely disseminated in national news publications such as the Washington Post, USA Today and Profootballtalk.com.

81.     Plaintiffs and other Class members were aware of and learned of Dundon's investment and his post-investment comments from multiple sources, including but not limited to, 1) the coaching staff of their respective teams, 2) general managers of their respective teams, 3) group chats with teammates spreading articles of Dundon's statements 4) Twitter, 5) Profootballtalk.com; and 6) other news aggregating sources.

82.     Both Schmidt and Northrup were aware of Dundon's investment and post-investment statements in February 2019.

83.     On February 19, 2019, Ebersol falsely stated to numerous news publications, including the Washington Post, that AAF was never in any serious financial jeopardy. Ebersol is quoted as saying in response to Dundon's investment, "After that first week of games, we were at the height of our valuation and were able to dictate our future."

84.     On February 19, 2019, Dundon's investment was used to make the first of two past-due payments to Plaintiffs and other Class members.

/ / /

/ / /

85.     Plaintiffs would not have played in the AAF, subjecting themselves to serious risk of physical harm or damage to their health resulting from playing professional football each and every time they went onto the field if they had known there was no legitimate intent to have a football league or that they were being used as lab rats to prove a technology. Plaintiffs would not have foregone other financial opportunities and entered into contracts with the Defendants as described herein if Plaintiffs knew the league was not financially viable from the outset.

86.     Plaintiffs would not have played in the league, subjecting themselves to serious risk of physical harm or damage to their health resulting from playing professional football, actual physical harm, and damage to their health resulting from playing professional football and would not have foregone other financial opportunities and entered into contracts with the Defendants as described herein if Plaintiffs knew the league was a technology business from the outset.

87.     Plaintiffs would not have played in the league, subjecting themselves to serious risk of physical harm or damage to their health resulting from playing professional football, actual physical harm, and damage to their health resulting from playing professional football and would not have foregone other financial opportunities as described herein if Plaintiffs knew the that the intent of its main investor was to fraudulently, deceptively, and pretextually acquire underlying intellectual property and/or technology from the league once that technology's concept had been proven unwittingly by the players and then cease league operations.

88.     Plaintiffs would not have continued to subject themselves to further serious risk of physical harm or damage to their health resulting from playing professional football after the first week of the season after the AAF failed to comply with its contractual obligations to pay Plaintiffs but for the representations of Defendants Dundon and Ebersol.

89.     Justifiably relying on Ebersol's knowledge of and intimate access to the AAF's true purpose and financials, Plaintiffs and other Class members did not seek alternative employment and residential opportunities because of Ebersol's assurances, representations, guarantees and conduct.

/ / /

90. Justifiably relying on Ebersol's false representations that the AAF was a legitimate football league that was financially secured for the term of Plaintiffs' and other Class Members' contracts and would present Plaintiffs and other Class members with a potential path to a successful career as an NFL player, Plaintiffs and other Class members were induced to sign the Form Contracts with the AAF.

91. Plaintiffs and other Class members would not have entered into the contracts with the AAF had they known that the AAF was truly a technology business and Plaintiffs and other Class members were being used to test the mobile betting application.

92. Plaintiffs and other Class members would not have entered into the Form Contracts with the AAF had they known that the AAF was not financially secure to perform for at least the 2019 season.

93. Justifiably relying on Ebersol's false representations that the AAF was a legitimate football league that was financially secure for the term of Plaintiffs' and other Class members' form contracts and would present Plaintiffs and other Class Members with a potential path to a successful career as an NFL player, Plaintiffs and other Class members would not have relinquished previous financial opportunities and relocated from their domiciles to the city in which their AAF team was located.

94. Justifiably relying on Dundon's knowledge of and intimate access to the nature of his investment in the AAF, Plaintiffs and other Class members continued to play professional football in the AAF for the additional weeks beyond the initial missed payroll.

95. Justifiably relying on Dundon's knowledge of and intimate access to the nature of his investment in the AAF, Plaintiffs and other Class members did not seek alternative employment and residential opportunities after the league missed payroll because of Dundon's assurances, representations, guarantees and conduct.

96. Justifiably relying on Dundon's statements to the media that were intended to and did reach Plaintiffs and other Class members, Plaintiffs and other Class members continued to play professional football in the AAF for additional weeks following the initial missed payroll and did

not seek alternative employment and residential opportunities because of Dundon's assurances, representations, guarantees and conduct.

97. Justifiably relying Dundon's statements to the media that were intended to and did reach Plaintiffs and other Class members, Plaintiff Northrup continued playing in the AAF for additional weeks following the initial missed payroll. On February 23, Plaintiff Northrup ruptured his ulnar collateral ligament during a game with the Memphis Express.

98. Plaintiffs and other Class members were physically harmed every single time they played football in the AAF, whether it be by practice or games, due to the physical nature of the game that took a direct toll on Plaintiffs' and other Class members' bodies including but not limited to concussions and an increased risk of CTE.

