# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-50900-CAG-7** |
| **LEGENDARY FIELD** | § | |
| **EXHIBITIONS, LLC, ET AL,** | § | |
| | § | **CHAPTER 7** |
| DEBTORS. | § | |
| | § | |
| | § | |
| | § | |
| **COLTON SCHMIDT, INDIVIDUALLY** | § | |
| **AND ON BEHALF OF OTHERS** | § | |
| **SIMILARLY SITUATED; AND REGGIE** | § | |
| **NORTHRUP, INDIVIDUALLY AND ON** | § | |
| **BEHALF OF OTHERS SIMILARLY** | § | |
| **SITUATED,** | § | |
| | § | |
| PLAINTIFFS, | § | **ADV. PRO. NO. 19-05053** |
| v. | § | |
| | § | |
| **AAF PLAYERS, LLC, THOMAS DUNDON,** | § | |
| **CHARLES "CHARLIE" EBERSOL,** | § | |
| **LEGENDARY FIELD EXHIBITIONS,** | § | |
| **LLC, AAF PROPERTIES, LLC, EBERSOL** | § | |
| **SPORTS MEDIA GROUP, INC. AND** | § | |
| **DOES 1 THROUGH 200, INCLUSIVE** | § | |
| | § | |
| DEFENDANTS. | § | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

Plaintiffs Colton Schmidt and Reggie Northup, individually and on behalf of others similarly situated (collectively, Schmidt, Northrup, and others similarly situated are "Plaintiffs"), file this Opposition to Defendant Thomas Dundon's ("Dundon") Motion to Dismiss ("Motion") (Dkt. Nos. 94-95) Plaintiffs' Second Amended Complaint ("SAC") (Dkt. No. 87), and Plaintiffs respectfully request this Court deny the Motion with prejudice, or, in the alternative, grant Plaintiffs' Motion for Leave to File a Fourth Amended Complaint. In support of the Opposition, Plaintiffs show as follows.

## PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

I.    **INTRODUCTION** ........................................................................................... 1

II.    **PROCEDURAL BACKGROUND** ................................................................. 1

III.    **STANDARD OF REVIEW** ........................................................................... 2

IV.    **FACTUAL ALLEGATIONS PLED IN THE COMPLAINT** ......................... 4

    a.   The Complaint Alleges that Dundon Made Specific, False Statements, Material Omissions and False Promises regarding his involvement in the AAF. ...................................... 4

    b.   Defendant Dundon's False and Misleading Statements Caused Significant Harm to Plaintiffs............................................................................................................... 6

V.    **ARGUMENT** ................................................................................................ 7

    a.   Defendant Dundon Is Improperly Asking the Court to Determine the Ultimate Merits of the Case Rather than to Determine Whether a Cause of Action Has Been Stated. ..................... 7

    b.   Plaintiff Have Properly Pled Sufficient Facts to State A Claim for Promissory Estoppel Against Dundon. ....................................................................................................... 8

        i.   The SAC alleges Dundon made a clear and unambiguous promise................................ 10

        ii.   The SAC alleges Plaintiffs and other Class members relied on Dundon's promises to their detriment. ....................................................................................................... 11

        iii.   Per Federal Rule of Civil Procedure 8(e)(2), Plaintiffs have properly pled promissory estoppel and breach of contract as alternative legal theories. ................................. 14

    c.   Plaintiffs Have Properly Pled Sufficient Facts to State a Claim for Fraud against Dundon. 15

        i.   The SAC Pleads Sufficient Facts Regarding Who, What, When and How .................... 17

        ii.   The SAC pleads Dundon knew the statements to be false when he made them.......... 20

        iii.   The SAC Pleads Pled Dundon Directed Statements to Plaintiffs ............................... 21

        iv.   The SAC Pleads Sufficient Facts to Infer Dundon's "Intent" to Commit Fraud ........ 21

        v.   Plaintiffs Relied on Dundon's Statements to their Detriment..................................... 23

        vi.   If any claims for fraud or promissory fraud is held viable against Ebersol, the SAC pleads enough facts to state that Dundon was Ebersol's co-conspirator and aided and abetted Ebersol's fraud. ....................................................................................................... 25

    d.   The SAC Pleads Sufficient Facts to State a Claim for Promissory Fraud against Dundon. 27

VI.    **LEAVE TO AMEND TO FILE THE THIRD AMENDED COMPLAINT** ............... 30

VII.    **CONCLUSION** ........................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002) ................................... 3

*Aceves v. U.S. Bank, N.A.*,192 Cal. App. 4th 218 (2011) ............................................................. 11

*Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226 (1995) ................................................. 12, 23

*AREA II Cases*, 216 Cal. App. 4th 1004 (2013) ......................................................................... 25

*Arista Records, LLC v. Doe 3*, 604 F. App'x 110 (2nd Cir. 2010) ................................................. 3

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 3

*Beckwith v. Dahl*, 205 Cal. App. 4th 1039 (2012) ...................................................................... 22

*Behnke v. State Farm General Ins. Co.*, 196 Cal. App. 4th 1443 (2011) ..................................... 27

*Bell Atl. Corp. v. Twombly* 550 U.S. 544 (2007) ........................................................................... 3

*Blankenheim v. E.F. Hutton & Co., Inc.*, 217 Cal.App.3d 1463 (1990) ...................................... 23

*Broberg v. Guardian Life Ins. Co. of America*, 171 Cal.App.4th 912 (2009) ........................ 12, 23

*Carpy v. Dowdell*, 115 Cal. 677 (1897) ...................................................................................... 10

*Dorsey v. Portfolio v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) ............................. 22

*Douglas E. Barnhart, Inc. v. CMC Fabricators*, Inc., 211 Cal. App. 4th 230 (2012) .................. 15

*Douglas Equipment, Inc. v. Mack Trucks, Inc.*, 471 F.2d 222 (7th Cir.1972) .............................. 14

*Fleet v. Bank of America N.A.*, 229 Cal App 4th 1403 (2014) ...................................................... 8

*Frances T. v. Village Green Owners Assn.*, 42 Cal.3d 490 (1986) .............................................. 29

*Garcia v. World Savings, FSB*, 183. Cal. App. 4th 1031 (2010) ................................................. 10

*Giannone v. United States Steel Corp.*, 238 F.2d 544 (3rd Cir.1956) .......................................... 14

*Granadino v. Wells Fargo Bank*, N.A., 236 Cal. App.4th 411 (2015) .......................................... 10

*Hasso v. Hapke*, 227 Cal. App. 4th 107 (2014) ........................................................................... 15

*Henry v. Weinman*, 157 Cal. App. 2d 360 (1958) ....................................................................... 11

*Hirshfield v. Schwartz*, 91 Cal. App. 4th 749 (2001) .................................................................... 9

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007) .............................................. 3

*In re Refco, Inc. Secs. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................ 8

*Jolley v. Chase Home Finance, LLC*, 213 Cal.App.4th 872 (2013) ................................. 16

*Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571 (1995)................................. 25

*Lazar v. Sup. Ct.*, 12 Cal. 4th 631 (1996) ........................................................ 20, 23, 27

*Lenk v. Total-Western, Inc.*, 89 Cal. App. 4th 959 (2001)........................................... 27

*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal.App.4th 603 (1992)...................... 16, 19

*Mayhugh v. County of Orange*, 141 Cal. App. 3d 763 (1983)....................................... 25

*Mirkin v. Wasserman*, 5. Cal. 4th 1082 (1993) ................................................... 23

*Molsbergen v. United States*, 757 F.2d 1016 (9th Cir. 1985) ...................................... 14

*Moncada v. West Coast Quartz Corp.*, 221 Cal.App.4th 768 (2013) ...................... 28, 29

*Navarette v. Meyer*, 237 Cal. App. 4th 1276 (2015) ............................................... 25

*PAE Government Services, Inc. v. MPRI, Inc.*, 514 F. 3d 856 (9th Cir. 2007) ............. 14

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F3d 436 (7th Cir.
2011) .................................................................................................. 3

*Public Employees' Retirement System v. Moody's Investors Service, Inc.*, 226 Cal. App. 4th 643
(2014)................................................................................................. 16

*Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014) ................................................... 3

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .......................................................... 7

*Service by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807 (1996)...................... 15

*Sindell v. Abbot Laboratories*, 26. Cal.3d 588 (1980) ............................................ 25

*Small v. Fritz Companies, Inc.*, 30 Cal.4th 167 (2003) ................................... 21, 23, 29

