UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| IN RE: | CASE NO.: 19-50900-cag |
| LEGENDARY FIELD EXHIBITIONS, LLC, et. al. | CHAPTER 7 |
| DEBTORS. | |
| COLTON SCHMIDT, et. al., | |
| PLAINTIFFS, | ADV. PROC. NO. 19-05053-cag |
| v. | JUDGE CRAIG A. GARGOTTA |
| AAF PLAYERS, LLC, et. al., | |
| DEFENDANTS. | |

**RESPONSE TO JOINT MOTION TO
(1) PRELIMINARILY APPROVE THE SETTLEMENT AGREEMENT;
(2) GRANT CLASS CERTIFICATION PURSUANT TO SETTLEMENT AGREEMENT;
(3) APPOINT CLASS COUNSEL AND CLASS REPRESENTATIVES PURSUANT TO SETTLEMENT AGREEMENT; (4) APPROVE THE FORM AND MANNER OF NOTICE TO CLASS MEMBERS; (5) SET A DEADLINE FOR OBJECTIONS TO THE SETTLEMENT; AND (6) SCHEDULE A HEARING FOR THE
<u>FINAL CONSIDERATION AND APPROVAL OF THE SETTLEMENT</u>**

TO THE HONORABLE CRAIG A. GARGOTTA, UNITED STATES BANKRUPTCY JUDGE

**COME NOW,** Thomas G. Dundon ("Dundon") and Dundon Capital Partners ("DCP), creditors and parties in interest herein, who file this their Response to Joint Motion to (1) Preliminarily Approve the Settlement Agreement; (2) Grant Class Certification Pursuant to Settlement Agreement; (3) Appoint Class Counsel and Class Representatives Pursuant to Settlement Agreement; (4) Approve the Form and Manner of Notice to Class Members; (5) Set a Deadline for Objections to the Settlement; and (6) Schedule a Hearing for the Final Consideration

and Approval of the Settlement ("Response"), wherein they oppose the Joint Motion to (1) Preliminarily Approve the Settlement Agreement; (2) Grant Class Certification Pursuant to Settlement Agreement; (3) Appoint Class Counsel and Class Representatives Pursuant to Settlement Agreement; (4) Approve the Form and Manner of Notice to Class Members; (5) Set a Deadline for Objections to the Settlement; and (6) Schedule a Hearing for the Final Consideration and Approval of the Settlement (the "Motion")(Doc. 175).

**TABLE OF CONTENTS**

I. SUMMARY .................................................................................................................. 1

II. RELEVANT FACTUAL BACKGROUND .............................................................. 1

III. ARGUMENTS AND AUTHORITIES ..................................................................... 3

    A. Legal Standard ................................................................................................ 3

    B. The Settlement is Improperly Designated as a Priority Wage Claim. ........ 4

        *1. Priority Wage Claims Are Claims Against the Estate For Labor Actually Performed—The Players Are Not Entitled To Priority Claims For The Final Two Weeks of The First Season.* ................................................................ 4

        *2. The League Compensated Plaintiffs for All Work Performed.* ................. 5

        *3. The SPAs Are Not Guaranteed Money Contracts and the Players Are Not Entitled to General Unsecured Claims Beyond the First Season.* ............ 6

        *4. By Approving the Settlement, the Court Would Prejudice Other Creditors By Diluting Their Valid Claims.* ................................................................... 7

    C. Mr. Ebersol's Inclusion in the Settlement Does Not Promote the Integrity of the Judicial System. .......................................................................................... 9

    D. Even if the Court Grants Conditional Certification For the Settlement Class, that Determination Has No Effect on Dundon or the Claims Asserted Against Dundon. ............................................................................................................ 11

PRAYER ................................................................................................................... 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alabama Football, Inc. v. Wright*,
   607 F.2d 1004 (5th Cir. 1979) ...................................................................................6, 7

*In re Cardinal Indus., Inc.*,
   160 B.R. 83 (Bankr. S.D. Ohio 1993) ............................................................................4

*Casimir Czyzewski, et. al. v. Jevic Holding Corp., et. al.*,
   137 S. Ct. 973 (2017) .....................................................................................................8