99. Contrary to Dundon's statements about his support of the continued viability of the AAF only months previously, on April 2, 2019, Dundon forced the AAF to suspend operations immediately. The decision to suspend operations and discontinue games constituted both an anticipatory breach of the contract and a material breach of the contract.

100. On or around April 2, 2019, the AAF announced that Plaintiffs and other Class members were free to pursue other playing opportunities, indicating the suspension of operations was permanent and league operations would not resume.

101. On April 2, 2019, Plaintiff Schmidt, Plaintiff Northrup, and the other Class members had performed all significant, material conditions, covenants, and obligations owed to AAF Players LLC pursuant to the terms of the Form Contracts.

102. On April 2, 2019, Plaintiff Schmidt, Plaintiff Northrup and the other Class members stood ready to perform every material condition, covenant, and obligation owed to AAF Players under the terms of their Form Contracts for the remaining term.

103. All Class members entered into the same standard form contract as Plaintiff Northrup and Plaintiff Schmidt.

/ / /

/ / /

104.     All Defendants, and each of them, were beneficiaries of AAF Players's contracts with league players and staff.  Defendants, and each of them, were all involved in cooperative and joint efforts for the operation and management of the AAF.

105.     On April 2, 2019, the contracts of Plaintiff Schmidt, Plaintiff Northrup, and the other members of the Class had not been voided, canceled, or terminated by the Defendants.

106.     On April 2, 2019, Defendants were not excused from performing every material condition, covenant, and obligation owed to the Plaintiffs and other Class members.

## CLAIMS FOR RELIEF

### Count I – Breach of Contract

**(Against Defendant AAF Players, LLC)**

107.     Plaintiffs and the other Class members, as permitted by Federal Rule of Civil Procedure 10(c), made applicable to this proceeding by Rule 7010 of the Federal Rules of Bankruptcy Procedure, incorporate by reference all other paragraphs as if set forth herein.

108.     Each Class member entered into the same standard Form Contract with AAF Players, LLC.

109.     Each such contract was a valid, enforceable contract between a Class member and AAF Players, whereby AAF Players agreed to pay the Class member certain sums of money for a term of three years and the Class member promised to be bound by all terms and conditions set forth in the contract.

110.     Plaintiff Schmidt, Plaintiff Northrup, and the other Class members substantially performed every material condition, covenant, and obligation owed to Defendant AAF Players under the contracts.

111.     AAF Players has materially breached the contracts by, among other things, failing and refusing to pay Class members the annual base compensation in the amounts stated in the contracts. AAF Players has clearly and positively indicated, by words and/or conduct, that it will not and cannot meet the contract requirements, including by the filing of Chapter 7 bankruptcy

protection.

112.     AAF Players's breach directly and proximately caused a reasonably foreseeable injury to the Class. All parties knew or could reasonably have foreseen that the harm to the Class was likely to occur in the ordinary course of events because of the breach of the contracts.

113.     As a direct and proximate result of AAF Players's breach of the Form Contracts, the Plaintiffs and the other Class members suffered damages as described above, and in an amount according to proof.

114.     The Plaintiffs further seek recovery of all other incidental, consequential, or compensatory damages to the Class arising from the breach of the contracts in an amount to be proven.

115.     Under California Civil Code, section 3287, the Plaintiffs seek pre-judgment interest at the maximum legal rate, from the date of breach until trial.

### Count II – Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against Defendant AAF Players, LLC, and DOES 1-200)

116.     Plaintiffs and the other Class members, as permitted by Federal Rule of Civil Procedure 10(c), made applicable to this proceeding by Rule 7010 of the Federal Rules of Bankruptcy Procedure, incorporate by reference all other paragraphs as if set forth herein.

117.     Each Class member entered into the same standard form contract with AAF Players, LLC.

118.     Each such contract was a valid, enforceable contract between a Class member and AAF Players, whereby AAF Players agreed to pay the Class member certain sums of money for a term of three years and the Class member promised to be bound by all terms and conditions set forth in the contract.

119.     Each Class Member entered into the same standard form Contract.

120.     The Class Members have substantially performed every material condition, covenant, and obligation owed to AAF Players under the terms of the contract.

/ / /

121.     Each party to such contracts owed the other party an obligation to deal fairly and in good faith with each other. AAF Players unfairly interfered with each Class Member's rights to receive the conditions, covenants, and obligations owed to them by AAF Players under the contracts.

122.     At the time of contracting, AAF Players, *inter alia*: 1) did not intend to honor the full-term length of the Class members' contracts; 2) did not intend for the AAF to be an actual football league but rather intended the league be an experiment, specifically and without disclosure utilizing the players in such experiment, for a technology business; and 3) did not intend to build the league into a long-term, viable business.

123.     AAF Players's bad faith directly and proximately caused reasonable and foreseeable injury to the Class. As a direct and proximate result of Defendants' bad faith, Class members have suffered damages as described above and in an amount according to proof.