Smith v. City & County of San Francisco, 225 Cal. App. 3d 38 (1990) ...................... 11

*Solano v. Ali Baba Mediterranean Grill, Inc.*, No. 3:15-cv-0555-G, 2015 WL 7770893 (N.D.
Tex. Dec. 3, 2015) ................................................................................. 22

*Toscano v. Green Music*, 124 Cal. App. 4th 685 (2004) ........................................... 9

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343 (5th Cir. 2013) ........... 3

*US Ecology Inc. v. State of California*, 92 Cal. App. 4th 113 (2001)............................ 10

*Whiteley v. Philip Morris Inc.*, 117 CA 4th 635 (2004) ........................................... 23

*Wilson v. Bailey*, 8 Cal.2d 416 (1937) ......................................................................... 10

**Statutes**

Cal. Civ. Code § 1709 ........................................................................................ 15, 16, 21

Cal. Civ. Code § 1711 ................................................................................................ 21, 29

Cal. Civ. Code §1710 ......................................................................................... 15, 16, 27

Cal. Code Civ. Proc. § 425.10 ........................................................................................ 1

**Other Authorities**

McCormick, Evidence § 265 (2nd ed. 1972) ................................................................. 14

REST. 2D TORTS § 546 .................................................................................................... 23

REST. 2D TORTS §§ 525, 531 .......................................................................................... 23

**Rules**

Fed. R. Civ. P. 8(a) ......................................................................................................... 2

Fed. R. Civ. P. 8(e)(2) ................................................................................................... 14

Fed. R. Civ. P. 9(b) ....................................................................................................... 16

Fed. R. Civ. P. 11(b) ....................................................................................................... 3

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 2, 3, 7, 8

## I.  INTRODUCTION

1.      This litigation arises from the abrupt closure of the now defunct professional football league, the Alliance of American Football ("AAF"). The AAF was founded by Defendant Charles "Charlie" Ebersol ("Ebersol"). Defendant AAF Players, LLC ("AAF Players") conducted business as the AAF, the assets of which were wholly-owned; operated; and/or controlled through Ebersol's equity and/or ownership interest in Defendants Legendary Field Exhibitions, LLC ("LFE"); AAF Properties, LLC ("AAF Properties"); and/or Ebersol Sports Media Group, Inc. ("ESMG"). *See* SAC Compl. at ¶¶ 3-11.

2.      The Court should deny Dundon's Motion with prejudice because the SAC sets forth sufficient factual allegations regarding Plaintiffs' claims against Dundon. In the alternative, Plaintiffs respectfully further request this Court grant their Motion for Leave to File a Third Amended Complaint.

## I.  PROCEDURAL BACKGROUND

3.      Plaintiffs filed the complaint ("Complaint," Dkt. No. 1-1) in California Superior Court in San Francisco (the "Civil Action").[1] The Complaint named the Alliance of American Football ("AAF"), Charles "Charlie" Ebersol ("Ebersol"), AAF Players, LLC ("AAF Players"), Legendary Field Exhibitions, LLC ("LFE"), Thomas Dundon ("Dundon"), AAF Properties, LLC ("AAF Properties"), and Ebersol Sports Media Group, Inc. ("ESMG") (collectively, the "Defendants"). *See* SAC at ¶¶ 3-8.

4.      On April 17, 2019 (the "Petition Date"), ESMG, Ebersol, AAF Players and LFE filed for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Texas (San Antonio).

5.      Following the Petition Date, as a result of Dundon's continued motion practice, this action was eventually transferred to this Court to be conducted as an adversary proceeding.

/ / /

---

[1] Pursuant to California Code of Civil Procedure 425.10, a complaint sets forth "a statement of facts constituting the cause of action, in ordinary and concise language."

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S
MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 1**

6.      On September 23, 2019, Dundon filed a Motion to Dismiss in the Western District. [Dkt. Nos. 3 & 4]. On October 29, 2019, Plaintiffs filed their opposition and moved for leave to amend their pleading with a First Amended Complaint ("FAC"). [Dkt. Nos. 22, 23 & 24].

7.      On November 7, 2019, the Court granted Plaintiffs leave and denied Dundon's original Motion to Dismiss as moot. [Dkt. Nos. 30 and 31].

8.      On November 22, 2019, Dundon filed his Motion to Dismiss Plaintiffs' FAC. [Dkt. No. 38-40].

9.      On December 6, 2019, Plaintiffs filed their oppositions to Dundon's renewed Motion to Dismiss. [Dkt. Nos. 51 and 53].

10.     On January 13, 2020, the Court conducted a hearing on Dundon's renewed Motions to Dismiss. Following the hearing, the Court granted Dundon's motion with prejudice and without leave to amend as to Count VIII (Inducing Breach of Contract). The Court also granted Dundon's motion without prejudice, but granted Plaintiffs leave to amend within fourteen (14) calendar days from the date of the entry of the order on Dundon's motion as to Counts III (Promissory Estoppel); VI (Fraud); and VII (Promissory Fraud). [Dkt. No. 81].

11.     On February 24, 2020, Plaintiffs filed their SAC, consistent with this Court's orders [Dkt. Nos. 81 and 82].

12.     On March 9, 2020, Dundon filed his Motion, in which he continues to argue that Plaintiffs have failed to state a claim upon which relief can be granted.

## II.     STANDARD OF REVIEW

13.     Federal Rule of Civil Procedure 8(a), made applicable to this proceeding by Bankruptcy Rule of Procedure 7008, requires a "short and plain statement of the claim showing that the pleader is entitled to relief…" Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding by Bankruptcy Rule of Procedure 7012 (b), authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."

14.     In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 346 (5th Cir. 2013) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)).

15.     To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly* 550 U.S. 544, 570 (2007) ("*Twombly*"). Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible "short and plain" statement of the plaintiff's claim, not an exposition of his legal argument. *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

16.     A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A complaint is sufficient if it gives the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 555. *Twombly* does not require heightened fact pleading of specifics, but "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  Generally, state substantive law and federal procedural law apply to state claims. *Range v. Douglas*, 763 F.3d 573, 580-581 (6th Cir. 2014).

17.     Federal Rule of Civil Procedure 11(b), made applicable to this proceeding by Bankruptcy Rule of Procedure 9011(b), expressly permits pleading on information and belief. *See also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F3d 436, 442 (7th Cir. 2011). In *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002), the Fifth Circuit held that "information and belief" allegations must be supported by other facts to support a probability that a person would possess the information pleaded. In *Arista Records, LLC v. Doe 3*, 604 F. App'x 110, 120 (2nd Cir. 2010), the Sixth Circuit discussed the pleading standards set forth in *Twombly* as follows:  "The *Twombly* plausibility standard, which applies to all civil actions . . . does not prevent a plaintiff from pleading facts alleged upon information and belief . . . where the belief is based on factual information that makes the inference of culpability plausible . . ." (internal citations omitted).

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 3**

III.     **FACTUAL ALLEGATIONS PLED IN THE COMPLAINT**

a.  **The Complaint Alleges that Dundon Made Specific, False Statements, Material Omissions and False Promises regarding his involvement in the AAF.**

18.     Upon inception, the AAF was started by Ebersol to be a technology business, not a developmental football league, with the players being a necessary means to (unwittingly) prove the viability of the technology business. *See* SAC at ¶ 181. Ebersol planned to license the data technology to other sports leagues, sports betting outlets, and non-sports businesses. *See id.* at ¶ 181. Ebersol did not disclose that plan to the players. *See id.*

19.     From the outset of the league to its last day, and specifically in an effort to induce Plaintiffs and other Class members to sign the Form Contracts with the AAF, Ebersol held out the AAF as a legitimate league that would provide Class members a potential path as a future NFL player. *See* SAC at ¶ 140. Ebersol's misrepresentations and concealment of the league's true purpose and long-term viability fraudulently induced Plaintiffs and other Class members to contract with AAF Players LLC. *See* SAC at ¶ 137.

20.     In early February 2019, the AAF was encountering significant cash-flow issues. *See* SAC at ¶ 53. After the first two weeks of the AAF season, the AAF failed to pay Plaintiffs and other Class members two of the ten (10) equal payments due to them under the Form Contract. *See* SAC at ¶ 51. Ebersol needed to infuse the AAF with cash to meet the league's commitment to Plaintiffs and other Class members or else the league was in serious jeopardy of folding. *See* SAC at ¶ 54.