*In re Derosa-Grund*,
   567 B.R. 773 (Bankr. S.D. Tex. 2017) ..............................................................3, 4, 9, 11

*In re Golden Gate Cmty. Health*,
   577 B.R. 567 (Bankr. N.D. Cal. 2017) ..........................................................................4

*In re Idearc, Inc.*,
   442 B.R. 513 (Bankr. N.D. Tex. 2010) .........................................................................4

*Lee v. Midland Cty.*,
   No. 08-00-00184-CV, 2001 WL 92374 (Tex. App.—El Paso Jan. 25, 2001) ..........10

*Matson v. Alarcon*,
   651 F.3d 404 (4th Cir. 2011) .....................................................................................4, 5

*In re Myer*,
   197 B.R. ..........................................................................................................................5

*Parker v. Bell Helicopter Co.*,
   78 F.R.D. 507 (N.D. Tex. 1978) ..................................................................................11

*Rooney v. EZCORP, Inc.*,
   330 F.R.D. 439 (W.D. Tex. 2019) ...............................................................................11

**Statutes**

11 U.S.C. § 502(b)(7) ...........................................................................................................7

11 U.S.C. § 507(a)(4)(A) ......................................................................................................4

11 U.S.C. § 510 .....................................................................................................................8

28 U.S.C. § 157(b)(2)(A) ......................................................................................................3

Bankruptcy Code section 507(a)(4)… ..............................................................................4, 5

**Other Authorities**

Black's Law Dictionary .......................................................................................................4

FED. R. BANKR. P. 9019 .................................................................................................3, 6

Federal Rules of Civil Procedure Rule 23 .......................................................................11

3 NORTON BANKR. L. & PRAC. 3d § 49:45 (2010) ..........................................................4

## I. SUMMARY

The Court should reject the proposed settlement agreement between Plaintiffs Colton Schmidt, Reggie Northrup, individually, and on behalf of those similarly situated (collectively, "Plaintiffs"), the Trustee, and Charles Ebersol (Plaintiffs, the Trustee, and Mr. Ebersol collectively, the "Settling Parties") because it grants non-existent priority rights to Plaintiffs while subrogating the rights of creditors Dundon and DCP. In addition, the proposed settlement's inclusion of Mr. Ebersol, who appears to be included only to provide potentially favorable testimony against third parties to the proposed settlement agreement on behalf of the Trustee in a potential future litigation, is improper because it does not promote the integrity of the judicial system. Accordingly, these issues make the Trustee's proposed settlement not "fair, equitable, and in the best interest of the estate," and Dundon and DCP ask the Court to reject the proposed settlement.

## II. RELEVANT FACTUAL BACKGROUND

1. On April 10, 2019, Plaintiffs sued Defendants Dundon; Ebersol; AAF Players; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; and Legendary Field Exhibitions, LLC (collectively, "Defendants") in the Superior Court of California in San Francisco County, California.

2. In June 2019, Dundon and DCP filed proofs of claim against the now defunct entities that comprised of the AAF, totaling $70,000,000.00. *See* Case No. 19-50900-cag, Claim# 187-188; Case No. 19-50902-cag, Claim# 20-21, Case No. 19-50906-cag, Claim# 3-4; Case No. 19-50905, Claim#8-9; Case No. 19-50903-cag, Claim# 9-10. The following month, the lead plaintiffs filed a Class Proof of Claim in the Bankruptcy Proceeding for $673,920,000.00. *See*

Case No. 19-50900-cag, Claim # 214. To date, Dundon, DCP, and Plaintiffs are the largest creditors of the bankruptcy estate and make up the vast majority of the total claims.

3. Dundon timely removed this case to the United States District Court for the Northern District of California, San Francisco Division. On September 6, 2019, the United States District Court for the Northern District of California transferred the case to the U.S. District Court Western District of Texas, San Antonio Division. Two weeks later, the Western District Court referred the case to this Court. Case No. 5:19-cv-01080-FB, ECF No. 32.