124.     The Plaintiffs and other Class members further seek recovery of all other incidental, consequential, or compensatory damages to the Class arising from the breach of the covenant of good faith and fair dealing in an amount to be proven.

125.     Under California Civil Code, section 3287, the Plaintiffs seek pre-judgment interest at the maximum legal rate, from breach until trial.

## Count III – Promissory Estoppel

**(Against all Defendants and DOES 1-200, except for Defendant AAF Players, LLC)**

126.     Plaintiffs and the other Class members, as permitted by Federal Rule of Civil Procedure 10(c), made applicable to this proceeding by Rule 7010 of the Federal Rules of Bankruptcy Procedure, incorporate by reference all other paragraphs as if set forth herein.

127.     Class Members were fraudulently induced into their contracts with AAF Players LLC, by way of Ebersol's misrepresentations and concealment of the league's true purpose and long-term viability.

128.     Defendants Dundon, Ebersol, Legendary, AAF Properties, ESMG, and DOES 1 through 200 (the "Count III Defendants") made and/or supported and/or disseminated clear and

unambiguous promises they should have reasonably expected would induce Plaintiffs and other Class members to make a substantial change of position, by act and forbearance, *including but not limited to:*

    a.  During the January 2019 league-wide meeting held in training camp, Ebersol promised, guaranteed, and represented to the Class that the league had enough money to survive the initial three-year length of their contracts and the NFL had invested two-hundred million dollars in the AAF. The league did not survive past eight weeks.

    b.  Post-investment, Dundon, in communications intended to reach and influence Class Members, assuaged fears regarding the long-term viability of the league by stating, among other things: 1) "my investment will keep this thing years to years to come…it's not a viability issue"; 2) "[the AAF] didn't have a permanent solution like I provided. That's enough money to run this league for a long time, we're good for many years to come with what I just did"; 3) "[t]here's a difference between commitments and funding. They had the commitments to last a long time, but maybe not the money in the bank. My money is in my bank. I'm sure of it. The amount of money they (AAF) needed for Thursday wasn't an amount of money that would have taken the league down. You could make me feel really good… but the truth is, they had other people, they were talking"; and 4) his investment was made with the intent of securing the AAF–a technology business–by keeping players playing long enough to test the technology, not the football league.[6]

    c.  On information and belief, Legendary, AAF Properties, ESMG, and DOES 1 through 200 supported and/or disseminated the statements of Dundon and Ebersol to the Plaintiffs and other Class Members.

---

[6] Dundon interview with Adam & Joe on 99.9 FM "the Fan" in Raleigh, NC (Station Owner - Capitol Broadcasting Company).

129.     Each Class member relied on and made a justified, substantial changes of position, by act and forbearance, as a direct, proximate result of the Count III Defendants' promises. *Inter alia:*

     i.  Prior to signing their contracts with the AAF, Plaintiffs and other Class members relied on Ebersol's repeated statements that: 1) the league would be around for a "long-time," 2) the league had the ability to meet at-least the initial term of their contracts, and 3) the players would receive revenue from the league's gambling application.

     ii.  After the AAF missed its initial payroll, Plaintiffs and other Class members would not have played in each of the subsequent weeks, subjecting themselves to serious risk of physical harm or damage to their health, or actual physical harm and damage to their health resulting from playing professional football but for Dundon's post-funding comments that the league was financially viable for the significant future.[7]

130.     Count III Defendants' promises proximately caused a reasonably foreseeable injury to the Class.

131.     As a direct and proximate result of Count III Defendants' promises, Plaintiffs and other Class members have suffered damages as described above and, in an amount according to proof.

### Count IV – Violation of Cal. Business and Professions Code § 17200, *et seq.*

### (Against Defendant AAF Players, LLC and DOES 1-200)

132.     Plaintiffs and the other Class members, as permitted by Federal Rule of Civil Procedure 10(c), made applicable to this proceeding by Rule 7010 of the Federal Rules of Bankruptcy Procedure, incorporate by reference all other paragraphs as if set forth herein.

/ / /

---

[7] Dundon interview with Adam & Joe on 99.9 FM "the Fan" in Raleigh, NC (Station Owner - Capitol Broadcasting Company).

133.    The failure by AAF Players and DOES 1 to 200 to pay the Class all wages due constitutes an unlawful, unfair, or fraudulent business act or practice, in violation of the California Unfair Competition Law provided by the California Business and Professions Code, section 17200.

134.    Orders for payment of wages unlawfully withheld from an employee are a restitutionary remedy authorized by the California Business and Professions Code, section 17203.

135.    Plaintiffs and other Class members may have restitution of all such unpaid amounts and reasonable attorneys' fees, in an amount according to proof at time of trial, because Class members are former employees from whom wages were unlawfully withheld.