21.     Rather than be honest with Plaintiffs regarding the financial viability of the league, representatives and agents of the AAF disseminated information to Plaintiffs and other Class members that the league was not in financial jeopardy. *See* SAC at ¶ 52.  Instead, Plaintiffs and other Class members were told there had been a glitch switching to a new payroll administrator and that the payment for the previous games would be made shortly. *See Id.*

/ / /

/ / /

22.    On February 14, 2019, Ebersol and Dundon agreed to a deal wherein Dundon committed to providing the AAF a multimillion-dollar line of credit to ensure AAF operations could continue following the missed payroll owed to the Plaintiffs and other Class members. *See* SAC at ¶ 56. When Dundon made his investment, Dundon knew that the AAF was experiencing significant cash-flow problems. *See id.* Further, Dundon knew that if the AAF failed to pay to Plaintiffs and other Class members per the contracts, the league would fold imminently. *See id.*

23.    On February 19, 2019, Dundon, with knowledge of AAF's failure to meet its payroll obligations, went on a media tour intending to reach and influence Plaintiffs. *See* SAC at ¶ 69. Dundon's media campaign included a widely disseminated February 19, 2019 post-investment interview on a radio station in North Carolina that was later disseminated through national media channels. *See* SAC at ¶ 70. Dundon's statements were made with the reasonable expectation that the statements would be heard by Plaintiffs and the other Class members. *See id.*

24.    In making these false statements, Dundon's purpose was to induce Plaintiffs and other Class members to stay with the AAF so that the league's technology could continue to be tested long enough to test its' viability.  *See* SAC at ¶ 77. Dundon represented to Plaintiffs and other Class members that if the players continued to work for the AAF, they would get paid stating, "My investment will keep this thing years to years to come…it's not a viability issue." Dundon assured many years of ongoing league operations: "The [AAF] didn't have a permanent solution like I provided. That's enough money to run this league for a long time, we're good for many years to come with that I just did." *See* SAC at ¶ 71. Dundon continued, "there's a difference between commitments and funding. They had the commitments to last a long time, but maybe not the money in the bank. My money is in my bank. I'm sure of it." *See* SAC at ¶ 72.

25.    Dundon's statements regarding his "money is in the bank" and providing the league with a "permanent solution" were expressed in a manner implying a factual basis which did not exist. *See* SAC at ¶ 74. Dundon's statements were made recklessly without regard for the representations' truth in order to influence Plaintiffs and Class members to continue playing additional weeks in the AAF, further testing the viability of the AAF's technology. *See* SAC at ¶

76.

26.     Despite having superior knowledge and special information regarding whether or not "his money was in the bank" or that he provided the league "a permanent solution," the image Dundon presented to Plaintiffs and other Class members was far from the truth. *See* SAC at ¶ 78.  Due to his position with the league, Dundon had the ability to know the truth of his statements, which were, in fact, false. *See* SAC at ¶ 176.  At no point before the league abruptly folded did Dundon let Plaintiffs or other Class members know that his money was not in the bank or that he never intended to provide the league with a permanent solution. *See* SAC at ¶ 78.

27.     Finally, Dundon knew of Ebersol's fraudulent scheme perpetrated on Plaintiffs and the other Class members. *See* SAC at ¶ 157. Dundon knew of Ebersol's long-term plans to use the AAF as a technology business; it was the only reason he invested in the AAF. *See* SAC at ¶ 158. Dundon possessed an opportunity and financial motive to mislead and defraud like Ebersol. *See* SAC at ¶ 160.

28.     With his investment in the AAF and corresponding statements designed to keep the sham league and proof of concept running, Dundon substantially assisted and furthered Ebersol in Ebersol's scheme to prove technology rather than run a legitimate professional football league. *See* SAC at ¶ 157. Dundon agreed with Ebersol and intended to further Ebersol's narrative that the AAF was an actual development league; all the while, both of them were in hot pursuit of the technology. *See* SAC at ¶ 158.

   **b. Defendant Dundon's False and Misleading Statements Caused Significant Harm to Plaintiffs.**

29.     Plaintiffs and other Class members were physically harmed every single time they played football in the AAF, whether it be by practice or games, due to the physical nature of the game that took a direct toll on Plaintiffs' and other Class members' bodies, including but not limited to,  concussions and an increased risk of CTE continuing to present day. *See* SAC at ¶ 98.

/ / /

/ / /

30.     After the two weeks of the AAF season, the AAF failed to pay Plaintiffs and other class members two of the ten (10) equal payments due to them under the Form Contract. *See* SAC at ¶ 51. On February 18, 2019, AAF Players through Ebersol, breached the Form Contracts by failing to pay Plaintiffs and other Class members for the first two weeks of games. *See* SAC at ¶ 68. During this period, there was widespread knowledge within the AAF and by Dundon specifically that Plaintiffs and other Class members had decided that they would not continue playing in the AAF, absent (1) payment for the previous games and (2) an understanding that there was enough capital to cover the entire term of Class members' contracts. *See* SAC at ¶ 67.

**31.     Despite no longer having any contractual obligation to play in the AAF following the league's breach, after Plaintiffs and other Class members heard of Dundon's investment and his post-investment comments regarding his personal "permanent solution" from multiple sources in February 2019, Plaintiffs and the other Class members continued to play professional football in the AAF for additional weeks beyond the league's breach**. *See* SAC at ¶ 94. **Plaintiffs and other Class members did not seek alternative employment and residential opportunities after the league's contractual breach because of Dundon's personal assurances, representations, guarantees and conduct. *See* SAC at ¶ 95**. Further, relying on Dundon's statements, Plaintiff Northrup ruptured his ulnar collateral ligament during a game after Dundon's representations. *See* SAC at ¶ 97.

## IV.    ARGUMENT

### a.    Defendant Dundon Is Improperly Asking the Court to Determine the Ultimate Merits of the Case Rather than to Determine Whether a Cause of Action Has Been Stated.

32.     For purposes of deciding a 12(b)(6) motion, the issue as the United States Supreme Court has stated, "is not whether a plaintiff will prevail in the action, but whether she is entitled to offer evidence in support of her claim." *Scheuer v. Rhodes*, 416 U.S. 232 (1974).

/ / /

/ / /

33.     Here, Dundon seeks to short circuit this litigation and not even allow Plaintiffs' claims to proceed to the discovery phase. Dundon cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder. *In re Refco, Inc. Secs. Litg., 503 F. Supp. 2d 611,658 (S.D.N.Y. 2007).*

34.     Plaintiffs' claims are supported by one hundred eighty-nine detailed, factual allegations and do not consist of legal conclusions that must be disregarded under the first step in *Iqbal.* Since the allegations of the forty-three-page Second Amended Complaint must be taken as true, Dundon cannot reasonably assert that the detailed allegations are not plausible on their face. Plaintiffs' SAC alleges specific events and circumstances that, assumed to be true, raise a reasonable inference of actionable conduct  Therefore, this case cannot be cut off at its inception on the theory that the facts asserted, and claims made are not plausible – when they are, in fact, wholly plausible if taken as true, as they must be.

35.     In sum, this Court should deny Dundon's Motion, as Plaintiffs have alleged sufficient facts against Dundon to overcome his Rule 12(b) challenge.

**b.  Plaintiff Have Properly Pled Sufficient Facts to State A Claim for Promissory Estoppel Against Dundon.**

36.     The elements of a cause of action for promissory estoppel are (1) a promise, (2) the reasonable expectation by the promisor that the promise will induce reliance or forbearance, (3) actual reliance or forbearance, and (4) the avoidance of injustice by enforcing the promise. *Fleet v. Bank of America N.A.*, 229 Cal App. 4th 1403, 1412 (2014).

> In California, under the doctrine of promissory estoppel, "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." Promissory estoppel is "a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced."

/ / /

/ / /

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S
MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 8**

37.     Here, Plaintiffs have pled enough facts to allow this Court to draw the reasonable inference that Dundon is liable for promissory fraud according to California law. The SAC alleges (1) Dundon made clear, unambiguous promises that were intended to reach and influence Plaintiffs' and other Class members' fears regarding the long-term viability of the AAF[2]; (2) Dundon had the reasonable expectation that his promises would induce Plaintiffs' reliance and forbearance[3]; (3) Plaintiffs and other Class members actually relied and forbore on their plans to walk away from the AAF[4]; and (4) the Plaintiffs and other Class members have suffered damages and the avoidance of injustice can be made by enforcing Dundon's promise.[5]

38.     The doctrine of promissory estoppel is commonly explained as promoting the same purposes as the tort of misrepresentation: punishing or deterring those who mislead others to their detriment and compensating those who are misled. "The object of equity is to do right and justice. It does not wait upon precedent which exactly squares with the facts in controversy but will assert itself in those situations where right and justice would be defeated but for its intervention. It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication." *Toscano v. Green Music*, 124 Cal. App. 4th 685, 693 (2004) (quoting *Hirshfield v. Schwartz*, 91 Cal. App. 4th 749, 770-71 (2001)).