4. Following the transfer, Dundon and Mr. Ebersol filed a series of motions to dismiss the allegations Plaintiffs asserted against them. *See* Case No. 19-05053 ("Adv.") ECF Nos. 29, 38-40, 46, 94. After multiple pleading amendments and hearings on subsequent motions to dismiss, the Court entered rulings that left the following claims against the following parties:

- Trustee and estate entities: breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, California Business and Professions Code, fraud, and promissory fraud;

- Charles Ebersol: promissory estoppel, fraud, and promissory fraud; and

- Thomas G. Dundon: fraud and promissory fraud.

*Compare* Adv. ECF No. 87 *with* Nos. 81, 82, 128.

5. In addition, the Trustee filed a comprehensive objection to the class claim. Among other things, the Trustee pointed out the contracts that form the basis of Plaintiffs' claims are not guaranteed money contracts; meaning, they pay the players for only the work the players actually performed.[1]

---

[1] The SPA provides: "If the SPA is terminated after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation having become due and payable up to the time of the termination." Case No. 19-50900-cag, Dkt. No. 424 at ¶ 26.

**RESPONSE TO JOINT MOTION FOR PRELIMINARY**      Page 2
**APPROVAL OF CLASS ACTION SETTLEMENT**

6. The parties then commenced phased class discovery after the court rendered its decisions on the pre-discovery motions.

7. In July 2021, the Settling Parties attempted to enter into a settlement to resolve the claims between and among them, which is the focus of this Response.

8. As part of that agreement, the Trustee purports to pay each of the purported class members nearly $14,000.00 as a priority wage claim and subrogate the remainder of the payments under the contracts as unsecured claims. *See* Adv. ECF No. 175, ¶ 29(d)(i).

9. In addition, the Trustee is paying for Mr. Ebersol's release in exchange for what appears to be general cooperation and future testimony as a witness in future litigation against third parties to this settlement. *See* Case No. 19-50900-cag, Dkt. No. 424, ¶ 46(j).

### III. ARGUMENTS AND AUTHORITIES

**A. Legal Standard**

"This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because its resolution affects the administration of the Debtor's bankruptcy estate." *In re Derosa-Grund*, 567 B.R. 773, 780 (Bankr. S.D. Tex. 2017). Rule 9019 of the Federal Bankruptcy Rules of Procedure governs it and it could arise only in the context of a bankruptcy case. *See Id.* at 780–81. For the Court to approve a compromise or settlement in bankruptcy proceedings, the Trustee must file a motion and seek approval from the Court. FED. R. BANKR. P. 9019.

The Trustee bears the burden of showing the settlement is "fair, equitable, and in the best interest of the estate." *Derosa-Grund*, 567 B.R. at 784 (quoting *In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008)). In making this determination, the Court considers: (1) probabilities of ultimate success if the claims are litigated; (2) complexity, expense, and likely duration of claims; (3) difficulties of collecting a judgment from such litigation; and (4) "all other factors

relevant to a full and fair assessment of the wisdom of the compromise." *Id*. at 784 (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424 (1968)).[2]

**B.     The Settlement is Improperly Designated as a Priority Wage Claim.**

> ***1.     Priority Wage Claims Are Claims Against the Estate For Labor Actually Performed—The Players Are Not Entitled To Priority Claims For The Final Two Weeks of The First Season.***

11 U.S.C. § 507(a)(4)(A) gives priorities for claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay **earned** by an individual." § 507(a)(4) (emphasis added). That specific section gives priority status to amounts earned as compensation in the 180 days preceding bankruptcy. *See Matson v. Alarcon*, 651 F.3d 404, 409 (4th Cir. 2011) (discussing what it means to "earn" compensation for purposes of § 507(a)(4) priority treatment). The Bankruptcy Code does not define the term "earn," but "Black's Law Dictionary defines it as '[t]o acquire by labor, service, or performance … [t]o do something that entitles one to a reward or result….'" *In re Idearc, Inc.*, 442 B.R. 513, 520 (Bankr. N.D. Tex. 2010) (quoting Black's Law Dictionary 584 (9th ed. 2009)). Generally, an "employee earns wages within the meaning of Code § 507(a)(4) at the time that the services are performed…." 3 Norton Bankr. L. & Prac. 3d § 49:45 (2010); *In re Golden Gate Cmty. Health*, 577 B.R. 567, 570 (Bankr. N.D. Cal. 2017); *see, e.g., In re Cardinal Indus., Inc.*, 160 B.R. 83, 85 (Bankr. S.D. Ohio 1993) (finding that "the focus [on timing] should be upon the time the individual performed the services …"). Wages are earned "when the work was performed," not some other point in time. *See in re Idaerc, Inc.*, 442 B.R. at