## Count–V - Fraud

### (Against all Defendants, including DOES 1-200)

136.    Plaintiffs and the other Class members, as permitted by Federal Rule of Civil Procedure 10(c), made applicable to this proceeding by Rule 7010 of the Federal Rules of Bankruptcy Procedure, incorporate by reference all other paragraphs as if set forth herein.

137.    Plaintiffs and the other Class members were fraudulently induced into their contracts with AAF Players LLC, by way of Ebersol's misrepresentations and concealment of the league's true purpose and long-term viability.

138.    Prior to Plaintiffs and the other Class members signing contracts with the AAF, Defendants failed to disclose to Plaintiffs and the other Class members that the players were being used like experiment rats to test the viability of the AAF's back-end technology, *inter alia*:

   a.  From the inception of the league, Ebersol, through the AAF, planned to launch a fully integrated fantasy experience that allowed viewers to play while watching. For viewers in states with legalized online wagering, the application would have allowed viewers to make real-time simultaneous in-game bets.

   b.  Ebersol never intended to use the AAF as a developmental football league; rather, Ebersol planned to license the data technology to other sports league, sports betting outlets, and non-sports business. However, to prove that his

technology could work, Ebersol needed Plaintiffs and Class Members to test its' efficiency.

139.    Ebersol represented to Plaintiffs and other Class members that the AAF was a successful and viable business and that patience was necessary. In an effort to induce Plaintiffs and other Class members to sign the Form Contracts with the AAF, Ebersol further represented that the AAF wanted to present itself as stable and secure.

140.    In an effort to induce Plaintiffs and other Class members to sign the Form Contracts with the AAF, Ebersol held out the AAF as a legitimate league that would provide Class members a potential path as a future NFL player.

141.    Due to his position with the AAF, Ebersol knew or should have known his statements were false. Ebersol's statements were expressed in a manner implying a factual basis for the league's true purpose when in fact no factual basis existed.

142.    Despite making such representations to Plaintiffs and the other Class Members, Ebersol and the AAF knew the true purpose of the league was always a technology business whose prized asset was the back-end technology, and that players were not the focus but instead a means to prove the effectiveness of the technology.

   a.   Ebersol admitted, after the players entered into their contracts with the league, that "the real place where we make revenue is in the back-end technology and how it can be sold to other partners…A lot of what this business is about is being an iceberg. You see about 10 percent of what the company is above water publicly."

   b.   Ebersol further stated, after the players entered into their contracts with the league, "[O]ur business started as a technology." In the same article, Ebersol admitted that the league and his plans were to license the data tech to other sports leagues, sports betting outlets, and non-sports businesses using the Class members as a proof-of-concept to these outlets. But even in the articles, Ebersol kept hidden his true intent to use the players' efforts and talent for his personal

gain.

143.	Each of Ebersol's representations were made recklessly without regard for the representations' truth in order to induce Plaintiffs' to sign the Form Contracts with the AAF.

144.	Prior to the first week of games in the AAF, the AAF held a league-wide meeting with Plaintiffs and other Class members to discuss the upcoming season and the long-term viability of the AAF. Plaintiff Schmidt and Plaintiff Northrup attended said meeting, as did the other Class members.

145.	During said meeting, Ebersol promised, guaranteed, and represented to Plaintiffs and other Class members that the league had enough money to survive the initial three-year length of their contracts and that the National Football League had invested two-hundred million dollars into the AAF. These statements benefitted Ebersol individually, as well as the corporate Defendants.

146.	Due to his position with the AAF, Ebersol had the ability to know the truth of his statements, which in fact were false. Ebersol's statements were expressed in a manner implying a factual basis for the league's true purpose and/or viability when in fact no factual basis existed. Despite making such representations to Plaintiffs and other Class members, Ebersol and the AAF knew that the league was suffering from financial difficulties and that the NFL had not invested two-hundred million dollars into the AAF.

147.	Each of Ebersol's representations made at training camp were made recklessly without regard for the representations' truth in order to induce Plaintiff's to play in the AAF so that Ebersol and the AAF could test the viability of the AAF's technology.

148.	On or about February 14, 2019, Ebersol and Dundon agreed to a deal wherein Dundon committed to providing the AAF a multi-million-dollar line of credit to ensure AAF operations could continue following the initial missed payroll owed to the Plaintiffs and other Class members.

/ / /

/ / /

149.     On February 14, 2019, Dundon knew that the AAF was experiencing significant cash-flow problems. Further, Dundon knew that if the AAF failed to make the payments owed to Plaintiffs and other Class members per the term of their Form Contracts with AAF Players, LLC, the league would fold immediately.

150.     On February 14, 2019, when Dundon agreed to provide the AAF with a multi-million-dollar line of credit, he did not intend to acquire the AAF as a developmental football league. At the time Dundon made his investment, Dundon knew of the scheme to outwardly tout the AAF as a legitimate league in order to give the players the illusion of a future while the true intent was to build the value of the AAF's technology with players unwittingly proving the technology's concept.