39.     In the case at bar, equity and justice will be served by compelling Dundon to perform all promises he made to Plaintiffs.

/ / /

/ / /

/ / /

---

[2] *See* SAC at ¶ 128.
[3] *See* SAC at ¶ 128.
[4] *See* SAC at ¶ 129,130.
[5] *See* SAC at ¶ 131.

### i. The SAC alleges Dundon made a clear and unambiguous promise.

40.     "A promise is an indispensable element of the doctrine of promissory estoppel." *Granadino v. Wells Fargo Bank, N.A.*, 236 Cal. App.4th 411, 417 (2015). A "promise" is an assurance that a person **will** or **will not** do something. *Id.*; *see also* Black's Law Dict. (7th ed. 1999) pp. 1229–1230); *see also US Ecology Inc. v. State of California,* 92 Cal. App. 4th 113, 131 (2001) (holding a promise as vague as a promise to use 'best efforts' to acquire land sufficient to support promissory estoppel.").

41.     The vital principle of promissory estoppel is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. *See Garcia v. World Savings, FSB*, 183. Cal. App. 4th 1031, 1041 (2010); *Wilson v. Bailey*, 8 Cal.2d 416, 423 (1937), quoting *Carpy v. Dowdell* 115 Cal. 677, 687 (1897). In such a case, although no consideration or benefit accrues to the person making the promise, he is the author or promoter of the very condition of affairs which stands in his way; and when this plainly appears, it is most equitable that the court should say that they shall so stand. *Garcia*, 183. Cal. App. 4th 1041.

42.     Defendant Dundon incorrectly argues that Plaintiffs fail to allege Dundon made a clear and unambiguous promise. [Dkt. 94 at p. 12]. Here, the SAC alleges Dundon knew of the league's failure to make payroll and knew that if the AAF failed to make the past-due payments to Plaintiffs per the Form Contracts, the league would fold imminently. *See SAC at ¶ 56*. With this knowledge, Dundon went on a media tour that Dundon knew or should have known would reach players intending to influence Plaintiffs' and other Class members' fears regarding the long-term viability of the league. *See* SAC at ¶ 71.

43.     With this knowledge, Dundon gave clear and unambiguous assurances to Plaintiffs and other Class members that:

    a) his "investment **will** keep this thing [the AAF] **years to years** to come…it's not a viability issue.";

    b) he, alone, **provided** the league a permanent solution, a permanent solution that

the league did not have without him;

    c) the league was good **for many years** with what he just did; and

    d) that he didn't just commit to the league, he funded the league, he put his money in the bank. See SAC at ¶ 72-73, 128. (Emphasis added.)

44. The SAC further alleges that on February 19, 2019, Dundon knew of the league's failure to make payroll, he knew of the Plaintiffs and other Class members' desire to walk away from the AAF and clearly wanted to assure Plaintiffs and other Class members they should stay with the league and continue playing in the AAF for his own personal financial benefit when he gave the interview on February 19, 2019. *See* SAC at ¶¶ 56, 69, 78.

45. Therefore, Dundon's promises are definite enough that this Court can determine the scope of Dundon's duty and provide the rational basis for the assessment of Plaintiffs and other Class Members' damages.

    **ii.**     **The SAC alleges Plaintiffs and other Class members relied on Dundon's promises to their detriment.**

46. Therefore, Dundon's promises are definite enough that this Court can determine the scope of Dundon's duty and provide the rational basis for the assessment of Plaintiffs and other Class Members' damages.

47. Reliance must be to the person's detriment—that the promisee made a substantial change in his or her position because of the promises or representations made. *Henry v. Weinman*, 157 Cal. App. 2d 360, 366-377 (1958); *see also Smith v. City & County of San Francisco*, 225 Cal. App. 3d 38, 47-48 (1990).

48. **Promissory estoppel** "applies whenever a promise *which the promissor should reasonably expect* to induce action or forbearance on the part of a promisee or a third person and which does induce such action or forbearance." *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 227 (2011).

/ / /

/ / /

49.     While discussing reasonable reliance in the context of fraud cause of action, California courts have held "except in the rare case where the undisputed facts leave no reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact. *Broberg v. Guardian Life Ins. Co. of America* 171 Cal.App.4th 912, 921(2009); See also *Alliance Mortgage Co. v. Rothwell* 10 Cal.4th 1226, 1239 (1995).

50.     While Defendant Dundon tries to avert the Court's attention to "the timing conundrum," Dundon misses the forest for the trees. Plaintiffs concede they contracted with the AAF months before Dundon's clear and unambiguous promises and that they had begun playing in the AAF before Dundon's clear and unambiguous promises.

51.     What Dundon fails to concede is that **the SAC makes clear that Dundon seized control of a distressed league once he entered the picture. After the first two weeks of play during the AAF season, the AAF failed to pay the Plaintiffs and other Class members two of the (10) equal payments due to them under the Form Contract, therefore breaching their contracts with Plaintiffs and other Class members.** *See* SAC at ¶ 51, 68. Despite boasting brashly about the AAF's immediate success to the public, behind the scenes, the AAF was encountering significant cash-flow issues between February 9 and February 19, 2019. *See* SAC at ¶ 53. Within that time period, Ebersol needed to infuse the AAF with cash to meet the league's commitment to Plaintiffs and other Class members or else the league was in serious jeopardy of folding. *See* SAC at ¶ 54.

52.     During that same time period, Plaintiffs and other Class Members decided that they would not continue playing football in the AAF, absent (1) payment for the previous games and (2) **an understanding that there was enough capital to cover the entire term of Class members' contracts.** *See* SAC at ¶ 67.

53.     On February 14, 2019, Dundon agreed to provide the AAF with a multi-million-dollar line of credit, knowing the AAF was experiencing significant cash-flow problems and knowing if the AAF failed to cure the breach, the league would fold immediately. *See* SAC at ¶ 55-56.

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 12**

54.     Dundon, with knowledge of AAF's breach, went on a media tour intending to reach and influence Plaintiffs that the league would be viable for the long-term and to continue playing in the AAF. *See* SAC at ¶ 69.  Dundon made these statements with the knowledge and understanding that Plaintiffs would hear them, intending to induce Plaintiffs and other Class members to detrimentally alter their position regarding their employment with the AAF, specifically that they would stay on the job. *See* SAC at ¶ 73,77.

55.     After hearing of Dundon's investment and his post-investment comments from multiple sources in February 2019 and but for the representations of Dundon, Plaintiffs continued to subject themselves to further **serious risk of** and **actual** physical harm or damage to their health resulting from playing professional football after the AAF violated its obligations to pay Plaintiffs. *See* SAC at ¶ 81,82, 88.

56.     Because of Dundon's assurances, representations, guarantees and conduct, Plaintiffs and other Class members refrained from seeking alternative employment and residential opportunities. *See* SAC at ¶ 95. In support of these allegations, Plaintiffs and other Class members cite one example of reasonable reliance on Dundon's statements, to wit, on February 23, Plaintiff Northrup ruptured his ulnar collateral ligament during a game. *See* SAC at ¶ 97.

57.     Dundon argues that because Plaintiffs and Class members were ultimately compensated for all the games, they played in the AAF, Dundon bears no responsibility for his widely disseminated statements which caused Plaintiffs and other Class members to justifiably rely on him for payment of the full term of their contracts. However, once the AAF missed the two payments to Plaintiffs, the AAF was in breach and Plaintiffs were under **no contractual obligation to continue playing**. *See* SAC at ¶ 68. The SAC alleges that the Plaintiffs and other Class members **elected to continue playing in the AAF following the breach because Dundon's statements led them to reasonably believe that the league would remain viable for the duration of their three-year contracts**. *See* SAC at ¶ 95.

/ / /

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 13**

58.     Accordingly, Plaintiffs allege sufficient facts to claim a cause of action for promissory estoppel claim against Dundon under the lowered pleading requirements of Rule 8.

### iii.     Per Federal Rule of Civil Procedure 8(e)(2), Plaintiffs have properly pled promissory estoppel and breach of contract as alternative legal theories.