---

[2] The Fifth Circuit looks to the following when assessing the fourth factor: (a) "paramount interest of creditors with proper deference to their reasonable views," (b) "extent to which proposed settlement is product of arms-length negotiations," (c), "whether the proposed settlement is with an insider," and (d) "whether the proposed settlement promotes the integrity of the judicial system." *Derosa-Grund, 567 B.R.* at 784-85 (citations omitted).

**RESPONSE TO JOINT MOTION FOR PRELIMINARY**                                                                                                      **Page 4**
**APPROVAL OF CLASS ACTION SETTLEMENT**

520; *see also Matson*, 651 F.3d at 408 (finding the triggering event permitting an employee to receive wages, salaries, or commissions was the employee's performance of their work).

In *In re Myer*, a sales representative argued he was entitled to commissions for work he *could have* performed under an Exclusive Sales Representative Agreement. 197 B.R. 875, 876 (Bankr. W.D. Mo. 1996). He was unable to obtain those commissions because the counterpart to the agreement filed for bankruptcy. In the lawsuit, the sales representative "[made] no allegation[] that he performed services for the Debtors that give rise to the earnings." *In re Myer*, 197 B.R. at 877. The bankruptcy court noted that "analysis of when the right to a § 507(a)(3) priority arises focuses on the time the individual **performed** the services giving rise to the right to the commissions." *Id.* (emphasis in original). There, the sales representative improperly attempted to claim priority "not for commissions earned and unpaid, but rather for commissions he never had a chance to earn…." *Id.* The court correctly found the sales representative did not perform services, and therefore he did not earn the "lost commissions." *Id.* Therefore, he was not entitled to priority under the Bankruptcy Code. *Id.*

2. *The League Compensated Plaintiffs for All Work Performed.*

The Settling Parties argue the purported class members are entitled to "[a]n allowed claim for $13,650.00 entitled to priority under Bankruptcy Code section 507(a)(4)…." Adv. ECF. No. 175 ¶ 29. However, the Trustee was correct when he earlier argued "Claimants['] claim is not entitled to priority treatment under 507(a)(4)." Case No. 19-50900-cag, Dkt. No. 270, Am. Trustee's Obj. to Claim No. 214-2 of Colton Schmidt and Reggie Northrup at 7.

Here, it is undisputed the potential class members did not perform—nor did they have the opportunity to perform—services during weeks 9 and 10 of the football season. Plaintiffs' own allegations confirm this point. *See* Adv. ECF No. 87, Second Am. Class Action Complaint at ¶ 99

(on April 2, 2019, the AAF suspended operations immediately and "discontinue[d] games"); Case No. 19-50900-cag, Dkt. No. 424, App. to Compromise and Settle Pursuant to Fed. R. Bankr. P. 9019 at 4 n.4 (explaining Plaintiffs *would have become entitled* to receive ten installments, but received only eight). Plaintiffs argue they were prepared to perform services, *see id.* at 102 (alleging that Plaintiffs "stood ready to perform"), but they did not. Because Plaintiffs did not play football during those weeks, they did not "earn" any wages. *See* Case No. 19-50900, Dkt. No. 424 at ¶ 14 ("With two weeks remaining in the AAF's season," football operations were suspended); *see also* Case No. 19-50900-cag, Dkt. No. 270, Trustee's Obj. at 7 (noting that the California Labor Code claim fails "because no earned wages were due and unpaid at the time of discharge"), ¶ 144 ("When the league suspended operations, there was no compensation due to either of them that was then earned but unpaid"), ¶ 153 ("Schmidt and Northrup admit that they are not entitled to any compensation for their services performed pre-petition").

### 3. *The SPAs are Not Guaranteed Money Contracts and the Players Are Not Entitled to General Unsecured Claims Beyond the First Season.*

Plaintiffs are also not entitled to funds beyond the first season. As the Trustee explained in prior filings, the underlying player contracts involved divisible obligations. These contracts did not guarantee compensation, and the AAF had sole discretion to terminate based on a variety of reasons. Upon termination, the player's compensation would be reduced to only the amount due upon the time of termination.