151.     On February 19, 2019, with knowledge of the AAF's failure to meet its payroll obligations, Dundon went on a media tour with the reasonable expectation that the statements would be heard by Plaintiffs and the other Class members. Further, Dundon made the comments with the intention of reaching and influencing Plaintiffs and Class Members to believe the league would be viable for the long-term. Dundon made knowingly false promises in his media campaign that were then heard by Plaintiffs and other Class members that he, personally, had provided the AAF a permanent financial solution, *inter alia*:

    a.   "[M]y investment will keep this thing years to years to come…it's not a viability issue." Defendant Dundon assured many years of ongoing league operations: "[The AAF] didn't have a permanent solution like I provided. That's enough money to run this league for a long time, we're good for many years to come with what I just did."[8]

152.     Dundon's representations were made recklessly without regard for the representations' truth in order to influence Plaintiff's and Class Members' to continue playing additional weeks in the AAF, further testing the viability of the AAF's technology.

---

[8] Dundon interview with Adam & Joe on 99.9 FM "the Fan" in Raleigh, NC (Station Owner - Capitol Broadcasting Company).

153. Plaintiffs and the other Class members were aware of and heard of Dundon's investment and his post-investment comments from multiple sources, including but not limited to: 1) the coaching staffs of their respective teams, 2) general managers of their respective teams, 3) group chats with teammates that spread articles of Dundon's statements, 4) Twitter, 5) Profootballtalk.com, and 6) other news aggregating sources.

154. Due to intimate knowledge of his investment, Dundon had the ability to know the falsity of his statements. Dundon's statements were expressed in a manner implying a factual basis for his investments. Despite making such representations that were heard by Class Members, Dundon knew his money was not in the bank and that he did not provide the league with a permanent financial solution, as long-term financial stability was not necessary to carry out Defendants' scheme.

155. At no point did Dundon let Plaintiffs and other Class Members know that his money was not in the bank nor that he never intended to provide the league with a permanent solution. Dundon instead furthered the narrative that the AAF was a legitimate, stable developmental football league, all the while knowing the true purpose of the league.

156. Dundon's comments were misrepresentations and concealment of material facts designed to induce Plaintiffs and the other Class members to alter detrimentally their position regarding their employment with the AAF, as Plaintiffs and other Class members had decided they would not continue playing football in the AAF absent (1) payment for the previous games and (2) an understanding that there was enough capital to cover the entire term of Class Members' contract.

157. Defendants, individually and as co-conspirators, concealed, misrepresented, and suppressed material information regarding the long-term viability of the AAF (or the lack thereof).

    a. Upon inception, the AAF was started by Ebersol to be a technology business, not a developmental football league. Ebersol therefore had no incentive or need to fully capitalize the investment. Instead, he planned to use players as guinea pigs in order to prove concept and license the AAF's data technology to other sports league, sports betting outlets, and non-sports businesses.

b. Dundon had knowledge of Ebersol's fraudulent scheme perpetrated on Plaintiffs and the other Class Members. With his investment in the AAF and corresponding statements, Dundon substantially assisted and furthered Ebersol in Ebersol's scheme to prove technology rather than run a legitimate professional football league.

158. Defendant Dundon knew of Ebersol's long-term plans to use the AAF as a technology business but furthered Ebersol's narrative that the AAF was an actual developmental league in pursuit of value from a proven, versus hypothetical, technology. Dundon agreed with Ebersol and intended to further Ebersol's narrative that the AAF was an actual developmental league in pursuit of the technology.

159. Ebersol had a financial motive to mislead and defraud Plaintiffs and the other Class members.

160. Dundon possessed an opportunity and financial motive to mislead and defraud like Ebersol.

a. Dundon is the majority owner of the Carolina Hurricanes of the National Hockey League, an exclusive league of 31 franchises.

b. Just six weeks following the AAF and MGM's historic deal to license the underlying technology to MGM, MGM and the National Hockey League announced a deal for the NHL to provide MGM access to the league's cutting-edge data that would unlock "innovative interactive fan engagement and betting opportunities."

c. The NHL and the AAF used similar player tracking technology that captured data. The AAF's application was a data capture manifestation device that allowed the data to be delivered off the field of play instantaneously to users.

d. Owning the AAF allowed Dundon to financially benefit by being able to control its underlying technology and possibly controlling the market in respect of the NHL and all future applications of the technology.

161. Defendants Ebersol, Dundon and the AAF concealed, misrepresented, and suppressed material facts about the financial health of AAF. Dundon and Ebersol had superior knowledge and special information regarding these material facts and yet purposefully did not disclose that information.

162. Defendants Ebersol, Dundon, and the corporate Defendants, in multiple statements, represented to the Class that the AAF would survive at least the three-year terms of their contracts.

        a. During post-investment interviews that Dundon intended to and did reach and influence Plaintiffs and other Class members and were so widely disseminated that Class members actually heard about them, Dundon assuaged fears regarding the long-term viability of the league. These statements benefitted Dundon individually, and the other Defendants. The league did not survive past eight weeks.