59.     The mere fact that a plaintiff alleges both a claim for breach of contract and promissory estoppel does not mean that the promissory estoppel claim must be dismissed. "[A] policy which permits one claim to be invoked as an admission against an alternative or inconsistent claim would significantly restrict, if not eliminate, the freedom to plead inconsistent claims provided by Rule 8(e)(2). Thus, courts have been reluctant to permit one pleading to be read as a judicial or evidentiary admission against an alternative or inconsistent pleading. *Molsbergen v. United States,* 757 F.2d 1016, 1019 (9th Cir. 1985); *see also Douglas Equipment, Inc. v. Mack Trucks, Inc.,* 471 F.2d 222 (7th Cir.1972); *Continental Insurance Co. v. Sherman,* 439 F.2d 1294 (5th Cir.1971); *Giannone v. United States Steel Corp.,* 238 F.2d 544 (3d Cir.1956); McCormick, *Evidence* § 265 (2nd ed. 1972). *Cf. Ryan v. Foster and Marshall,* 556 F.2d 460, 463 (9th Cir.1977) (plaintiffs' assertion of inconsistent and alternative claims may not be construed as a waiver by plaintiffs of their rights to recovery under either claim).

60.     As noted in *PAE Government Services, Inc. v. MPRI, Inc.*, 514 F. 3d 856, 860 (9th Cir. 2007), "The short of it is that there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations. Unless there is a showing that the party acted in bad faith—a showing that can only be made after the party is given an opportunity to respond under the procedures of Rule 11— inconsistent allegations are simply not a basis for striking the pleading."[6]

*/ / /*

---

[6]Even though Plaintiffs' breach of contract and promissory estoppel claims maybe eventually be deemed mutually exclusive, at this stage, the Federal Rule of Civil Procedure 8(e)(2) allows litigants to present alternative and inconsistent pleadings.

61.     Therefore, Dundon's argument that the underlying consideration between Plaintiff and AAF Players bar asserting promissory estoppel against him is a red herring. "Unlike contract law, which enforces promises because the parties have bargained for and agreed to be bound by them, promissory estoppel is an 'alternative theory of recovery' that enforces promises because the promisee has justifiably and foreseeably relied on the promise and equity demands enforcement to avoid injustice." *Douglas E. Barnhart, Inc. v. CMC Fabricators*, Inc., 211 Cal. App. 4th 230, 242 (2012).

62.     Finally, Dundon incorrectly states there is no dispute in this case that the players' contracts were binding contract. [Dkt. 94 at p. 12]. However, the SAC alleges (1) the Form Contracts were breached on February 18, 2019, the day before Dundon's statements and (2) the Plaintiffs and other Class members fraudulently induced into their contracts with AAF Players LLC, by way of Ebersol's misrepresentations. See SAC at ¶ 68,127.

### c.  Plaintiffs Have Properly Plead Sufficient Facts to State a Claim for Fraud against Dundon.

63.     "A cause of action for fraud contains the following elements: : "(1) a knowingly false representation by the defendant; (2) an intent to deceive or induce reliance; (3) justifiable reliance by the plaintiff; and (4) resulting damages." *Hasso v. Hapke*, 227 Cal. App. 4th 107, 127 (2014) (quoting *Service by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1816 (1996)).

64.     California Civil Code § 1709 states, "**one who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.** California Civil Code §1710 further defines "a deceit" as either: (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) promise, made without any intention of performing it. There may be liability in fraud for an opinion where it is expressed in a manner implying a factual basis which does not

exist. *Jolley v. Chase Home Finance, LLC,* 213 Cal.App.4th 872 (2013).

65.     The rule has long been settled in this California that although one may be under no duty to speak as to a matter, "if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure."  *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* 6 Cal.App.4th 603, 613 (1992). When one party possesses, or assumes to possess, superior knowledge or special information regarding the subject matter of the representation, and the other party is so situated that he may reasonably rely upon such supposed superior knowledge or special information, a representation made by the party possessing or assuming to possess such knowledge or information, though it might be regarded as but the expression of an opinion if made by any other person, is not excused if it be false." *Public Employees' Retirement System v. Moody's Investors Service, Inc.,* 226 Cal. App. 4th 643, 662 (2014).

66.     Here, even under the heightened pleading standard of Rule 9(b), the factual allegations in the SAC set forth sufficient facts to state a claim for relief plausible for a cause of action of fraud against Dundon. Under the standard set by California Civil Procedure Code §§ 1709 and 1710, Plaintiffs allege that (1) Dundon willfully deceived Plaintiffs via statements which were not true, (2) Dundon did not believe the statements to be true, (3) Dundon had no grounds for believing the statements to be true, (4) Dundon made the statements with the intent Plaintiffs would alter their decision to walk away from the AAF to their injury and risk of injury. *See* SAC ¶ 69-73, 85-98, 148-171.

67.     Therefore, the SAC sets forth sufficient factual allegations to support a claim of fraud against Dundon.

/ / /

/ / /

/ / /

/ / /

i.      **The SAC Pleads Sufficient Facts Regarding Who, What, When and How**

68.     Throughout the SAC, Plaintiffs allege with specificity the "who, what, when, where and how" regarding Dundon's fraud against the players. Dundon, Ebersol, and their vehicle to commit the fraud, the AAF, are the **who**. *See, e.g.,* SAC ¶¶ 4-5. The **what** is the AAF that served as a front to sign up and host the human guinea pigs (players) with a true purpose of vetting its prized asset, the back-end technology. Plaintiffs and the other Class members were never the focus of the "developmental football league," but instead a means to prove the effectiveness of the technology. *See* SAC ¶¶ 21-29, 50. The **when** is March 2018 until April 2019 specifically focusing on the two-week period between February 9, 2019 and February 19. *See* SAC ¶¶ 20, 29, 30, 31,49-68, 99-106. The **where** is North Carolina, the internet, the airwaves, AAF headquarters in San Francisco, the AAF locker rooms, AAF stadiums and AAF cities. *See* SAC ¶¶ 6-8, 70, 80-81.

69.     The **how** is widely described in the SAC: the AAF was never intended to be a developmental football league; rather the plan was to license the data technology to other sports leagues, sports betting outlets, and non-sports business. *See* SAC ¶¶ 21, 24. However, to do so, the AAF, Ebersol, and later Dundon needed Plaintiffs and the other Class members to test the technology's efficiencies and thereby increase its value. *See* SAC ¶¶ 47,77-78, 142,150, 157.

70.     Between February 9 and February 19, 2019, the AAF was suffering from a major cash flow issue and the league failed to make two payments owed to the Plaintiffs and other Class members. *See* SAC ¶¶ 54, 68. During this same time period, Plaintiffs and other Class Members decided they would not continue playing football in the AAF, absent (1) payment for the previous games and (2) an understanding that there was enough capital to cover the entire term of Class members' contracts. *See* SAC ¶ 67.

71.     Not coincidentally, needing moment of need to keep the guinea pigs in the pen, Ebersol and Dundon hit the airwaves/internet/player and staff rumor mills to announce an alleged deal wherein Dundon committed to providing the AAF with a multi-million-dollar line of

credit to allegedly ensure AAF operations. *See* SAC ¶ 55. In other words, the timing alone of Dundon's and Ebersol's statements, when considered against the backdrop of the overall scheme, support Plaintiffs' claims of fraud.

72.     When Dundon made his investment, Dundon knew the AAF was a technology business and not a legitimate football league. Dundon invested due to the technology's potential applicability to Dundon's NHL team, which utilized a similar technology as the AAF. *See* SAC ¶¶ 55-63.

73.     Dundon incorrectly argues that there are no allegations contained with the SAC that Dundon knew of Plaintiffs' intent to walk away from the AAF absent assurances of financial viability.  [Dkt. 94 at p. 19]. The SAC alleges when Dundon made his investment he knew if the AAF failed to pay Plaintiffs and other Class members per the Form Contracts, the league would fold imminently.  *See* SAC at ¶ 55-56.