In *Alabama Football, Inc. v. Wright*, the U.S. District Court for the Northern District of Texas addressed a similar situation. There, a former Dallas Cowboy, Rayfield Wright, signed a contract to play for the World Football League franchise based in Birmingham, Alabama. 452 F. Supp. 182, 183 (N.D. Tex. 1977). Under the contract, Wright would receive a signing bonus, a reporting bonus, and annual salary for the first three football seasons. *Id.* Alabama Football, Inc.

quickly filed for bankruptcy. *Id.* Wright then argued he was entitled to recover the reporting bonus and unpaid salary under his contract. *Id.* at 184.

In the face of Wright's argument that the contract should be treated as a lump sum, the trial court found the contract included five independent financial agreements. *Id.* at 185. At the time the football league failed and disbanded, both parties were discharged from further legal obligations, and therefore the team was not required to pay the reporting bonus or salary for games he did not play. *Id.* at 185. The Fifth Circuit affirmed the district court's decision. *Alabama Football, Inc. v. Wright*, 607 F.2d 1004 (5th Cir. 1979).

Similarly, the SPAs here listed salary for the first three seasons with no guarantees. There is no evidence before the Court showing Schmidt, Northrup, or any of the more than 400 football players, at the time of contracting, intended the risk of the AAF's financial failure and disbanding would be solely undertaken by the AAF.

Moreover, 11 U.S.C. § 502(b)(7) limits damages arising "from the termination of an employment contract" to one year following the earlier of the petition filing or "the date the employer directed the employee to terminate, or such employee terminated, performance under such contract," "plus any unpaid compensation due under such contract, without acceleration, on the earlier of such dates." The league and termination of the contracts occurred April 2019. Accordingly, the settlement's proposal of running claims through the third year is not viable.

    4.    ***By Approving the Settlement, the Court Would Prejudice Other Creditors By Diluting Their Valid Claims.***

Granting approval of the settlement is problematic because it allows Plaintiffs to leapfrog over other creditors because of the proposed priority status when they are not entitled to priority under the law. While it is generally appropriate for some claims to take priority over others in the bankruptcy context, as explained above, Plaintiffs did not prove they are even entitled to a priority

claim. The proposed settlement involuntarily alters the priority of Dundon's and DCP's claims by subordinating them to that of the players unilaterally. While there are provisions in the Bankruptcy Code that address equitable subordination, *see* 11 U.S.C. § 510, claim priority is defined by the statute and the Supreme Court has been critical of end-runs around priority. *See Casimir Czyzewski, et. al. v. Jevic Holding Corp., et. al.*, 137 S. Ct. 973 (2017) (holding "a bankruptcy court may not approve a structured dismissal of a Chapter 11 case that provides for distributions that do not follow the Bankruptcy Code's ordinary priority rules without the affected creditors' consent.").

Further, it would be inequitable and prejudicial to other creditors if the Court awards Plaintiffs a general claim for amounts Plaintiffs allege they are owed under years two and three of the SPAs. As explained above, the SPAs were not guaranteed money contracts, and Plaintiffs did not provide any services or labor in the second or third years of the contract. Moreover, the evidence before the Court demonstrates at least some of the potential class members took advantage of other opportunities, thus mitigating any alleged damages if such damages existed.[3] With the bankruptcy estate's admitted limited funds, granting the Motion and gifting Plaintiffs these priority and general claims (which total over $5,600,000.00) are unsupported by the evidence and the law, prejudices other creditors, including DCP and Dundon. *See* Case No. 19-50900-cag, Dkt. 424, p. 23, n. 28.

Accordingly, because the Trustee has strong probability of ultimate success on claims related to payments under the contract and subrogating the claims of Dundon and DCP is effectively subrogating the interest of third party creditors to Plaintiffs and giving them a non-

---

[3] For example, both Schmidt and Northrup sought and obtained employment with XFL teams. At least 17 other individuals in the potential class are reported to have found their way to NFL rosters by September 4, 2019. *See* Case No. 19-50900-cag, Dkt. No. 270 at ¶ 122.