163. Class members' contracted with and continued to play in the AAF following the Defendants' concealment, misrepresentation, and suppression of material facts wrongfully subjected the Class to serious risk of physical damage to their health and actual physical damage to their health.

164. Once Defendants Ebersol, Dundon, and the corporate Defendants made repeated statements regarding the long-term viability of the AAF, Defendants Ebersol, Dundon, and the corporate Defendants had to make a full and fair disclosure regarding the league's true purpose and financial inability to honor the terms of Class members' contracts.

165. Class members were unaware that the AAF was truly a technology company disguised as a developmental football league, and in particular had no knowledge they were being used as lab rats to test the technology.

166. Class Members would not have acted as they did if they had known of the concealed or suppressed facts regarding the league's (and their) true purpose and viability. The concealed facts were material in that any reasonable person in Class Members' position would have found them important in determining how he would have acted before subjecting himself to serious risk

of physical harm or actual damage to his health. Class Members acted reasonably in relying on Defendants' misrepresentations.

    a. Prior to the signing of their Form Contracts, *inter alia*:

        i. Class Members would not have entered into contracts with the AAF had they known that the AAF was truly a technology business and that Class Members were being used to test that technology.

        ii. Class Members would not have entered into the contracts with the AAF had they known that the AAF was not financially secure for the full-length of their contracts.

        iii. Class Members relinquished previous financial opportunities and relocated from their domiciles to the city in which their AAF team was located.

    b. After the AAF failed to pay its agreed upon payroll, Plaintiffs and the other Class members would not have played in each of the subsequent weeks but-for Dundon's post-funding comments disseminated to players by multiple channels that the AAF was financially viable for the significant future, *inter alia*:

        i. Class Members would not have continued to play professional football in the AAF for additional weeks.

        ii. Class Members would have sought alternative employment and residential opportunities.

167. Because of Dundon's knowledge, intimate access to the nature of his investment in the AAF, assurances, representations, guarantees and conduct, Plaintiff Schmidt, Plaintiff Northrup, and the other Class members relied on Dundon's widely disseminated statements and continued to play in the AAF, subjecting themselves to serious risk of physical harm or damage to their health resulting from playing professional football, actual physical harm and damage to their health, and forewent other financial opportunities.

/ / /

168. Had Class Members known the league was not financially viable from the outset, and that the intent of its main investors was to fraudulently, deceptively, and pretextually acquire underlying intellectual property and/or technology from the league and then cease league operations, they would not would not have played in the additional weeks of the AAF.

169. The AAF failed to make payments due to Plaintiffs and the other Class members per their Form Contracts with AAF Players, LLC. The Plaintiffs and the other Class members would not have continued to subject themselves to serious risk of physical harm or damage to their health resulting from playing professional football and continued to forego other financial opportunities but for Dundon's statements (supported by the league) and alleged financial commitment to the league following the initial week of games.

170. As a direct and proximate result of Ebersol's, Dundon's, and the other Defendants' misrepresentations, the Class has suffered damages as described above and, in an amount according to proof.

171. As a direct and proximate result of Ebersol's, Dundon's, and the other Defendants' misrepresentations, Plaintiffs pray for punitive damages, in an amount according to proof.

<u>**Count VI – Promissory Fraud**</u>

**(Against all Defendants, including DOES 1-200)**

172. Plaintiffs and the other Class members, as permitted by Federal Rule of Civil Procedure 10(c), made applicable to this proceeding by Rule 7010 of the Federal Rules of Bankruptcy Procedure, incorporate by reference all other paragraphs as if set forth herein.

173. Defendant Ebersol made promises to class members regarding the long-term longevity, purpose, and health of the league, *inter alia:*

    a. Prior to Plaintiffs and the other Class members signing their contracts with the AAF, Ebersol promised, "there is a limitless cap on what a player can make, money from the amount of bets placed on them is one of the ways."

    b. Prior to the first games in the AAF, the AAF held a league-wide meeting with Plaintiffs and other Class members to discuss the upcoming season and the

long-term viability of the AAF. Plaintiff Schmidt and Plaintiff Northrup attended said meeting.

c. During said meeting, Ebersol promised, guaranteed and represented to Plaintiffs and the other Class members that the league had enough money to survive the initial three-year length of their contracts and that the National Football League had invested two-hundred million dollars into the AAF. These statements benefitted Ebersol individually, as well as the corporate Defendants.