74.     On February 19, 2019, Dundon, with knowledge of the AAF's failure to meet its payroll obligations, went on a media tour intending to reach and influence Plaintiffs and other Class members not to walk away from the AAF, which would allow Dundon and Ebersol to continue proving the technology concept. *See* SAC ¶ ¶ 69-73. In a February 19, 2019, post-investment interview disseminated through national media channels that Dundon knew and had the reasonable expectation would be heard by Plaintiffs and other Class Members, Dundon implied that if the players continued to work for the AAF, they would get paid, stating "My investment will keep this things years to years to come…it's not a viability issue." *See id.*

75.     Dundon assured many years of ongoing league operations: "[The AAF] didn't have a permanent solution like I **provided**. That's enough money to run this league for a long time, **we're good for many years to come with what I just did**." *See id.*  Dundon continued to make representations like "[t]here's a difference between commitments and funding. They had the commitments to last a long time, but maybe not the money in the bank. **My money is in my bank**. I'm sure of it. The amount of money they (AAF) needed for Thursday wasn't an amount of money that would have taken the league down. You could make me feel really good… but the

truth is, they had other people, they were talking." *See id.*

76.     These statements are not regarding some event in the future like Dundon argues. [Dkt. 94 at p. 18]. Dundon did not state he will provide a permanent solution for the AAF sometime in the future. Nor does he say he will put his money in the bank at some time in the future. And his thinly veiled attempt to be humble suggests he knew those who believed what he was saying would be impressed by Dundon's actions of saving a newly formed league to which, as television ratings made clear, the public had taken an immediate liking.

77.     The statements alleged are clear about the past and the present, Dundon states, "**I** **provid*ed***" and "**my money *is in* my bank.**" To believe Dundon's explanation that his statement that the AAF didn't have a permanent solution like he **provided** was regarding some future event would be afront to grade school grammar teachers everywhere as it is clear that the past tense of a regular verb, like "provide", is "provided."

78.     Despite having superior knowledge and special information regarding whether "his money [was] in the bank" or he provided the league "a permanent solution," the image Dundon presented to Plaintiffs and other Class members was far from the truth. *See* SAC ¶ 78. As required by *Marketing West, Inc v. Sanyo Fisher*, once Dundon responded to inquiries about his investment in the AAF, he was bound not only to state truly what he says but also not to suppress or conceal any facts within his knowledge which would materially qualify those he stated. *Once, Dundon spoke, he was required by California law, to make a full and fair disclosure.*

79.     At no point before the league abruptly folding did Dundon let Plaintiffs or other Class members know that his money was not in the bank or that he never intended to provide the league with a permanent funding solution. *See id.* Instead, Dundon's statements furthered the narrative the AAF was a legitimate, stable developmental football league. All the while, his true purpose was to increase the value of the AAF's technology (for his own benefit and that of those he was working in concert with) through the proof of concept the players were providing. *See id.*

/ / /

80.     Dundon argues that because Plaintiffs and Class members were ultimately compensated for all the games Plaintiffs played in the AAF, he bears no responsibility for his statements. However, the SAC alleges **if Plaintiffs and other Class members knew that they would only be paid through the premature end of the first season, they would have sought other employment and residential opportunities following the breach and would not have risked their health**. *See* SAC at ¶ 67, 94-97. Plaintiffs and Class members did not sign a week to week contract with the league, the long-term security and length of their contracts was a material factor in their decision to sign with the AAF. *See* SAC at ¶ 20, 30,31.

81.     The SAC sets forth the who, what, when, where and how of Dundon's fraud perpetuated against Plaintiffs.

**ii.     The SAC pleads Dundon knew the statements to be false when he made them.**

82.     Dundon incorrectly represents to this Court there are no allegations in the SAC that Dundon knew the statements to be false when he made them. [Dkt. 94 at p. 18].The law is that a defendant must know the statement is false or act with reckless disregard of its truth or falsity. *Lazar v. Sup. Ct.,* 12 Cal. 4th 631, 638 (1996). Here, there are over five allegations Dundon knew his statements to be false when he made them contained within the SAC. In paragraph 69, Plaintiffs allege Dundon continually made knowingly false promises that he personally had provided the AAF a permanent financial solution. In Paragraph 176, Plaintiffs allege that due to his position with the AAF, Dundon had the ability to know the truth of his statements, which were in fact false.

83.     Further, the SAC alleges Dundon's representations were made recklessly without regard for the representations' truth in order to influence Plaintiffs and other Class members to continue playing additional weeks in the AAF, further testing the viability of the AAF's technology for the gain of Dundon and others but to the detriment of the players. *See* SAC at ¶¶ 76,152.

/ / /

### iii.      The SAC Pleads Dundon Directed Statements to Plaintiffs

84.      Next, Dundon incorrectly asserts there is no allegation Dundon directed his statements to any of the Plaintiffs. [Dkt. 94 at p. 18]. It is not required that Dundon have spoken directly to Plaintiffs. Fraud can be perpetuated by any means of communication intended to reach and influence the recipient. *Small v. Fritz Companies, Inc.*, 30 Cal.4th 167 (2003). Further, California Civil Code § 1711 states "one who practices a deceit with the intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, who is actually misled by the deceit."

85.      Here, the SAC alleges that on February 19, 2019, Dundon, with knowledge of the AAF's failure to meet its payroll obligations, went on a media tour intending to reach and influence Plaintiffs. *See* SAC at ¶ 69. Dundon's media campaign included a widely disseminated February 19, 2019 post-investment interview on a radio station in North Carolina that was later disseminated through the national media channels that Dundon knew or should have known would reach the players. *See* SAC at ¶ 70. Further, the SAC alleges Dundon's statements were made with the reasonable expectation that the statements would be heard by Plaintiffs and the other Class members and that Dundon's statements were made with the knowledge and understanding that Plaintiffs and other Class members would hear them. *See* SAC at ¶ 73.

### iv.      The SAC Pleads Sufficient Facts to Infer Dundon's "Intent" to Commit Fraud

86.      In an attempt to play both sides of the fence, Dundon argues there is no allegation Dundon intended to defraud Plaintiffs and then argues "Plaintiffs' allegations as to Dundon's alleged true motivation in the league for its technology is irrelevant." [Dkt. 94 at pp. 18-19]. Either there are no allegations of Dundon's intent, or the allegations are irrelevant, it cannot be both.

87.      Defendant must intend to induce the other party to act in reliance on the false information. California Civil Code. §1709. The relevant intent is to induce reliance, not to deceive. *Small v. Fritz Cos., Inc., 30 C. 4th 167, 173-174* (2003). Fraudulent intent is an issue for

the trier of fact to decide. *Beckwith v. Dahl,* 205 Cal. App. 4th 1039, 1061 (2012).

88.     Although the defendant's knowledge and intent may be alleged generally, simply alleging that Defendants possess fraudulent intent will not satisfy Rule 9(b). *Dorsey v. Portfolio v. Portfolio Equities, Inc.,* 540 F.3d 333, 339 (5th Cir. 2008). "The factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show the defendant's motive." *Solano v. Ali Baba Mediterranean Grill, Inc.,* No. 3:15-cv-0555-G, 2015 WL 7770893 at *3 (N.D. Tex. Dec. 3, 2015).

89.     Here, the SAC alleges Dundon made the statements with the intent to induce Plaintiffs' reliance and to quell Plaintiffs and other Class members' fears regarding the long-term viability of the league. *See* SAC at ¶¶ 69-73. The SAC further alleges Dundon's statements were made intending to influence Plaintiffs' and other Class members' decision to continue playing in the AAF versus quitting due to nonpayment. *Id.* Specifically, the SAC alleges Dundon's misrepresentations were designed to induce Plaintiffs to detrimentally alter their employment with the AAF to further Dundon's and Ebersol's scheme to keep the players in the league long enough to have proof of concept. *See* SAC at ¶ 77. The timing of Dundon's statements alone suggests his intent, along with the abrupt closure of the league, despite its positive ratings and positive trajectory.

90.     Further, the SAC gives the Court adequate factual background to infer fraudulent intent by illustrating Dundon's motive. Dundon possessed an opportunity and financial motive to mislead and defraud. *See* SAC at ¶ 160. Dundon is the majority owner of the Carolina Hurricanes of the National Hockey League, an exclusive league of 31 franchises. *See id.* Just six weeks following the AAF and MGM's historic deal to license the underlying technology to MGM, MGM and the National Hockey League announced a deal for the NHL to provide MGM access to the league's cutting-edge data that would unlock "innovative interactive fan engagement and betting opportunities." *See id.* The NHL and the AAF used similar player tracking technology that captured data, but the AAF's application took it a step further as it was a data capture manifestation device that allowed the data to be delivered off the field of play instantaneously to

users. *See id.* Owning the AAF allowed Dundon to financially benefit by controlling its underlying technology and possibly controlling the market regarding the NHL and all future applications of the technology. *See id.*

91.     Therefore, the SAC includes sufficient facts to infer Dundon intended to defraud Plaintiffs and the other Class members and to induce their reliance.