**RESPONSE TO JOINT MOTION FOR PRELIMINARY**            **Page 8**
**APPROVAL OF CLASS ACTION SETTLEMENT**

existent priority right, the Trustee failed to meet his burden and the Court should reject the settlement. *See Derosa-Grund*, 567 B.R. at 785-90.

**C.    Mr. Ebersol's Inclusion in the Settlement Does Not Promote the Integrity of the Judicial System.**

Mr. Ebersol's role in the settlement is the least justified. Mr. Ebersol provides no funds to Plaintiffs, nor does he forego any of his rights. Instead, Mr. Ebersol purports to:

> [P]rovide to the Trustee all information known to him relevant to any claims the Trustee may have or bring against third parties and to cooperate and make himself available to the Trustee and the Trustee's representatives in connection with the Trustee's administration of the Debtor's bankruptcy estate. In exchange, the Trustee will covenant and agree that while any Bankruptcy Case is open, the Trustee will not directly or indirectly commence any action against Ebersol on account of any of the Settlement Cass Assigned Claims or any other claims against Eberson arising out of his involvement as a director, manager, or employee, as the case may be, with any Debtor. At such time as the last Bankruptcy Case is closed, provided Ebersol is not in default, the Trustee will release Ebersol of and from any such claims or suits.

*See* Case No. 19-50900-cag, Dkt. No. 424 ¶ 46 (j).

Mr. Ebersol's role in the proposed settlement is to offer "cooperation" to the Trustee in exchange for the Trustee paying his settlement amount to Plaintiffs for his dismissal from this case, the Plaintiffs releasing claims against Mr. Ebersol, and a future release of claims the Trustee could bring against Mr. Ebersol. This proposed settlement leaves open the possibility of Mr. Ebersol—the perpetrator of a majority of the allegations of Plaintiffs—to effectively become a "pre-paid" witness in a potential future case against third parties, including Dundon and DCP. *See generally*, Adv. ECF No. 87, Second Am. Class Action Complaint at ¶¶ 19-53. Among other things, Plaintiffs accuse Mr. Ebersol of:

- Creating and developing the entire league as a farce under the pretense of a "developmental football league";
- Making multiple misrepresentations to induce players into joining the league and signing contracts between September and January 2019, which foreclosed them of the opportunity to play for any league other than the National Football League; and
- Making further misrepresentations during the league training camp that the league was financially viable to last the three-year length of their contracts, the NFL invested $200,000,000.00 into the league, and promise of additional revenue from bets placed as part of the gambling application.

*See id*. ¶¶ 24, 29-33, and 38-45.

Mr. Ebersol provides no consideration in exchange for the release and protection he receives from these claims Plaintiffs allege are worth nearly $700,000,000.00, meaning there is no valid agreement. *See Lee v. Midland Cty.*, No. 08-00-00184-CV, 2001 WL 92374, at *3 (Tex. App.—El Paso Jan. 25, 2001) (not reported) (finding a court order that gave retirees dental and health insurance for free and did not impose any burden on retirees lacked consideration and, therefore, was not an enforceable contract).[4] As presented currently, the Trustee has the discretion to determine whether Mr. Ebersol complies with his "bargain" and effectively earned a release.

---

[4] The Texas Rules of Disciplinary Conduct address the issue of paid testimony in a civil settlement. *See* TEX. DISP. R. PROF'L. COND. 3.04(b) ("A lawyer shall not . . . pay, offer to pay, or acquiesce in the offer or payment of compensation to a witness or other equity contingent upon the content of the testimony of the witness or outcome of the case."). Dundon makes no allegations against any attorneys in this case and wants to be clear on that point. Dundon only brings this to the Court's attention because approval could be problematic if the founder of the league, Mr. Ebersol, who is currently being sued in a class action litigation that totals nearly $700,000,000.00 (acknowledging liability could be split among multiple parties), receives a release from any liability or obligation to pay any portion of a potential damages sum without providing valid consideration, and then testifies in subsequent proceedings against third parties who are perceived to have funds to defend such claims.