174. At the time Ebersol made the promises, Ebersol did not intend to perform the promises. *Inter alia:*

a. Due to his position with the AAF, Ebersol had the ability to know the truth of his statements, which were false. Ebersol's statements were expressed in a manner implying a factual basis for the league's true purpose when in fact no factual basis existed.

b. Despite making such representations to Plaintiffs and other Class Members, Ebersol and the AAF knew that the league was suffering from financial difficulties and that the NFL had not invested two-hundred million dollars into the AAF.

c. Ebersol admitted after the players entered into their contracts with the league that "the real place where we make revenue is in the back-end technology and how it can be sold to other partners...A lot of what this business is about is being an iceberg. You see about 10 percent of what the company is above water publicly."

d. Ebersol further stated, "[O]ur business started as a technology business." In the same article, Ebersol admitted that the league's plans were to license the data tech to other sports leagues, sports betting outlets, and non-sports businesses using Class Members as a proof of concept to these outlets.

/ / /

e. Ebersol failed to disclose, however, that the AAF merely provided a means to an end—i.e., unwittingly using real-life players to prove the league's proprietary technology would work in application.

175. On February 19, 2019, Dundon furthered Ebersol's scheme and made knowingly false promises that he, personally, had provided the AAF a permanent financial solution, *inter alia*:

a. "[M]y investment will keep this thing years to years to come…it's not a viability issue." Defendant Dundon assured many years of ongoing league operations: "[The AAF] didn't have a permanent solution like I provided. That's enough money to run this league for a long time, we're good for many years to come with what I just did."[9]

176. Due to his position with the league, Dundon had the ability to know the truth of his statements, which were false. Dundon's statements were expressed in a manner implying a factual basis for his investments.

177. Despite making such representations to Plaintiffs and other Class members, Dundon knew his money was not in the bank and that he did not provide the league with a permanent financial solution, nor did he intend to, as his focus was on doing as little as possible in order to prove the true reason for his investment, that the league's technology was viable.

178. At no point did Dundon let Plaintiffs or other Class members know that his money was not in the bank or that he never intended to provide the league with a permanent solution.

179. Dundon furthered Ebersol's false narrative that the AAF was a legitimate, stable developmental football league, all the while knowing the true purpose of the league was the technology business.

/ / /

/ / /

/ / /

---

[9] Dundon interview with Adam & Joe on 99.9 FM "the Fan" in Raleigh, NC (Station Owner - Capitol Broadcasting Company).

180.     At the time Dundon made the promises in widely disseminated public statements, Dundon did not intend to perform the promises. *Inter alia:*

    a.  By February 14, 2019, Dundon knew that the AAF was experiencing significant cash-flow problems. Further, Dundon knew that if the AAF failed to make the payments owed to Class Members per the term of their agreement with AAF Players, LLC, the league would fold immediately.

    b.  On February 14, 2019, when Dundon agreed to provide the AAF with a multi-million-dollar line of credit, he did not intend to acquire the AAF as a developmental football league. At the time Dundon made his investment, Dundon knew that the AAF was a technology business being propped up as if it was a legitimate football league in order to prove up the technology. Accordingly, at the time Dundon made his investment, Dundon had knowledge of and took specific actions to further Ebersol's fraudulent scheme being perpetrated on Plaintiffs and the other Class members.

    c.  Dundon possessed an opportunity and financial motive to mislead and defraud, as did Ebersol and the corporate Defendants.

        i.  Dundon is the majority owner of the Carolina Hurricanes of the National Hockey League, an exclusive league of 31 franchises.

        ii.  Just six weeks following the AAF and MGM's historic deal to license the underlying technology to MGM, MGM and the National Hockey League announced a deal for the NHL to provide MGM access to the league's cutting-edge data that would unlock "innovative interactive fan engagement and betting opportunities."

        iii.  The NHL and the AAF used similar player tracking technology that captured data. The AAF's application was a data capture manifestation device that allowed the data to be delivered off the field of play instantaneously to users.

        iv.   Owning the AAF allowed Dundon to financially benefit by being able to control its underlying technology and possibly controlling the market in respect of the NHL and all future applications of the technology.

181.    Defendants, individually and as co-conspirators, concealed, misrepresented, and suppressed material information regarding the long-term viability of the AAF.

        a.   Upon inception, the AAF was started by Ebersol to be a technology business, not a developmental football league, with the players being a necessary means to (unwittingly) prove the viability of the technology business. Ebersol planned to license the data technology to other sports league, sports betting outlets, and non-sports businesses. Ebersol did not disclose that plan to the players.

        b.   Dundon had knowledge of and participated in Ebersol's fraudulent scheme perpetrated on Plaintiffs and the other Class members. With Dundon's investment in the AAF and corresponding statements, Dundon substantially assisted Ebersol in Ebersol's plan to use the AAF as a technology business rather than a professional football league.

        c.   Defendant Dundon knew of and took specific steps to further Ebersol's long-term plans to use the AAF as a technology business, including furthering Ebersol's false narrative that the AAF was an actual developmental league.

182.    Defendants intended that Plaintiffs and the other Class members rely on their promises.

183.    Plaintiffs and the other Class members reasonably relied on Defendants' promises that were widely disseminated by the media and representatives of the AAF.