**v.          Plaintiffs Relied on Dundon's Statements to their Detriment.**

92.     Therefore, the SAC sets forth sufficient factual allegations to support a claim of fraud against Dundon.

93.     Actual reliance is shown if the misrepresentation substantially influences plaintiff's decision to act. *Whiteley v. Philip Morris Inc.,* 117 CA 4th 635, 678 (2004). The misrepresentation need not be the only, or even the predominant or decisive factor driving plaintiff's action. *Id.* A plaintiff's decision not to do something may satisfy the reliance element. *Small v. Fritz Cos.,* 30 C. 4th at 174 (citing REST. 2D TORTS §§ 525, 531). In cases involving concealment, the plaintiff must prove that, had the suppressed facts been disclosed, plaintiff would have acted differently. *Mirkin v. Wasserman*, 5. Cal. 4th 1082, 1093 (1993) (citing REST. 2D TORTS § 546).

94.     Whether a plaintiff justifiably relied is judged subjectively, not by a hypothetical "reasonable person" standard. *Blankenheim v. E.F. Hutton & Co., Inc.,* 217 Cal.App.3d 1463, 1474 (1990). "Except in the rare case where the undisputed facts leave no reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact. *Broberg v. Guardian Life Ins. Co. of America* 171 Cal.App.4th 912, 921 (2009); See also *Alliance Mortgage Co. v. Rothwell* 10 Cal.4th 1226, 1239 (1995).

95.     In *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996), the court held,

> a person who accepts at-will employment must decide to accept the inherent risk that such employment will be terminated without recourse, or that the terms of employment that led to acceptance of employment may be changed, a person has a legally protectable right to assess the risk of termination or change free of fraudulent misrepresentation or concealment of known factors that affect the

probability that employment will be terminated or its terms changed. Otherwise stated, a person who must decide whether to accept or continue employment should not be expected to accept the risk that adverse changes in the terms of employment are even though substantially likely to occur for reasons already known to the employer.

96.    Here, Plaintiffs allege **despite no longer having any contractual obligation to play in the AAF following the league's breach, after Plaintiffs and other Class members heard of Dundon's investment and his post-investment comments regarding his personal "permanent solution" from multiple sources in February 2019, Plaintiffs and the other Class members continued to play professional football in the AAF for additional weeks beyond the league's breach at risk of their physical health.** *See* SAC at ¶ 94. In support of these allegations, Plaintiffs and other Class members cite one example of reasonable reliance on Dundon's statements, to wit, on February 23, Plaintiff Northrup ruptured his ulnar collateral ligament during a game. *See* SAC at ¶ 97.

97.    **Further, relying on Dundon's personal assurances, representations, guarantees and conduct after the league's contractual breach, Plaintiffs and other Class members refrained from seeking alternative employment and residential opportunities.** *See* **SAC at ¶ 95**.

98.    Had Plaintiffs and Class members known of Ebersol's original scheme, which Defendant Dundon substantially furthered and assisted, Plaintiffs would not have foregone other financial opportunities and would not have subjected themselves to serious risk of physical har and actual physical harm. *See* SAC at ¶ 85. Had they known Dundon's intent was to fraudulently, deceptively, and pretextually acquire underlying Ebersol's fraudulently acquired intellectual property and/or technology from the league and then cease league operations, they would not have played in the additional weeks of the AAF, they would have sought other employment opportunities. *See* SAC at ¶ 166.

99.    The SAC sets forth sufficient factual allegations regarding reliance on Dundon's investment comments.

/ / /

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 24**

> **vi.** **If any claim for fraud or promissory fraud is held viable against Ebersol, the SAC pleads enough facts to state that Dundon was Ebersol's co-conspirator and aided and abetted Ebersol's fraud.**

100.     To support a conspiracy claim, a plaintiff must allege these elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct to further the conspiracy, and (3) damages arising from the wrongful conduct. *AREA II Cases,* 216 Cal. App. 4th 1004, 1021(2013).

101.     The basis for civil conspiracy is the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act. The conspiring defendants must also actually know that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose. *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995).

102.     In *Sindell v. Abbot Laboratories,* 26. Cal.3d 588, 605 (1980), the California Supreme Court determined whether a complaint stated a cause of action under Section 876 of the Restatement Second of Torts, and explained that "those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him."

103.     Express agreement is not necessary, and all that is required is that there be a tacit understanding. *Navarette v. Meyer*, 237 Cal. App. 4th 1276, 1286 (2015); *see also Mayhugh v. County of Orange,* 141 Cal. App. 3d 763, 768 (1983) ("civil liability of aiding and abetting commission of a tort has no overlaid requirement of an independent duty but focuses on whether a defendant knowingly gave substantial assistance to someone who performed "wrongful conduct.").

104.     Here, the SAC alleges that from the inception of the league, Ebersol, through the AAF, planned to use the AAF as an avenue to license the data technology of the league to other sports leagues, sports betting outlets, and non-sports businesses and had no intention of operating a legitimate developmental football league. *See* SAC at ¶ 23. From the beginning of the league, the AAF needed players to test the application's efficiency. *Id.*

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S
MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 25**

105.    In an effort to induce Plaintiffs and other Class members to sign Form Contracts with the AAF and to continue playing in the AAF, Ebersol held out the AAF as a legitimate league that would provide each Plaintiff and Class member a potential path as a future NFL player. *See* SAC at ¶ 140. Despite these representations to Plaintiffs and other Class members, Ebersol knew the true purpose of the league was always a technology business whose prized asset was the back-end technology and that the players were not the focus but instead a means to prove the effectiveness of the technology. *See* SAC at ¶ 142.

106.    The SAC alleges Dundon knew of, participated in, and furthered Ebersol's fraudulent scheme perpetrated on Plaintiffs and the other Class members. *See* SAC at ¶ 181. Specifically, Dundon knew the AAF was a technology business and not a legitimate football league. *See* SAC at ¶ 58. With Dundon's alleged long-term (and actual short-term) investment in the AAF and corresponding statements, Dundon substantially assisted Ebersol in Ebersol's plan to use the AAF as a technology business rather than a professional football league. *See id.*

107.    Defendant Dundon knew of and took specific steps to further Ebersol's plans to use the AAF as a technology business, including furthering Ebersol's false narrative that the AAF was an actual developmental league. *See id.*  With his investment in the AAF, Dundon engaged in, co-conspired, and aided and abetted Ebersol's fraudulent scheme of masking the AAF as a developmental football league when in reality it was always a technology business established to use players as lab rats to test the technology. *See* SAC at ¶ 62.

108.    Dundon's comments were misrepresentations/concealed material facts and were designed to induce Plaintiffs and other Class members to detrimentally alter their position regarding their employment with the AAF to further Dundon's and Ebersol's scheme to keep the players in the league long enough to have proof of concept. *See* SAC at ¶ 77. As a result, Plaintiffs were wrongfully harmed. See SAC at ¶¶ 85-98.

109.    Therefore, to the extent a cause of action for fraud is viable against Ebersol, Dundon's motion to dismiss should be denied; Dundon co-conspired, aided, abetted and co-conspired with Ebersol to defraud Plaintiffs and other Class members.

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 26**

**d. The SAC Pleads Sufficient Facts to State a Claim for Promissory Fraud against Dundon.**

110.    "The elements of promissory fraud (i.e., of fraud or deceit based on a promise made without any intention of performing it) are: (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise." *Behnke v. State Farm General Ins. Co.*, 196 Cal. App. 1443, 1453 (2011). One of the definitions of "a deceit" under California Civil Code § 1710 states a "**promise, made without any intention of performing it**."

111.    In *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996),  a plaintiff, who had been terminated from a management position with the defendant/employer, sued, alleging, among other claims, that defendant had induced him to relocate from New York to Los Angeles with his family, and to relinquish a secure job as the president of the family company where he had worked all of his life, based on verbal representations of continued employment, the company's strong financial base, and pay raises, all of which were false and which defendant's agents knew to be false when making them. The court further held that a claim for promissory fraud does not depend upon whether the defendant's promises were ultimately enforceable as a contract because tort actions may lie even by at-will employees. *Id.* at 639; *see also Lenk v. Total-Western, Inc.*, 89 Cal. App. 4th 959 (2001) (misrepresentations related to the financial stability of a company, the company's future plans to relocate its operations, and the job applicant's promotion in the corporate ranks were enough to state a cause of action for promissory fraud).

112.    Like in *Lazar,* Plaintiffs here forwent other financial opportunities, risked physical harm and actually damaged their health based *in part* on Dundon's verbal representations of the AAF strong financial base, the security of his investment, and the fact that his money was in the bank. *See* SAC ¶¶ 85-98.