**RESPONSE TO JOINT MOTION FOR PRELIMINARY**                 **Page 10**
**APPROVAL OF CLASS ACTION SETTLEMENT**

Accordingly, because this settlement does not promote the integrity of the judicial system, the Trustee failed to meet his burden, and the Court should reject the settlement agreement. *See Derosa-Grund*, 567 B.R. at 785-90.

**D.    Even if the Court Grants Conditional Certification For the Settlement Class, that Determination Has No Effect on Dundon or the Claims Asserted Against Dundon.**

To the extent the Court grants conditional certification for the purported settlement class, that certification applies to only the claims between and among the Settling Parties. Any related finding should have no binding effect on Dundon or the claims asserted against him. Dundon affirmatively contests the settlement to the extent any party attempts to impute a determination of conditional class against Dundon. Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs have the burden of demonstrating that the elements have been satisfied. *See Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) ("Plaintiffs seeking to certify a class under Rule 23 bear the burden of establishing the prerequisites to certification have been met."). Moreover, the "logic and the policy of Fed. R. Civ. P. 23 require that plaintiffs meet this burden as to each defendant." *Parker v. Bell Helicopter Co.*, 78 F.R.D. 507, 510 (N.D. Tex. 1978). Plaintiffs explicitly excluded claims against Dundon from the Motion,[5] and they have not met this burden as to defendant Dundon. Consequently, any determination of certification status as to Plaintiffs is limited to certification with regard to claims against the Settling Parties and not claims against Dundon. *See id*.

---

[5] *See, e.g.*, Motion at ¶ 20, ¶ 28 n.2, ¶ 29(d)(2), ¶ 29(f).

**RESPONSE TO JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**                                                                  Page 11

# PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Thomas G. Dundon and Dundon Capital Partners, LLC respectfully request the Court to deny the Joint Motion, not to approve the settlement agreement, not grant class certification pursuant to the settlement agreement, not appoint class counsel and class representatives pursuant to the settlement agreement, not approve the form and manner of notice to class members, not set a deadline for objections, and not set a hearing for final consideration of approval of the settlement agreement, and for such other and further relief, at law and in equity, to which they may be entitled.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: */s/ Brent D. Hockaday*
Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Brent D. Hockaday
Texas Bar No. 24071295
bhockaday@bellnunnally.com
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
214.740.1400 (Telephone)
214.740.1499 (Facsimile)

And

**BRANSCOMB PLLC**

Patrick H. Autry
Texas Bar No. 01447600
pautry@branscomblaw.com
8023 Vantage, Suite 560
San Antonio, Texas 78230
210.598.5400 (Telephone)
210.598.5405 (Facsimile)

**ATTORNEYS FOR DEFENDANT THOMAS G. DUNDON AND DUNDON CAPITAL PARTNERS, LLC**

## CERTIFICATE OF SERVICE

I certify on September 7, 2021, I served the foregoing document with the counsel of record by electronic means.

| | |
|---|---|
| Jonathon S. Farahi<br>Boris Treyzon<br>Abir Cohen Treyzon Sala, LLP<br>16001 Ventura Blvd., Suite 200<br>Encino, CA 91436<br>Email: JFarahi@actslaw.com<br>Email: btreyzon@actslaw.com<br><br>*Counsel for Plaintiffs* | Brian S. Engel<br>Barrett Daffin Frappier Turner & Engel<br>3809 Juniper Trace, Suite 205<br>Austin, TX 78738<br>Email: brianen@bdfgroup.com<br><br>*Counsel for Trustee Randolph N. Osherow* |
| William N. Radford<br>Aaron B. Michelsohn<br>Thompson, Coe, Cousins & Irons, L.L.P.<br>700 N. Pearl Street, Twenty-Fifth Floor<br>Dallas, TX 75201<br>Email: wradford@thompsoncoe.com<br>Email: amichelsohn@thompsoncoe.com<br><br>*Counsel for Defendant Charles Ebersol* | Michael J. Saltz<br>Jacobson, Russell, Saltz, Nassim & de le Torre<br>1880 Century Park East, Suite 900<br>Los Angeles, CA 90067<br>Email: msaltz@jrsnd.com<br><br>*Counsel for Defendant Charles Ebersol*<br><br>    */s/ Brent D. Hockaday*<br>    Brent D. Hockaday |