184.    Plaintiffs and the other Class members were unaware that the AAF was a technology company disguised as a developmental football league in which the players served as guinea pigs to further the technology.

/ / /

/ / /

185.    Plaintiffs and the other Class Members would not have acted as they did in continuing to play in the league if they had known of the concealed or suppressed facts regarding the league's true purpose and lack of long-term viability.

186.    The concealed facts were material in that any reasonable person in a Class member's position would have found it important in determining how he would have acted before subjecting himself to serious risk of physical harm or damage to his health. Class members acted reasonably in relying on Defendant Ebersol's, Dundon's and the other Defendants' misrepresentations:

    a.  Class members relied on Ebersol's repeated statements that: 1) the league would be around for a "long-time," 2) the league had the ability to meet at-least the initial term of their contracts, and 3) the players would receive revenue from the league's gambling application.

    b.  After the initial payroll was missed, Plaintiffs and the other Class members would not have played in each of the subsequent weeks but-for Dundon's post-funding comments (supported by the league) that the league was financially viable for the significant future.

187.    Class members' contracted with and continued to play in the AAF following the Defendants' concealment, misrepresentation, and suppression of material facts wrongfully subjected Plaintiffs and the other Class members to serious risk of physical damage to their health and actual physical damage to their health.

188.    The Class was harmed and Plaintiffs' and the other Class members' reliance on Defendant Ebersol's, Dundon's, and the other Defendants' promises substantially caused Plaintiffs harm.

189.    As a direct and proximate result of Defendant Ebersol's, Dundon's, and the other Defendants' conduct, Plaintiffs and the other Class members have suffered damages in an amount to be proven.

/ / /

## DAMAGES

Plaintiffs and the other Class members incorporate by reference as if set forth herein every allegation in this Complaint.

As a direct and proximate result of the acts and omissions of the Defendants alleged herein, Plaintiffs and the other Class members were injured and damaged. The injuries and damages for which Plaintiffs and the other Class members seek compensation from the Defendants include, but are not limited to:

a.      Compensatory damages according to proof;

b.      Physical pain and suffering of a past, present, and future nature;

c.      Emotional pain and suffering of a past, present and future nature;

d.      Medical bills and expenses of a past, present and future nature

e.      Loss of earnings;

f.      Loss of earning capacity;

g.      Pre-and-post-judgement interest;

h.      Statutory and discretionary costs; and

i.      All such further relief, both general and specific, to which they may be entitled.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, pray for damages and other judicial relief, including:

1.      That the Court determine this action may be maintained as a class action and certify the Class;

2.      That Plaintiffs and each and every Class member recover threefold the damages determined to have been sustained by them, and that joint and several judgments for Plaintiffs and every member of the Class, respectively, be entered against Defendants and each of them;

3.      For general damages according to proof during trial;

4.      For special damages according to proof during trial;

5.      For prejudgment and post-judgment interest at the highest rate according to any applicable provision of law, and according to proof;

6.      For costs of suit and reasonable attorneys' fees as provided by law or equity, including, but not limited to attorneys' fees under Class Action Fairness Act and California Business and Professions Code;

7.      For punitive damages as provided by law;

8.      Restitutionary remedies authorized by the California Business and Professions Code, section 17203; and

9.      For such other and further relief as the Court deems proper, at law or in equity.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Plaintiffs, on their own behalf and on behalf of all others similarly situated, respectfully demand a jury trial.[10]

Dated: February 24, 2020

Respectfully submitted,

*/s/ Jonathon Farahi, Esq.*

**Boris Treyzon** (CA SBN 18893)
**Jonathon Farahi** (CA SBN 324316)

**ABIR COHEN TREYZON SALO, LLP**
16001 Ventura Boulevard, Suite 200
Encino, California 91436
Phone: (424) 288-4367
Fax: (424) 288-4368
btreyzon@actslaw.com
jfarahi@actslaw.com

-and-

**Joshua L. Hedrick**
Texas State Bar No. 24061123
**Katharine Battaia Clark**
Texas State Bar No. 24046712

**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone: (214) 880-9600
Fax: (214) 481-1844
Josh@HedrickKring.com
KClark@HedrickKring.com

**COUNSEL FOR COLTON SCHMIDT, REGGIE NORTHRUP, INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED**

---

[10] On January 27, 2020, Plaintiffs filed a Motion for Leave to Appeal [Dkt. Nos. 77-78], pursuant to 28 U.S.C. §§ 158(a)(3) & 1292(b) and Federal Rule of Bankruptcy Procedure 8004, this Court's Order Striking Plaintiffs' Jury Demand [Dkt. No. 70]. On January 28, 2020, the United States District Court for the Western District of Texas docketed Plaintiffs' appeal as Case No. 5:20-cv-00104-OLG.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served electronically via the Court's ECF noticing system on those parties who receive notice from that system in this matter on this 24th day of February, 2020

*/s/ Jonathon Farahi*
Jonathon Farahi