/ / /

113.     *Moncada v. West Coast Quartz Corp*., 221 Cal.App.4th 768 (2013), involved a claim by former employees of a company against both the employing entity and ***its former owners in their individual capacity***. The owners were in the process of selling the business and wanted the employees to keep working until the completion of the sale. To that end, the owners repeatedly represented to the employees that so long as they continued to remain working for the company, they would be paid a retirement bonus. Plaintiffs alleged that in reliance on these representations, they remained on the job and did not seek alternative employment. Following the sale, the owners did not pay the bonus. The employees thereafter brought a series of causes of action against the owners, including causes of actions for promissory fraud, and promissory estoppel. The trial court sustained demurrers to these and other causes of action. The court of appeal reversed as to the claims for breach of contract, fraud, and promissory estoppel.

114.     With respect to the fraud count the appellate court explained,

> Plaintiffs' allegations, if true, would establish all the elements of promissory fraud. ...,
> plaintiffs allege that, in order to induce them to continue to work... until the company sold,
> defendants intentionally represented to plaintiffs that defendants would pay plaintiffs a bonus
> at the time of the sale that would be sufficient for plaintiffs to retire. Plaintiffs further allege
> that defendants' representations were false, in that defendants intended to pay them a
> nominal bonus (or no bonus at all) at the time of sale. Plaintiffs allege they justifiably relied
> on the representations, because defendants repeatedly assured them of the bonus. Plaintiffs
> further allege they did not seek alternative employment or residential opportunities and
> remained at West Coast because of the promise of the bonus. These allegations adequately
> state a cause of action for promissory fraud as traditionally understood.

115.     This Court has distinguished *Moncada* from the case at bar because (1) the representations made in Moncada were made directly from the employer to the employees in *Moncada* and (2) the Defendants in *Moncada* were the direct employers of the employees in *Moncada.* However, the allegations contained within the SAC are factually similar to those alleged in *Moncada.*

116.     To address this Court's first concern that unlike the misrepresentations in *Moncada* Dundon's comments were not made directly to Plaintiffs, California law does not require that Dundon have spoken directly to Plaintiffs. Fraud can be perpetuated by any means of

communication intended to reach and influence the recipient. *Small v. Fritz Companies, Inc*, 30 Cal.4th 167 (2003); See also California Civil Procedure Code § 1711.

117.    To address this Court's second concern that Dundon was not the direct employer of Plaintiffs, Plaintiffs note that the *Moncada* court held that the *Moncada* plaintiffs' cause of action for promissory fraud was sufficient to support a promissory fraud claim against the **individual owners of the company**. Further, to maintain a tort claim against a corporation's board member in his personal capacity, a plaintiff must show that the individual specifically authorized, directed or participated in the allegedly tortious conduct. *Frances T. v. Village Green Owners Assn.,* 42 Cal.3d 490, 508 (1986).  Here, Dundon had assumed control of the AAF as chairman of the board at the time he made his knowingly false statements on the radio waves on February 19, 2019. *See* SAC ¶ 64,69.

118.    The factual allegations in Plaintiffs' SAC set forth sufficient facts to state a claim to relief for false promises (also known as promissory fraud) against Dundon. For many of the same reasons in the above analysis for fraud and promissory estoppel, the SAC alleges that Dundon made promises that he personally had **provided** the AAF a permanent financial solution inferring like in *Moncada*, so long as Plaintiffs show up to work, they would receive the benefits of their contract (i.e. payment for the entire 3 year term). *See* SAC ¶ 175. When Dundon made his promises, Dundon had no intention of performing because he was after the technology business being propped up as if it was a legitimate football league. *See* SAC ¶ 180. Dundon made knowingly false misrepresentations to induce Plaintiffs and other Class members to detrimentally alter their position regarding their employment with the AAF, specifically like in *Moncada, that they do not seek alternative employment opportunities*. *See* SAC at ¶ 77. After the missed payroll, Plaintiffs made a justified substantial change of position by act and forbearance in reliance on Dundon's representations. *See* SAC at ¶¶ 85-98. Dundon did not provide the league a permanent solution like he promised, as Dundon caused the league to end prematurely on April 2, 2019. *See* SAC at ¶ 99. As a result, Plaintiffs and other Class members were substantially harmed by playing football in the AAF, including but not limited to concussions, an increased

risk of CTE, and foregone opportunities of other employment. *See* SAC at ¶ 98.

119.    Therefore, the SAC sets forth sufficient factual allegations to support a claim of promissory fraud against Dundon.

**V.      LEAVE TO AMEND TO FILE THE THIRD AMENDED COMPLAINT**

120.    The Court should deny Dundon's Motion for all the foregoing reasons, but in an abundance of caution, if the Court considers the Motion to have merit, Plaintiffs respectfully request leave to amend their pleadings.

**VI.     CONCLUSION**

121.    For all these reasons, Plaintiffs respectfully request the Court deny Dundon's Motion in its entirety.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Dated: March 30, 2020

Respectfully submitted,

*/s/ Jonathon Farahi, Esq.*

**Boris Treyzon** (CA SBN 18893)
**Jonathon Farahi** (CA SBN 324316)

**Abir Cohen Treyzon Salo, LLP**
16001 Ventura Boulevard, Suite 200
Encino, California 91436
Phone: (424) 288-4367
Fax: (424) 288-4368
btreyzon@actslaw.com
jfarahi@actslaw.com

-and-

**Katharine Battaia Clark**
Texas State Bar No. 24046712

Nicole L. Williams
Texas State Bar No. 24041784

**Thompson Coburn LLP**
1919 McKinney Avenue, Suite100
Dallas, Texas 75201
Phone: (972) 629-7100
Fax: (972) 629-7171
KClark@ThompsonCoburn.com
NWilliams@ThompsonCoburn.com

**COUNSEL FOR PLAINTIFFS COLTON SCHMIDT AND REGGIE NORTHRUP, INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED**

## CERTIFICATE OF SERVICE

I hereby certify that, on the 30th day of March, 2020, a true and correct copy of the foregoing pleading has been served electronically via the Court's ECF filing system on those parties who receive notice from that system, with a courtesy copy by email to the below service list.

AFF Players, LLC
c/o Randolph N. Osherow, Esq.
342 W. Woodlawn Avenue, Suite 100
San Antonio, TX 78212
rosherow@hotmail.com

AAF Properties, LLC
c/o Randolph N. Osherow, Esq.
342 W. Woodlawn Avenue, Suite 100
San Antonio, TX 78212
rosherow@hotmail.com

Ebersol Sports Media Group, Inc.
c/o Randolph N. Osherow, Esq.
342 W. Woodlawn Avenue, Suite 100
San Antonio, TX 78212
rosherow@hotmail.com

Legendary Field Exhibitions, LLC
c/o Randolph N. Osherow, Esq.
342 W. Woodlawn Avenue, Suite 100
San Antonio, TX 78212
rosherow@hotmail.com

Randolph N. Osherow, Esq.
342 W. Woodlawn Avenue, Suite 100
San Antonio, TX 78212
rosherow@hotmail.com

Brian S. Engel, Esq.
Barrett Daffin Frappier Turner & Engel
3809 Juniper Trace, Suite 205
Austin, TX 78738
brianen@bdfgroup.com

Jeffrey S. Lowenstein, Esq.
Alana K. Ackels, Esq.
Brent D. Hockaday, Esq.
Brent A. Turman, Esq.
Bell Nunnally & Martin
2323 Ross Avenue, Suite 1900
Dallas, TX 75201
jlowenstein@bellnunnally.com
aackels@bellnunnally.com
bhockaday@bellnunnally.com
bturman@bellnunnally.com

Jason I. Bluver, Esq.
Leila S. Narvid, Esq.
Payne & Fears LLP
235 Pine Street, Suite 1175
San Francisco, CA 94104
jjib@paynefears.com
ln@paynefears.com

William N. Radford, Esq.
Aaron B. Michelsohn, Esq.
Thompson, Coe, Cousins & Irons, LLP
700 N. Pearl Street, 25th Floor
Dallas, TX 75201-2832
wradford@thompsoncoe.com
amichelsohn@thompsoncoe.com

*/s/ Jonathon Farahi, Esq.*
Jonathon Farahi (CA SBN 324316)

**PLAINTIFFS' OPPOSITION TO DEFENDANT THOMAS DUNDON'S MOTION TO DISMISS SECOND AMENDED COMPLAINT – Page 32**