**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-50900-CAG-7** |
| **LEGENDARY FIELD** | § | |
| **EXHIBITION, LLC, ET AL,** | § | |
| | § | **CHAPTER 7** |
| DEBTORS. | § | |
| | § | |
| | § | |
| | § | |
| **COLTON SCHMIDT, INDIVIDUALLY** | § | |
| **AND ON BEHALF OF OTHERS** | § | |
| **SIMILARLY SITUATED; AND REGGIE** | § | |
| **NORTHRUP, INDIVIDUALLY AND ON** | § | |
| **BEHALF OF OTHERS SIMILARLY** | § | |
| **SITUATED,** | § | |
| | § | |
| PLAINTIFFS, | § | **ADV. PROC. NO. 19-05053** |
| | § | |
| **AAF PLAYERS, LLC, THOMAS DUNDON,** | § | |
| **CHARLES "CHARLIE" EBERSOL,** | § | |
| **LEGENDARY FIELD EXHIBITIONS,** | § | |
| **LLC, AAF PROPERTIES, LLC, EBERSOL** | § | |
| **SPORTS MEDIA GROUP, INC. AND** | § | |
| **DOES 1 THROUGH 200, INCLUSIVE,** | § | |
| | § | |
| DEFENDANTS. | § | |

## APPENDIX

| Exhibit | | Page |
|---|---|---|
| A | Contract of Reggie Northrup | App 001 |
| B | Contract of Colton Schmidt | App 025 |
| C | Deposition Excerpts of Reggie Northrup | App 049 |
| D | Deposition Excerpts of Colton Schmidt | App 093 |

# EXHIBIT A

# Contract of
# Reggie Northrup

EXHIBIT
PENGAD 800-631-6989
1
5-12-21    Northrup



**ALLIANCE**
OF **AMERICAN FOOTBALL**

## STANDARD PLAYER AGREEMENT

**THIS AGREEMENT** is made and entered into by and between AAF Players, LLC, a Delaware limited liability company, d/b/a The Alliance of American Football (the "Alliance"), and Reggie Northrup ("Player") (this "Agreement" or "Standard Player Agreement" or "SPA") with regard to the use by the Alliance of Player's personal services and expertise as a professional football player and Player's Likeness on, and in connection with, the Embodiments, Promotional Rights and Non-Commercial License (as defined below).

By executing this Agreement, Player expressly agrees to be bound by (i) all terms and conditions set forth in this SPA; (ii) all terms and conditions set forth in the Standard Terms and Conditions of the SPA as set forth in the attached Exhibit A, which is incorporated herein by this reference (as may be amended, altered or modified from time to time, "Exhibit A") (collectively, the SPA and Exhibit A shall be referred to herein as the "SPA," the "Standard Player Agreement" or the "Agreement") and (iii) the terms and conditions of employment applicable to Alliance players (as may be amended, altered or modified from time to time, the "Football Administration Manual"). The terms and conditions of the Football Administration Manual shall prevail over any conflicting term or condition in this Agreement, provided that the SPA, Exhibit A and the Football Administration Manual shall be construed in such a manner as to effectuate the intent of the Alliance to effectively manage and administer a professional football league, including the Alliance's commercial interests therein and provided, further, that the parties to this Agreement may agree upon terms over and above the minimum requirements established in the Football Administration Manual. All capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in Exhibit A or the Football Administration Manual, as applicable.

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in the SPA and any other addenda, schedules, and exhibits hereto (which are all incorporated in this Agreement by this reference), the parties agree as follows:

A. **CONTRACT PERIOD:** The term of this Agreement shall commence on the last date set forth on the signature page below (the "Effective Date") and shall end three (3) years after the Effective Date on the final day of the applicable League Year (as defined in the Football Administration Manual) (the "Contract Period").

B. **GRANT OF PROMOTIONAL RIGHTS:** Player hereby acknowledges and confirms his grant to the Alliance of the right to use Player's Likeness on and in connection with the Embodiments, Promotional Rights and the Non-Commercial License as such terms are defined and set forth herein.

C. **BASE COMPENSATION:** Subject to the Effective Date, the Payment Period (as defined in the Football Administration Manual), and Player's compliance with the terms and conditions of employment set forth in the Football Administration Manual, the Alliance

shall pay Player an annual base compensation in the amount set forth opposite the contract year indicated below (subject to any withholdings and other applicable payroll deductions required by law, "Base Compensation") in ten (10) equal payments during the applicable regular season:

| League Year | Base Compensation |
|---|---|
| 2019 | $70,000 |
| 2020 | $80,000 |
| 2021 | $100,000 |

Notwithstanding the foregoing, Player shall receive a per diem payment for each day that Player participates in a day of Designated Team Activities ("DTA") as designated by the Alliance or the team to which Player is allocated by Alliance. The amount of per diem payments shall be equal to the amount set forth in the Football Administration Manual. Where applicable, the Alliance may, in its sole discretion, provide meal, lodging and transportation for Player in connection with Player's participation in any DTA and as an offset to the amounts set forth in the Football Administration Manual.

D.     **BONUSES:** In addition to Base Compensation, the Alliance may elect to pay Player the following bonuses as set forth in the Football Administration Manual:

1.     Player will be eligible to receive a performance bonus if Player satisfies certain statistical or performance targets as established and awarded by Player's Alliance team;

2.     Player will be eligible to receive a post-secondary education tuition stipend for each year that Player completes with the Alliance (in accordance with the applicable Alliance program); and

3.     Player may be eligible to receive additional bonuses, as determined and established in the sole discretion of the Alliance, which will be determined by, among other things, Player's personal performance and the performance of the Alliance.

This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart). Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from or be represented by persons of his own selection.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Alliance of American Football Standard Player Agreement as of the last date set forth below.

**AAF PLAYERS, LLC**

By: _JK McKay_

Name:  JK McKay

Its:  Head of Football Operations

**PLAYER**

Name:          Reggie Northrup

Signature:

Date of Birth:          ███████

Street Address:          ███████████

City, State or Province, Zip Code and Country: ██████████

U.S. Social Security # or Canadian Social Insurance ██████████

Telephone:          ███████████

Email:          ███████████

Date:          10/15/2018

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:          David Canter

Street Address:          N/a

City, State or Province, Zip Code and Country: N/a

Telephone:          ███████████

Email:          ███████████

Date:          N/a



## EXHIBIT A

### STANDARD TERMS AND CONDITIONS TO THE
### ALLIANCE OF AMERICAN FOOTBALL STANDARD PLAYER AGREEMENT

These Standard Terms and Conditions (these "Terms and Conditions") are hereby incorporated into the Alliance of American Football Standard Player Agreement (the "SPA") and are subject to the rules, regulations and policies of the Alliance as set forth in the "Football Administration Manual" (which may be amended from time to time). The terms and conditions of the Football Administration Manual shall prevail over any conflicting term or provision of the SPA, provided that the SPA and the Football Administration Manual shall be construed in such a manner as to effectuate the intent of the Alliance to effectively manage and administer a professional football league, including the Alliance's commercial interests therein, and provided, further, that the parties to the SPA may agree upon terms over and above the minimum requirements established in the Football Administration Manual. All capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the SPA or the Football Administration Manual, as applicable.

1.      Compensation and Player Category. During the Contract Period, the Alliance shall employ Player as a skilled professional football player and the Alliance shall compensate Player as set forth in Sections C and D of the SPA and below. Player acknowledges that the Alliance has no responsibility to render tax advice and assumes no responsibility with respect to Player's tax obligations.

(a)      Unless otherwise agreed to in writing, if the SPA is executed (or Player is activated) after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation becoming due and payable after he is activated. If the SPA is terminated after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation having become due and payable up to the time of termination.

(b)      Prior to and following the Contract Period, Player will not be employed by the Alliance and will not be covered by workers' compensation insurance or by any other insurance or employee benefit of the Alliance (including health insurance).

2.      Player Obligations. In addition to complying with the obligations set forth in the Football Administration Manual, at all times during the Contract Period, Player shall:

(a)      give his best efforts and loyalty to the Alliance and conduct himself on and off the field with appropriate recognition and acknowledgment of the fact that the success of professional sports organizations is dependent upon the public's respect for those associated with the game and upon the public's confidence in the integrity of Alliance games. Player will report promptly for and participate fully in all Alliance mandatory mini-camp(s), preseason training camp(s), all Alliance and Alliance team meetings and practice sessions and all pre-season, regular season and post-season football games scheduled for or by the Alliance. If invited, Player will practice for and play in any all-star football game sponsored by the Alliance;

(b)     not play football or attempt to play any type of football (i.e., indoor or outdoor, regardless of the surface) for any team, league or association of teams other than the team to which Player is allocated by the Alliance, except with the prior written consent of the Alliance, which may be given or withheld in the Alliance's sole and absolute discretion;

(c)     be in default or in violation of his obligations under the SPA or the Football Administration Manual if Player, without the prior written consent of the Alliance, fails or refuses to report to an Alliance team as allocated by the Alliance or fails to practice with or play for an Alliance team to which he has been allocated or leaves such Alliance team for any reason, other than Player's injury (as certified by Alliance physicians) or death;

(d)     maintain a high level of physical and mental conditioning and competitive skills, not engage in alcohol abuse, not use prohibited substances or any other substances in contravention of the law or the Alliance policies applicable to Player and generally develop and maintain a physical and mental readiness necessary to play for the Alliance. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Alliance or fails to make the required full and complete disclosure and good faith responses to any Alliance physician, then the Alliance may terminate the SPA;

(e)     authorize and hereby authorizes and consents to the Alliance and all Alliance physicians to use and disclose such Player's complete health information (whether obtained by Alliance physicians or provided by other Player physicians) for use in physical condition assessments, determination and treatment of injuries and insurance purposes;

(f)     serve as a spokesman for the Alliance and the team to which Player is allocated by the Alliance when reasonably requested and only as directed, by the Alliance, to do so;

(g)     comport and conduct himself at all times, both on and off the field, to a high standard of honesty, fair play and sportsmanship and in a manner befitting his position as a representative of the Alliance and the team to which Player is allocated by the Alliance and be in compliance with all applicable laws;

(h)     refrain from conduct which is, or may be, detrimental to the best interest of the Alliance or Alliance teams, reputation, character or standing of the Alliance, Alliance teams or any of its affiliates or conduct that undermines the public's confidence in the Alliance and its games; and

(i)     submit to testing for performance-enhancing substances and participate in mental health screening and treatment in accordance with the Alliance policies.

3.     Conditions to Effectiveness of Agreement. If performance of this Agreement or of any obligation hereunder by the Alliance is prevented or substantially restricted or interfered with by reason of an event of "Force Majeure" (defined below) or by reason of a material business interruption, the Alliance, upon giving notice to the Player, shall be excused from such performance to the extent of and for the duration of such prevention, restriction or interference. The Alliance shall use its reasonable efforts to avoid or remove such causes of nonperformance and shall continue performance hereunder whenever such causes are removed. "Force Majeure" means fire, earthquake, flood, or other casualty or accident; strikes or labor disputes; war, civil strife or other violence; any law, any change in law, order,

proclamation, regulation, ordinance, action, demand, action or requirement of any government agency or utility; or any other act or condition beyond the reasonable control of the Alliance.

4.      Exclusive Compensation.  Player shall not be permitted to receive any payments or other benefits from any team or team operator or any other entity or person related to or affiliated with the Alliance, in exchange for the services provided by Player under the SPA (or any other agreement entered into between Player and the Alliance).  In the event that Player receives any payments or other benefits (except for per diem payments, travel-related expenses, approved lodging and meal expenses or other payments that are approved in writing by the Alliance) from any team or team operator or any other entity or person related to or affiliated with the Alliance, Player shall promptly disclose such payments or benefits to the Alliance or the team to which Player has been allocated by the Alliance.  In the event of any dispute under this Section 4, Player shall have the burden to show that such payment or benefit (i) was not received in exchange for the services provided by Player under the SPA, or the Football Administration Manual; and (ii) represents fair market value for the services provided for such payment.

5.      Representations and Warranties.

(a)      Player represents and warrants as follows:

(i)      that he is not obligated to play football in or for any other league, association of teams or team during the Contract Period other than the Alliance;

(ii)      that by executing the SPA, Player grants to the Alliance the exclusive right to his services as a professional football player, including, but not limited to, playing professional football, practicing and training to play professional football and such other rights and services typically attendant to a person playing professional football (all of which are collectively referred to as "Playing Rights"), the Non-Commercial License, the Promotional Rights (as defined below) and Player's Likeness (as defined below) and no third party has any competing rights therein and neither Player nor any third party will attempt to assert any rights therein against the Alliance;

(iii)      that he is free to enter into the SPA and that his doing so does not violate any other agreement to which he may be a party;

(iv)      that he does not and will not, either directly or indirectly, own any stock or hold any other ownership or financial interest in any Alliance team or any other entity related to or affiliated with the Alliance;

(v)      that by executing the SPA, he understands and accepts that he may be waiving any remaining eligibility to play collegiate sports and any related college scholarship or grant (not including any scholarship or grant provided by the Alliance, unless otherwise set forth in the SPA);

(vi)      that he knows of no physical or mental conditions that could impair his ability to play skilled professional football during the Contract Period and has not knowingly concealed any such conditions;

(vii)      that he shall maintain himself in excellent physical condition; and

(viii) that he has not breached any previous standard player agreement or any other agreements between Player and the Alliance, in particular but without limitation, in connection with the provisions governing the use of the Playing Rights, the Player's Likeness and the Promotional Rights.

(b) The Alliance represents and warrants that it is free to enter into the SPA and that doing so does not violate any other agreement to which it is party.

(c) The warranting party will indemnify, defend and hold the other party harmless of and from any claims, actions, demands, losses, costs, expenses, liabilities, penalties and damages in the event its representations and warranties set forth in this Section are in any way materially inaccurate and the warrantee will use reasonable efforts to mitigate any loss suffered by it.

6. Video/Digital Images, Pictures, Likenesses and Promotions.

(a) During the Contract Period, the Alliance shall have the right to create or have created Embodiments, individually and/or as part of a group, at or in connection with any training, games (including Player features for game broadcasts or other publication regardless of platform or format) and/or on and in connection with the Promotional Rights. Player shall be available during the Contract Period, individually or with other players, to have Embodiments created at such reasonable times and places as the Alliance or the team to which Player is allocated by the Alliance shall designate. The Alliance shall have Promotional Rights with respect to any Embodiments created under the SPA or the Football Administration Manual. All rights, including, but not limited to, copyright, in any such Embodiments shall belong to the Alliance throughout the world and Player assigns such rights to Alliance together with all causes of action and enforcement mechanisms, rights and procedures. All rights in the Embodiments created under the SPA and all Promotional Rights with respect to such Embodiments shall be exclusive, irrevocable and survive the termination of the Contract Period (and without regard to the circumstances in which the SPA expires or is terminated).

(b) Grant of Non-Commercial Licensing Rights. Player hereby grants to the Alliance the authority to use Player's Likeness ("Non-Commercial License") for any and all uses or purposes that promote the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other media or formats whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms, and Player hereby acknowledges that the Non-Commercial License includes the right and authority for the Alliance to use and authorize affiliates and business partners to use the Non-Commercial License solely for the purposes described herein. Player will cooperate with any such media and will participate upon request in reasonable activities to promote the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league. Player will not contest the rights of the Alliance and Alliance teams to use Player's Likeness and the Playing Rights in connection with the telecast, broadcast or other transmission of Alliance football games or any other related content or the right of the Alliance to use Player's Likeness to

produce, sell, market, advertise or distribute football game film footage or any other related content for the promotion of the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league.  The Alliance may also use such broadcasts, telecasts or transmissions of footage in social media, digital gaming and Alliance digital platforms and in any and all media now or hereafter known.

       7.      <u>Definitions</u>.  For purposes of the SPA and the Football Administration Manual and such other Alliance rules, regulations and policies applicable to Player, the definitions set forth below apply:

           (a)     "<u>Embodiment</u>" means any communication or depiction of any Likeness of Player, alone or together with other players' Likenesses, which is recognizable or identifiable, whether live, fixed in any tangible form, reproduced or simulated, still or moving, in audio, visual, audiovisual and other forms of media and no matter how stored, transmitted, distributed or otherwise communicated to others, by any means or media now or hereafter known.

           (b)     "<u>Likeness</u>" means a player's:

               (i)     picture, image, photograph, portrait or performance (whether such picture, image, photograph, portrait or performance is still, motion, video, digital, high definition or any other medium now known or hereafter developed);

               (ii)     name or nickname;

               (iii)     signature or facsimile thereof;

               (iv)     voice;

               (v)     identifiable attributes or any colorable imitation or adaptation thereof;

               (vi)     to the extent that he has rights therein, biometric data, regardless of how such biometric data is collected, transmitted, obtained or stored; and

               (vii)     to the extent that he has rights therein, biographical information.

           (c)     "<u>Promotional Rights</u>" shall mean the right to promote, advertise and otherwise disseminate, by any means or media now or hereafter known, any Embodiments, created during the Contract Period, for the promotion, marketing, sale or advertising of the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league, and the right to grant to third parties the right to use Player's Likeness to create and use any Embodiments to promote, market, advertise, sell, by any means or media now or hereafter known, the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league.

       8.      <u>Player's Unique Skill and Breach of Agreement; Dispute Resolution</u>.

(a)     Player represents that he has extraordinary and unique skill and ability as a football player, that the services to be rendered by him under the SPA cannot be replaced or the loss thereof adequately compensated for in money damages and that any breach or violation by Player of the SPA or the Football Administration Manual (as the case may be) will cause irreparable injury to the Alliance and to its assignees.  In addition, Player understands and acknowledges that refusing or failing to report to training, games or commercial appearances (with respect to the Promotional Rights or Non-Commercial License) for any reason without the prior written approval of the Alliance constitutes a breach or a violation of the SPA or the Football Administration Manual (as the case may be) and is extremely disruptive to the operation of the Alliance.  Therefore, in the event that the Alliance believes Player is, during the Contract Period, refusing or failing to report for any reason or playing, attempting or threatening to play, or negotiating for the purpose of playing for any other person, firm, corporation, professional football team, association, league or organization, without the prior written consent of the Alliance, then the Alliance and its assignees shall have the right to seek equitable relief or otherwise resolve the dispute through the Grievance Procedures set forth and defined in the Football Administration Manual.

(b)     Player understands that he is competing with other players for a position on an Alliance team roster within the applicable player roster limits.  If at any time, in the sole judgment of the Alliance, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions in the Alliance (a "Skill Termination"), or if Player engages in or has engaged in conduct that is detrimental to the best interests of the Alliance or the public's confidence in the integrity of Alliance games, or may otherwise impair, the reputation, character or standing of the Alliance (as determined by the Alliance in its sole discretion) (a "Morality Termination"), then the Alliance may immediately terminate this Agreement with no further payment obligations to Player.  Further, if Player is terminated by the Alliance for a Morality Termination, the Player's remaining annual salary for that Alliance regular season shall be escrowed until such time as the charges or claims that resulted in Player's Morality Termination are fully and finally adjudicated.  If such changes are adjudicated as false or improper, then the escrowed amount shall be paid to Player.  If such charges result in Player's conviction or such claims are adjudicated as proper, the Alliance shall permanently retain the escrowed amount and Player waives any and all rights to such escrowed amount.

(c)     Except as otherwise provided herein with respect to injunctive relief, all disputes arising out of, relating to and in connection with the SPA, or otherwise relating to Player's employment by the Alliance, shall be resolved exclusively and solely through the Grievance Procedures set forth in the Football Administration Manual.

(i)     All decisions issued pursuant to the Grievance Procedures shall be final, unappealable and binding on the parties and may be immediately entered as a judgment in any court of competent jurisdiction.

(ii)     Player and the Alliance understand that once a decision has been rendered pursuant to the Grievance Procedures set forth in the Football Administration Manual, such decision may be immediately taken to any court having jurisdiction for the purpose of confirming a judgment and seeking appropriate enforcement and relief, including obtaining such equitable relief as may be appropriate, including but not limited to a decree enjoining Player from any further breach or violation of the SPA or the Football Administration Manual (as the case may be) or any other agreement or commitment to provide exclusive rights or services to the Alliance or Alliance Properties, including from

playing football for any other person, firm, corporation or organization during the Contract Period, all without the Alliance posting a bond or other security or proving actual damages.

9.      Teams as Alliance Agents.  Instructions given or requests made by the Alliance to Player pursuant to the SPA or the Football Administration Manual may be made by the team to which Player has been allocated by the Alliance and for such purposes such Alliance team shall be acting as an authorized agent of the Alliance, acting through its General Manager or Head Coach or their designees.  The scope of the authority of teams to act as agent of the Alliance shall be as set forth in the Alliance's rules, policies and regulations governing the relationship between the Alliance teams and the Alliance.  In relation to those instructions and/or requests specifically contemplated by the SPA or the Football Administration Manual to be directed to Player by a team, Player shall be entitled to assume that the team has the authority to act on the Alliance's behalf.

10.     Injury.  If Player is injured in the performance of his services under the SPA and promptly reports such injury to an Alliance or Alliance team physician, then Player will receive such medical and hospital care during the Contract Period as an Alliance physician may deem necessary and, if during the regular season Player is physically unable to perform the services required of him by the SPA because of such football-related injury, as determined by the Alliance or Alliance team physician in such physician's sole and absolute professional judgment, Player will continue to receive his Base Compensation for the period he is physically unable to perform during the season of injury only and for no subsequent period covered by the SPA.  If Player's injury in the performance of his services under the SPA results in his death, the unpaid balance of his Base Compensation for the season of injury only will be paid to his stated beneficiary or, in the absence of a stated beneficiary, to his estate.

11.     Workers' Compensation.  Any compensation paid to Player under the SPA, for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial or permanent partial disability will be deemed an advance payment of workers' compensation benefits due to Player and the Alliance will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

12.     General Provisions.

(a)      Interpretation of Terms.  The terms of the SPA and the Football Administration Manual shall be interpreted to give maximum effect to the Alliance's intent (and Player's acknowledgment thereof) to establish, through the SPA, the Football Administration Manual and other rules, regulations, policies and practices applicable to Player and players, a framework within which to manage effectively and administer a professional sports league.  The language of the SPA shall be construed neutrally and without regard for which party drafted such language.  If any provision of the SPA is determined to be invalid or unenforceable, the remaining provisions of the SPA, as applicable, shall be enforced in accordance with their terms.  Player acknowledges that by executing the SPA, he understands that he is bound by the terms of the SPA, the Football Administration Manual and such other player-related policies as may be adopted and implemented from time to time by the Alliance, all of which shall be adopted with notice to Player and made available to Player on the Alliance website or by any other digital storage that is accessible to Player.

(b)  Termination.  The rights of termination set forth in the SPA and/ or the Football Administration Manual will be in addition to any other rights of termination allowed either party by law.  Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under the SPA, will automatically terminate the SPA.

(c)  Rules.  Player will comply with and be bound by all Alliance rules, regulations, policies and employment practices applicable to Player and players in the Alliance in effect (or as amended) during the Contract Period.

(d)  Integrity of Game.  Player recognizes the detriment to the Alliance and professional football that would result from impairment of public confidence in the integrity of the game, in the honest and orderly conduct of Alliance games, or in the integrity and good character of the Alliance players.  Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix any Alliance game; fails to promptly report a bribe offer or an attempt to throw or fix any Alliance game; bets on any Alliance game; knowingly associates with gamblers or unauthorized gambling activity; or is guilty of any other form of conduct judged by the Alliance to be detrimental to the best interests of the Alliance, to the public's confidence in the integrity of the game, or the best interest of the game of professional football in general, then, subject to the Alliance's sole and absolute discretion, the Alliance shall have the right to issue appropriate discipline including banning Player from playing in the Alliance indefinitely and to terminate the SPA.

(e)  Extension.  If Player becomes a member of the Armed Forces of the United States or any other country, accepts a contractual offer to join a non-Alliance team with the Alliance's prior written consent, retires from professional football as an active player or otherwise fails or refuses to perform his services under the SPA, then the SPA will be tolled between the date of Player's induction into the Armed Forces, his acceptance of a non-Alliance contract, his retirement or his failure or refusal to perform and the later date of his return to professional football with the Alliance.  During the period the SPA is tolled, Player will not be entitled to any compensation or benefits.  On Player's return to professional football with the Alliance, the Contract Period will be extended for a period equal to the number of seasons (or portion of a season) remaining at the time the SPA was tolled.  The Alliance's right of renewal, if any, contained in the SPA will remain in effect until the end of any such extension of the Contract Period.

(f)  Assignment.  The Alliance may assign the SPA and Player's services thereunder to any successor to the Alliance or to any other team in the Alliance.  Player will report to his assigned Alliance team promptly upon being informed of any such assignment and will faithfully perform his services under the SPA.  Player may not assign the SPA without the prior written consent of the Alliance.

(g)  Notice.  Any notice, request, approval or consent under the SPA or the Football Administration Manual will be sufficiently given if in writing and delivered in person, emailed or mailed (certified or first class) by one party to the other at the addresses set forth on the signature page to the SPA or to such other address as the recipient may subsequently have furnished in writing to the sender.

(h)  Other Agreements.  The SPA, and the Authorized Alternative League Release, set forth the entire agreements between the parties regarding the subject matter of this Agreement and cannot be modified or supplemented orally.

(i)    Law.  The SPA is made under and shall be governed by the laws of the State of Delaware.

*[Remainder of Page Intentionally Left Blank]*



## STANDARD COMMERCIAL LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** is made and entered into by and between Alliance Properties, LLC, a Delaware limited liability company ("Alliance Properties"), and Reggie Northrup ("Player") (the "Agreement") with regard to the use by Alliance Properties of Player's Likeness on, and in connection with, the Commercial License (as such terms are defined below).

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in this Agreement, the parties agree as follows:

1.    Term, Termination and Extension.

(a)    Term.  Subject to the termination provision(s) of this Agreement, the term of this Agreement shall commence on the last date set forth on the signature page below (the "Effective Date") and shall continue for three (3) years from the Effective Date (the "Term").

(b)    Termination.  Notwithstanding the foregoing, if Player's Standard Player Agreement with AAF Players, LLC (the "Alliance") (the "SPA") is terminated due to a Skill Termination or a Morality Termination (as those terms are defined in Player's SPA), this Agreement may be terminated by Alliance Properties, at which time, subject to Section 2 of this Agreement, Player shall have no further rights with respect to the Player Participation Pool (as defined below). The rights of termination set forth in this Agreement will be in addition to any other rights of termination allowed to either party by law.  Termination will be effective upon the giving of written notice, except that Player's death will automatically terminate this Agreement.

(c)    Extension.  The Term shall be extended for another three (3) years upon execution by Player of a new SPA during the Term of this Agreement.  If Player's SPA is terminated due to Player's acceptance of a contract with an Authorized Alternative League (as defined in Player's SPA) (an "Authorized Alternative League Termination"), the remaining Term of this Agreement shall be extended to include the conclusion of the next subsequent Alliance League Year (as defined in the Football Administration Manual) immediately following the date on which the Term of this Agreement would have otherwise expired.

2.    Grant of Commercial Licensing Rights.  Player hereby grants to Alliance Properties worldwide, exclusive rights in and to Player's Likeness pursuant to the terms set forth herein (the grant of the worldwide, exclusive rights in and to Player's Likeness as set

forth herein, the "Commercial License"). Player acknowledges that this grant of the worldwide, exclusive rights in and to Player's Likeness is essential to the formation of the Player Participation Pool, a new potential source of compensation for all players in the Alliance, and commercial programs associated therewith. Player hereby acknowledges that the rights he is granting to Alliance Properties under the Commercial License shall include, but are not limited to, the irrevocable and exclusive worldwide right, in any and all media now or hereafter known, including, but not limited to, newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other media or formats whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms, to use, assign or license the Likeness (including the right to use or license Player's Likeness in connection with the Likenesses of other players, former players and other persons affiliated with the Alliance of American Football (the "League")) in combination with the use of any or all League team names, logos, trademarks, trade dress, uniforms or other form of intellectual property, for any commercial purpose, including but not limited to: (1) in any form of trade or consumer promotion; in the sale, distribution, promotion, marketing or advertising of any good, of any consumer product, or of any service; such rights shall also include the use of Player's Likeness in all collateral materials, point of sale materials, and/or packaging associated with the rights set forth herein, (2) in any form of, or in connection with, products licensed by Alliance Properties, and (3) on and in connection with any sponsorship or endorsement of the League by third parties. Player understands and agrees that at the conclusion of the Contract Period (as set forth in Player's SPA), Alliance Properties shall continue to have the right to use the Commercial License, subject to Player's continuing eligibility to participate in the Player Participation Pool (as defined below). Player acknowledges that Alliance Properties may grant, sub-license or assign the Commercial License without Player's further approval or consent. Player also understands and agrees that this Commercial License authorizes Alliance Properties to use his Likeness in connection with corporate sponsorships and Alliance Properties shall have the right to represent Player and commit Player, subject to Player's reasonable availability and approval, to make appearances and provide other personal services on behalf of Alliance Properties and in connection with corporate sponsorships and the general promotion of the Alliance, provided that Player shall be eligible to receive additional compensation for such appearances and other personal services through the Player Participation Pool.

3. Embodiments. During the Term, Alliance Properties shall have the right to create or have created Embodiments, individually and/or as part of a group, at or in connection with any training, games (including Player features for game broadcasts or other publication regardless of platform or format). Player shall be available during the Term, individually or with other players, to have Embodiments created at such reasonable times and places as the Alliance shall designate. All rights, including, but not limited to, copyright, in any such Embodiments, shall belong to Alliance Properties throughout the world and Player assigns such rights to Alliance Properties together with all causes of action and enforcement mechanisms, rights and procedures. All rights in the Embodiments shall be exclusive and irrevocable, and survive the termination of the Term.

4. Exception to Grant Commercial Licensing Rights to Authorized Alternative League. Notwithstanding anything herein to the contrary, upon Player's written request, Alliance Properties may grant Player written permission to grant use of Player's Likeness to an Authorized Alternative League, provided: (1) such Authorized Alternative League has teams playing in no fewer than 25 professional football markets; and (2) Player presents

Alliance Properties with suitable evidence of a contract offer from a team in such Authorized Alternative League and, within three (3) days of its complete execution, Player provides Alliance Properties with a copy of the fully executed contract to play in such Authorized Alternative League.

5.     <u>Restriction from Granting Commercial Licensing Rights to Competitive Alternative League</u>.  Player shall not:

(a)     permit a professional football league (or any person or entity associated therewith) that plays its regular season games primarily in or between the months of February through July ("<u>Competitive Alternative League</u>") to use Player's Likeness for any reason during the Term of this Agreement and for the duration of the next subsequent Alliance League Year following the Term of this Agreement, or

(b)     provide any personal services to a Competitive Alternative League during the Term of this Agreement and for the duration of the next subsequent Alliance League Year following the Term of this Agreement.

6.     <u>Player Participation Pool and Commercial Advances</u>.  As consideration for Player's grant of the Commercial License, if Player is added to the regular season roster of a League team, Player will be eligible to receive a fractional share of the Player Participation Pool in proportion to use of Player's Likeness to the total overall usage of all players' Likenesses in all programs, promotional activities, sales and licenses that are subject to the Player Participation Pool.  As additional consideration for the grant of the Commercial License, Player shall receive, as an advance against all payments that Player may earn or which may otherwise become due to Player under the Player Participation Pool: (i) One Hundred Dollars ($100.00) if Player is added to the training camp roster of the League or a League team ("<u>Training Camp Commercial Advance</u>") and (ii), as an advance against all payments that Player may earn or which may otherwise become due to Player under the Player Participation Pool, an additional Nine Hundred Dollars ($900.00) if Player is added to the regular season roster of a League team ("<u>Regular Season Commercial Advance</u>"). Notwithstanding the foregoing, in the event that Player is not on a regular season roster and has not earned an amount equal to or greater than the Training Camp Commercial Advance and/or the Regular Season Commercial Advance, as applicable, Alliance Properties will not seek to recoup any unearned portion of the Training Camp Commercial Advance or the Regular Season Commercial Advance, as applicable.

(a)     <u>Standard Player Agreement</u>.  Player understands that nothing in Player's grant of the Commercial License above negates any of the Alliance's rights under the SPA or in the Football Administration Manual.

(b)     <u>Protection and Enforcement of Commercial License</u>.  Player hereby authorizes Alliance Properties to take all actions necessary to protect and enforce rights granted in the Commercial License.  Player further consents to Alliance Properties joining him as a party in any proceeding to prosecute or defend any claims relating to the Commercial License so long as Alliance Properties pays for the reasonable costs (including reasonable attorney's fees) of prosecuting and/or defending Player's interests in such an action; <u>*provided*</u>, <u>*however*</u>, that Alliance Properties shall not be required to pay such costs (including reasonable attorney's fees) if such joinder is in connection with Player's obligation (set forth in Section 6(e)) to indemnify Alliance Properties.

(c)    Further Assurances.  Player shall take such additional steps as Alliance Properties may reasonably request in connection with the Commercial License, including but not limited to the execution of additional documents that may be necessary for Alliance Properties to implement, confirm or enforce its rights under the Commercial License.

(d)    Acknowledgments.  Player acknowledges that the consideration stated herein, including the Training Camp Commercial Advance, the Regular Season Commercial Advance and payments from the Player Participation Pool, if earned, constitutes the entire and adequate consideration for the Commercial License.  Player further acknowledges that nothing in the Commercial License is intended to confer upon him any rights in the Embodiments created by or on behalf of Alliance Properties or its sponsors or licensees and nothing in the Commercial License is intended to obligate Alliance Properties, or its respective sponsors or licensees, to use Player's Likeness for any purpose.  For purposes of clarity, Player acknowledges that Alliance Properties has established, as and for additional consideration for the Commercial License, a pool of funds to compensate Player and players for the Commercial License and for participating in commercial, endorsement, and fan engagement activities, and such consideration shall be paid in accordance with Alliance Properties' policies (the "Player Participation Pool"), which may be amended from time to time to effectuate its intent to encourage Player and players to participate in commercial, promotional endorsement, and fan engagement activities.

(e)    Indemnification.  Player represents and warrants that he has not entered into any other agreements concerning his Likeness that would in any way conflict with Alliance Properties' rights (or those of its licensees or assignees) under the Commercial License.  Player shall indemnify and hold Alliance Properties (and its affiliates, licensees, and assignees) harmless from any claims, actions, demands, losses, costs, liabilities, penalties and damages arising out of his entering into agreements that conflict or interfere with the rights granted to Alliance Properties (or its respective licensees or assignees) under the Commercial License or his breach of this Agreement.

7.    Covenants.  Player shall:

(a)    not use the name or logo of any League team or Alliance Properties or any related entity for any purpose unless he shall have received the prior written consent and approval of Alliance Properties (which may be withheld in Alliance Properties' sole and absolute discretion);

(b)    not use or make any endorsements or commercial appearances, sponsor any products or consent to any third party using Player's name, picture or Likeness in which (1) he appears, either alone or with others, in any League team uniform, in any attire which closely resembles or is substantially similar to any League team uniform, is likely to confuse the public as to the affiliation of Alliance Properties or any League teams or in any attire bearing or displaying the marks and/or logos of any League teams; (2) he appears together with two (2) or more players or former players in the League in which Player and the other players, either directly or indirectly, identify themselves as players or former players in the League, regardless of their attire; or (3) he either directly or indirectly identifies himself as a player or former player in the League, unless he has received the prior written consent and approval of Alliance Properties (which may be withheld in Alliance Properties' sole and absolute discretion);

(c)    at all League team games, practices, training camps, clinics or other

events sponsored or arranged by Alliance Properties or any League teams and at all Player appearances, wear and/or display only such footwear, clothing, equipment and other items as are endorsed by Alliance Properties or the team to which Player is allocated by the League (and shall promptly obey and comply with any and all other guidelines and directives hereinafter issued by Alliance Properties regarding apparel and/or equipment, permitted or not permitted to be worn or utilized by players for such League team); and

(d)　　not display any logo upon or endorse, or agree to display any logo upon or endorse, any item of on-field equipment which is not produced by an official equipment supplier of the League.

8.　　Definitions.  For purposes of this Agreement and such other League rules, regulations and policies applicable to Player, the definitions set forth below apply.

(a)　　"Embodiment" means any communication or depiction of any Likeness of Player, alone or together with other players' Likenesses, which is recognizable or identifiable, whether live, or fixed in any tangible form, reproduced or simulated, still or moving, in audio, visual, audiovisual and other forms of media and no matter how stored, transmitted, distributed or otherwise communicated to others, by any means or media now or hereafter known.

(b)　　"Likeness" means a player's:

(i)　　picture, image, photograph, portrait or performance (whether such picture, image, photograph, portrait or performance is still, motion, video, digital, high definition or any other medium now known or hereafter developed);

(ii)　　name or nickname;

(iii)　　signature or facsimile thereof;

(iv)　　voice;

(v)　　identifiable attributes or any colorable imitation or adaptation thereof;

(vi)　　to the extent that he has rights therein, biometric data, regardless of how such biometric data is collected, transmitted, obtained or stored; and

(vii)　　to the extent that he has rights therein, biographical information.

9.　　General Provisions.

(a)　　Interpretation of Terms.  The language of this Agreement shall be construed neutrally and without regard for which party drafted such language.  If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement, as applicable, shall be enforced in accordance with their terms.

(b)　　Assignment.  Alliance Properties may assign this Agreement and Player's obligations thereunder to any successor to Alliance Properties.  Player may not assign this Agreement without the prior written consent of Alliance Properties.

(c)    <u>Notice</u>. Any notice, request, approval or consent under this Agreement will be sufficiently given if in writing and delivered in person, emailed or mailed (certified or first class) by one party to the other at the addresses set forth on the signature page to this Agreement or to such other address as the recipient may subsequently have furnished in writing to the sender.

(d)    <u>Other Agreements</u>. This Agreement, sets forth the entire agreement between Player and Alliance Properties and cannot be modified or supplemented orally. Player and Alliance Properties each represent that no other agreement, oral or written, except as specifically incorporated in this Agreement, exists between them.

(e)    <u>Amendment and Modification</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

(f)    <u>Disputes</u>.

(i)    <u>Injunctive Relief</u>. Player acknowledges that this grant of the worldwide, exclusive rights in and to Player's Likeness is essential to the formation of the Player Participation Pool, a new potential source of compensation for all players in the League, and commercial programs associated with the Player Participation Pool. Player acknowledges that his grant of the Commercial License in and to Player's Likeness is unique and has significant intangible and intrinsic value to Alliance Properties. Player acknowledges that Player's breach of the provisions of this Agreement will irreparably harm Alliance Properties and substantially interfere with and impair the effective administration of the Player Participation Pool and the commercial programs associated therewith to the substantial detriment to Alliance Properties and, among other things, other players who participate in the Player Participation Pool, and that any injury suffered by Alliance Properties as a result of Player's breach of the terms and conditions of this Commercial License cannot be adequately remedied with monetary damages. Accordingly, Player and Alliance Properties agree that irreparable damage would occur from any breach or threatened breach of any provision of this Agreement and that to prevent any breach or threatened breach of any provision of this Agreement, Player and Alliance Properties shall be entitled to equitable relief, including a temporary restraining order, preliminary injunction and such other injunctive or equitable relief, including specific performance, in addition to any other remedy to which they are entitled at law or in equity, all without Alliance Properties posting a bond or other security or proving actual damages.

(ii)    <u>Other Disputes</u>. Except as otherwise provided herein with respect to injunctive relief in Section 9(f)(i), all other disputes arising out of, relating to and in connection with this Agreement shall be resolved exclusively and solely through the Grievance Procedures set forth in the League's Football Administration Manual.

(A)    All decisions issued pursuant to the Grievance Procedures shall be final, unappealable and binding on the parties and may be immediately entered as a judgment in any court of competent jurisdiction.

(B)    Player and Alliance Properties understand that once a decision has been rendered pursuant to the Grievance Procedures set forth in the Football Administration Manual, such decision may be immediately taken to any court having jurisdiction for the purpose of confirming a judgment and seeking appropriate enforcement and relief, including obtaining such equitable relief as may be appropriate, including but not

limited to a decree enjoining Player from any further breach or violation of this Agreement, all without Alliance Properties posting a bond or other security or proving actual damages.

(g)    Law.  This Agreement is made under and shall be governed by the laws of the State of Delaware.

(h)    Counterparts.  This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart).  Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from or be represented by persons of his own selection.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Standard Commercial License Agreement as of the last date set forth below.

**ALLIANCE PROPERTIES, LLC**

By: *JK McKay*

Name:  JK McKay

Its:  Head of Football Operations

**PLAYER**

Name:          Reggie Northrup

Signature:

Date of Birth:        ████████

Street Address:       ████████

City, State or Province, Zip Code and Country: ████████████

U.S. Social Security # or Canadian Social Insurance: ██████

Telephone:        ██████

Email:        ████████████

Date:          10/15/2018

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:              David canter

Street Address:    N/a

City, State or Province, Zip Code and Country: N/a

Telephone:        ██████████

Email:            ██████████

Date:              N/a



## AUTHORIZED ALTERNATIVE LEAGUE RELEASE

**THIS AGREEMENT** is made and entered into by and between AAF Players, LLC, a Delaware limited liability company, d/b/a The Alliance of American Football (the "Alliance"), and Reggie Northrup ("Player")

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in this Agreement, the parties agree as follows:

Player is a party to a Standard Player Agreement ("SPA") with the Alliance and Player has requested Alliance consent to terminate his SPA to sign a contract to play in an Authorized Alternative League (i.e., a professional football league that plays all its games, except such league's championship game, in or between August through January and which has teams playing in no fewer than 25 of the top 40 Designated Market Areas in the United States of America). Player represents that he has met the conditions set forth in the SPA, and that prior to making his request for termination of his SPA, Player received a bona fide offer from the Authorized Alternative League.

Player acknowledges that the Alliance has (1) made a significant investment in Player's development; (2) provided a valuable forum for player to showcase his skills and (3) made a significant investment in the development and operation of the Alliance. Player also acknowledges that the termination of the SPA is not required of Alliance and further that Alliance has provided Player with other good and valuable consideration, the sufficiency and receipt of which is also hereby acknowledged by player.

Player agrees that, in exchange for the Alliance's termination of the SPA and for the other good and valuable consideration, receipt of which Player hereby acknowledges, he shall not, for a period of eighteen (18) months from the initial date on which he is no longer under contract with an Authorized Alternative League (the "Competitive Alternative League Exclusion"), execute a contract with, or play football for any team, professional football league, or association of teams that plays its regular season games in or between the months of

February through July ("Competitive Alternative League"), or provide any other personal services to a Competitive Alternative League. Following the expiration of the Competitive Alternative League Exclusion, Player agrees that Alliance shall have an additional thirty (30) day exclusive period to tender and sign a new SPA with Player ("Exclusive Tender and Signing Period") at the then prevailing compensation rate for Player, based on his years of service to Alliance and that during the Exclusive Tender and Signing Period, Player may not solicit or accept an offer to play football in a Competitive Alternative League.

Parties agree that irreparable damage would occur from any breach or threatened breach of any provision of this Agreement and that to prevent any breach or threatened breach of any provision of this Agreement, Player and Alliance shall be entitled to equitable relief, including a temporary restraining order, preliminary injunction and such other injunctive or equitable relief, including specific performance, in addition to any other remedy to which they are entitled at law or in equity, all without the Alliance posting a bond or other security or proving actual damages.

The language of this Agreement shall be construed neutrally and without regard for which party drafted such language. If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement, as applicable, shall be enforced in accordance with their terms.

The Alliance may assign this Agreement and Player's obligations thereunder to any successor to the Alliance. Player may not assign this Agreement without the prior written consent of the Alliance.

This Agreement, along with the SPA, sets forth the agreements between the parties regarding the subject matter of this Agreement and cannot be modified or supplemented orally.

This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

This Agreement is made under and shall be governed by the laws of the State of Delaware.

This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart). Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from and be represented by persons of his own selection and acknowledges that he has read, understands, and agrees to the rights and responsibilities created by this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed and agreed to this Authorized Alternative League Release as to form and content as of the last date set forth below.

**AAF PLAYERS, LLC**

By:

Name:  JK McKay

Its:  Head of Football Operations

**PLAYER**

Name:           Reggie Northrup

Signature:

Date of Birth:

Street Address:

City, State or Province, Zip Code and Country:

U.S. Social Security # or Canadian Social Insurance:

Telephone:

Email:

Date:           10/15/2018

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:           David Canter

Street Address:           N/a

City, State or Province, Zip Code and Country: N/a

Telephone:

Email:

Date:           N/a





# EXHIBIT B

# Contract of
# Colton Schmidt



**ALLIANCE**
OF AMERICAN FOOTBALL



EXHIBIT
10
Schmidt 5-18-21

### STANDARD PLAYER AGREEMENT

**THIS AGREEMENT** is made and entered into by and between AAF Players, LLC, a Delaware limited liability company, d/b/a The Alliance of American Football (the "Alliance"), and Colton Schmidt ("Player") (this "Agreement" or "Standard Player Agreement" or "SPA") with regard to the use by the Alliance of Player's personal services and expertise as a professional football player and Player's Likeness on, and in connection with, the Embodiments, Promotional Rights and Non-Commercial License (as defined below).

By executing this Agreement, Player expressly agrees to be bound by (i) all terms and conditions set forth in this SPA; (ii) all terms and conditions set forth in the Standard Terms and Conditions of the SPA as set forth in the attached Exhibit A, which is incorporated herein by this reference (as may be amended, altered or modified from time to time, "Exhibit A") (collectively, the SPA and Exhibit A shall be referred to herein as the "SPA," the "Standard Player Agreement" or the "Agreement") and (iii) the terms and conditions of employment applicable to Alliance players (as may be amended, altered or modified from time to time, the "Football Administration Manual"). The terms and conditions of the Football Administration Manual shall prevail over any conflicting term or condition in this Agreement, provided that the SPA, Exhibit A and the Football Administration Manual shall be construed in such a manner as to effectuate the intent of the Alliance to effectively manage and administer a professional football league, including the Alliance's commercial interests therein and provided, further, that the parties to this Agreement may agree upon terms over and above the minimum requirements established in the Football Administration Manual. All capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in Exhibit A or the Football Administration Manual, as applicable.

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in the SPA and any other addenda, schedules, and exhibits hereto (which are all incorporated in this Agreement by this reference), the parties agree as follows:

A.     **CONTRACT PERIOD:** The term of this Agreement shall commence on the last date set forth on the signature page below (the "Effective Date") and shall end three (3) years after the Effective Date on the final day of the applicable League Year (as defined in the Football Administration Manual) (the "Contract Period").

B.     **GRANT OF PROMOTIONAL RIGHTS:** Player hereby acknowledges and confirms his grant to the Alliance of the right to use Player's Likeness on and in connection with the Embodiments, Promotional Rights and the Non-Commercial License as such terms are defined and set forth herein.

C.     **BASE COMPENSATION:** Subject to the Effective Date, the Payment Period (as defined in the Football Administration Manual), and Player's compliance with the terms and conditions of employment set forth in the Football Administration Manual, the Alliance

shall pay Player an annual base compensation in the amount set forth opposite the contract year indicated below (subject to any withholdings and other applicable payroll deductions required by law, "Base Compensation") in ten (10) equal payments during the applicable regular season:

| League Year | Base Compensation |
|---|---|
| 2019 | $70,000 |
| 2020 | $80,000 |
| 2021 | $100,000 |

Notwithstanding the foregoing, Player shall receive a per diem payment for each day that Player participates in a day of Designated Team Activities ("DTA") as designated by the Alliance or the team to which Player is allocated by Alliance. The amount of per diem payments shall be equal to the amount set forth in the Football Administration Manual. Where applicable, the Alliance may, in its sole discretion, provide meal, lodging and transportation for Player in connection with Player's participation in any DTA and as an offset to the amounts set forth in the Football Administration Manual.

D.  **BONUSES:** In addition to Base Compensation, the Alliance may elect to pay Player the following bonuses as set forth in the Football Administration Manual:

1.  Player will be eligible to receive a performance bonus if Player satisfies certain statistical or performance targets as established and awarded by Player's Alliance team;

2.  Player will be eligible to receive a post-secondary education tuition stipend for each year that Player completes with the Alliance (in accordance with the applicable Alliance program); and

3.  Player may be eligible to receive additional bonuses, as determined and established in the sole discretion of the Alliance, which will be determined by, among other things, Player's personal performance and the performance of the Alliance.

This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart). Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from or be represented by persons of his own selection.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Alliance of American Football Standard Player Agreement as of the last date set forth below.

**AAF PLAYERS, LLC**

By: *JK McKay*

Name:  JK McKay

Its:  Head of Football Operations

**PLAYER**

Name:          Colton Schmidt

Signature:     *Colton Schmidt*

Date of Birth:          ▮▮▮▮

Street Address:        ▮▮ ▮ ▮

City, State or Province, Zip Code and Country: ▮▮▮▮▮

U.S. Social Security # or Canadian Social Insurance: ▮ ▮ ▮

Telephone:             ▮▮

Email:                 ▮▮▮▮

Date:          1/9/2019

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:          Derrivk Fox

Street Address:        N/A

City, State or Province, Zip Code and Country:  N/A

Telephone:             ▮▮

Email:         N/A

Date:          N/A



**ALLIANCE**
OF AMERICAN FOOTBALL

**EXHIBIT A**

## STANDARD TERMS AND CONDITIONS TO THE
## ALLIANCE OF AMERICAN FOOTBALL STANDARD PLAYER AGREEMENT

These Standard Terms and Conditions (these "Terms and Conditions") are hereby incorporated into the Alliance of American Football Standard Player Agreement (the "SPA") and are subject to the rules, regulations and policies of the Alliance as set forth in the "Football Administration Manual" (which may be amended from time to time). The terms and conditions of the Football Administration Manual shall prevail over any conflicting term or provision of the SPA, provided that the SPA and the Football Administration Manual shall be construed in such a manner as to effectuate the intent of the Alliance to effectively manage and administer a professional football league, including the Alliance's commercial interests therein, and provided, further, that the parties to the SPA may agree upon terms over and above the minimum requirements established in the Football Administration Manual. All capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the SPA or the Football Administration Manual, as applicable.

1.      Compensation and Player Category. During the Contract Period, the Alliance shall employ Player as a skilled professional football player and the Alliance shall compensate Player as set forth in Sections C and D of the SPA and below. Player acknowledges that the Alliance has no responsibility to render tax advice and assumes no responsibility with respect to Player's tax obligations.

(a)      Unless otherwise agreed to in writing, if the SPA is executed (or Player is activated) after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation becoming due and payable after he is activated. If the SPA is terminated after the beginning of the regular season, Base Compensation payable to Player will be reduced proportionately and Player will be paid the portions of his Base Compensation having become due and payable up to the time of termination.

(b)      Prior to and following the Contract Period, Player will not be employed by the Alliance and will not be covered by workers' compensation insurance or by any other insurance or employee benefit of the Alliance (including health insurance).

2.      Player Obligations. In addition to complying with the obligations set forth in the Football Administration Manual, at all times during the Contract Period, Player shall:

(a)      give his best efforts and loyalty to the Alliance and conduct himself on and off the field with appropriate recognition and acknowledgment of the fact that the success of professional sports organizations is dependent upon the public's respect for those associated with the game and upon the public's confidence in the integrity of Alliance games. Player will report promptly for and participate fully in all Alliance mandatory mini-camp(s), preseason training camp(s), all Alliance and Alliance team meetings and practice sessions and all pre-season, regular season and post-season football games scheduled for or by the Alliance. If invited, Player will practice for and play in any all-star football game sponsored by the Alliance;

(b)    not play football or attempt to play any type of football (i.e., indoor or outdoor, regardless of the surface) for any team, league or association of teams other than the team to which Player is allocated by the Alliance, except with the prior written consent of the Alliance, which may be given or withheld in the Alliance's sole and absolute discretion;

(c)    be in default or in violation of his obligations under the SPA or the Football Administration Manual if Player, without the prior written consent of the Alliance, fails or refuses to report to an Alliance team as allocated by the Alliance or fails to practice with or play for an Alliance team to which he has been allocated or leaves such Alliance team for any reason, other than Player's injury (as certified by Alliance physicians) or death;

(d)    maintain a high level of physical and mental conditioning and competitive skills, not engage in alcohol abuse, not use prohibited substances or any other substances in contravention of the law or the Alliance policies applicable to Player and generally develop and maintain a physical and mental readiness necessary to play for the Alliance. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Alliance or fails to make the required full and complete disclosure and good faith responses to any Alliance physician, then the Alliance may terminate the SPA;

(e)    authorize and hereby authorizes and consents to the Alliance and all Alliance physicians to use and disclose such Player's complete health information (whether obtained by Alliance physicians or provided by other Player physicians) for use in physical condition assessments, determination and treatment of injuries and insurance purposes;

(f)    serve as a spokesman for the Alliance and the team to which Player is allocated by the Alliance when reasonably requested and only as directed, by the Alliance, to do so;

(g)    comport and conduct himself at all times, both on and off the field, to a high standard of honesty, fair play and sportsmanship and in a manner befitting his position as a representative of the Alliance and the team to which Player is allocated by the Alliance and be in compliance with all applicable laws;

(h)    refrain from conduct which is, or may be, detrimental to the best interest of the Alliance or Alliance teams, reputation, character or standing of the Alliance, Alliance teams or any of its affiliates or conduct that undermines the public's confidence in the Alliance and its games; and

(i)    submit to testing for performance-enhancing substances and participate in mental health screening and treatment in accordance with the Alliance policies.

3.    Conditions to Effectiveness of Agreement. If performance of this Agreement or of any obligation hereunder by the Alliance is prevented or substantially restricted or interfered with by reason of an event of "Force Majeure" (defined below) or by reason of a material business interruption, the Alliance, upon giving notice to the Player, shall be excused from such performance to the extent of and for the duration of such prevention, restriction or interference. The Alliance shall use its reasonable efforts to avoid or remove such causes of nonperformance and shall continue performance hereunder whenever such causes are removed. "Force Majeure" means fire, earthquake, flood, or other casualty or accident; strikes or labor disputes; war, civil strife or violence; any law, any change in law, order,

proclamation, regulation, ordinance, action, demand, action or requirement of any government agency or utility; or any other act or condition beyond the reasonable control of the Alliance.

4.　　Exclusive Compensation.  Player shall not be permitted to receive any payments or other benefits from any team or team operator or any other entity or person related to or affiliated with the Alliance, in exchange for the services provided by Player under the SPA (or any other agreement entered into between Player and the Alliance).  In the event that Player receives any payments or other benefits (except for per diem payments, travel-related expenses, approved lodging and meal expenses or other payments that are approved in writing by the Alliance) from any team or team operator or any other entity or person related to or affiliated with the Alliance, Player shall promptly disclose such payments or benefits to the Alliance or the team to which Player has been allocated by the Alliance.  In the event of any dispute under this Section 4, Player shall have the burden to show that such payment or benefit (i) was not received in exchange for the services provided by Player under the SPA, or the Football Administration Manual; and (ii) represents fair market value for the services provided for such payment.

5.　　Representations and Warranties.

(a)　　Player represents and warrants as follows:

(i)　　that he is not obligated to play football in or for any other league, association of teams or team during the Contract Period other than the Alliance;

(ii)　　that by executing the SPA, Player grants to the Alliance the exclusive right to his services as a professional football player, including, but not limited to, playing professional football, practicing and training to play professional football and such other rights and services typically attendant to a person playing professional football (all of which are collectively referred to as "Playing Rights"), the Non-Commercial License, the Promotional Rights (as defined below) and Player's Likeness (as defined below) and no third party has any competing rights therein and neither Player nor any third party will attempt to assert any rights therein against the Alliance;

(iii)　　that he is free to enter into the SPA and that his doing so does not violate any other agreement to which he may be a party;

(iv)　　that he does not and will not, either directly or indirectly, own any stock or hold any other ownership or financial interest in any Alliance team or any other entity related to or affiliated with the Alliance;

(v)　　that by executing the SPA, he understands and accepts that he may be waiving any remaining eligibility to play collegiate sports and any related college scholarship or grant (not including any scholarship or grant provided by the Alliance, unless otherwise set forth in the SPA);

(vi)　　that he knows of no physical or mental conditions that could impair his ability to play skilled professional football during the Contract Period and has not knowingly concealed any such conditions;

(vii)　　that he shall maintain himself in excellent physical condition; and

Concord - Document ID: MzQyOTNiZDUtNG

(viii)    that he has not breached any previous standard player agreement or any other agreements between Player and the Alliance, in particular but without limitation, in connection with the provisions governing the use of the Playing Rights, the Player's Likeness and the Promotional Rights.

(b)    The Alliance represents and warrants that it is free to enter into the SPA and that doing so does not violate any other agreement to which it is party.

(c)    The warranting party will indemnify, defend and hold the other party harmless of and from any claims, actions, demands, losses, costs, expenses, liabilities, penalties and damages in the event its representations and warranties set forth in this Section are in any way materially inaccurate and the warrantee will use reasonable efforts to mitigate any loss suffered by it.

6.      Video/Digital Images, Pictures, Likenesses and Promotions.

(a)    During the Contract Period, the Alliance shall have the right to create or have created Embodiments, individually and/or as part of a group, at or in connection with any training, games (including Player features for game broadcasts or other publication regardless of platform or format) and/or on and in connection with the Promotional Rights. Player shall be available during the Contract Period, individually or with other players, to have Embodiments created at such reasonable times and places as the Alliance or the team to which Player is allocated by the Alliance shall designate. The Alliance shall have Promotional Rights with respect to any Embodiments created under the SPA or the Football Administration Manual. All rights, including, but not limited to, copyright, in any such Embodiments shall belong to the Alliance throughout the world and Player assigns such rights to Alliance together with all causes of action and enforcement mechanisms, rights and procedures. All rights in the Embodiments created under the SPA and all Promotional Rights with respect to such Embodiments shall be exclusive, irrevocable and survive the termination of the Contract Period (and without regard to the circumstances in which the SPA expires or is terminated).

(b)    Grant of Non-Commercial Licensing Rights. Player hereby grants to the Alliance the authority to use Player's Likeness ("Non-Commercial License") for any and all uses or purposes that promote the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other media or formats whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms, and Player hereby acknowledges that the Non-Commercial License includes the right and authority for the Alliance to use and authorize affiliates and business partners to use the Non-Commercial License solely for the purposes described herein. Player will cooperate with any such media and will participate upon request in reasonable activities to promote the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league. Player will not contest the rights of the Alliance and Alliance teams to use Player's Likeness and the Playing Rights in connection with the telecast, broadcast or other transmission of Alliance football games or any other related content or the right of the Alliance to use Player's Likeness to

produce, sell, market, advertise or distribute football game film footage or any other related content for the promotion of the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league. The Alliance may also use such broadcasts, telecasts or transmissions of footage in social media, digital gaming and Alliance digital platforms and in any and all media now or hereafter known.

7.    <u>Definitions</u>.  For purposes of the SPA and the Football Administration Manual and such other Alliance rules, regulations and policies applicable to Player, the definitions set forth below apply:

(a)    "<u>Embodiment</u>" means any communication or depiction of any Likeness of Player, alone or together with other players' Likenesses, which is recognizable or identifiable, whether live, fixed in any tangible form, reproduced or simulated, still or moving, in audio, visual, audiovisual and other forms of media and no matter how stored, transmitted, distributed or otherwise communicated to others, by any means or media now or hereafter known.

(b)    "<u>Likeness</u>" means a player's:

(i)    picture, image, photograph, portrait or performance (whether such picture, image, photograph, portrait or performance is still, motion, video, digital, high definition or any other medium now known or hereafter developed);

(ii)    name or nickname;

(iii)    signature or facsimile thereof;

(iv)    voice;

(v)    identifiable attributes or any colorable imitation or adaptation thereof;

(vi)    to the extent that he has rights therein, biometric data, regardless of how such biometric data is collected, transmitted, obtained or stored; and

(vii)    to the extent that he has rights therein, biographical information.

(c)    "<u>Promotional Rights</u>" shall mean the right to promote, advertise and otherwise disseminate, by any means or media now or hereafter known, any Embodiments, created during the Contract Period, for the promotion, marketing, sale or advertising of the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league, and the right to grant to third parties the right to use Player's Likeness to create and use any Embodiments to promote, market, advertise, sell, by any means or media now or hereafter known, the Alliance, Alliance teams, Alliance games, game broadcasts and telecasts, programming focused on the Alliance, Alliance players, Alliance teams, and the Alliance's brand and identity as a professional football league.

8.    <u>Player's Unique Skill and Breach of Agreement; Dispute Resolution</u>.

(a)     Player represents that he has extraordinary and unique skill and ability as a football player, that the services to be rendered by him under the SPA cannot be replaced or the loss thereof adequately compensated for in money damages and that any breach or violation by Player of the SPA or the Football Administration Manual (as the case may be) will cause irreparable injury to the Alliance and to its assignees. In addition, Player understands and acknowledges that refusing or failing to report to training, games or commercial appearances (with respect to the Promotional Rights or Non-Commercial License) for any reason without the prior written approval of the Alliance constitutes a breach or a violation of the SPA or the Football Administration Manual (as the case may be) and is extremely disruptive to the operation of the Alliance. Therefore, in the event that the Alliance believes Player is, during the Contract Period, refusing or failing to report for any reason or playing, attempting or threatening to play, or negotiating for the purpose of playing for any other person, firm, corporation, professional football team, association, league or organization, without the prior written consent of the Alliance, then the Alliance and its assignees shall have the right to seek equitable relief or otherwise resolve the dispute through the Grievance Procedures set forth and defined in the Football Administration Manual.

(b)     Player understands that he is competing with other players for a position on an Alliance team roster within the applicable player roster limits. If at any time, in the sole judgment of the Alliance, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions in the Alliance (a "Skill Termination"), or if Player engages in or has engaged in conduct that is detrimental to the best interests of the Alliance or the public's confidence in the integrity of Alliance games, or may otherwise impair, the reputation, character or standing of the Alliance (as determined by the Alliance in its sole discretion) (a "Morality Termination"), then the Alliance may immediately terminate this Agreement with no further payment obligations to Player. Further, if Player is terminated by the Alliance for a Morality Termination, the Player's remaining annual salary for that Alliance regular season shall be escrowed until such time as the charges or claims that resulted in Player's Morality Termination are fully and finally adjudicated. If such changes are adjudicated as false or improper, then the escrowed amount shall be paid to Player. If such charges result in Player's conviction or such claims are adjudicated as proper, the Alliance shall permanently retain the escrowed amount and Player waives any and all rights to such escrowed amount.

(c)     Except as otherwise provided herein with respect to injunctive relief, all disputes arising out of, relating to and in connection with the SPA, or otherwise relating to Player's employment by the Alliance, shall be resolved exclusively and solely through the Grievance Procedures set forth in the Football Administration Manual.

(i)     All decisions issued pursuant to the Grievance Procedures shall be final, unappealable and binding on the parties and may be immediately entered as a judgment in any court of competent jurisdiction.

(ii)     Player and the Alliance understand that once a decision has been rendered pursuant to the Grievance Procedures set forth in the Football Administration Manual, such decision may be immediately taken to any court having jurisdiction for the purpose of confirming a judgment and seeking appropriate enforcement and relief, including obtaining such equitable relief as may be appropriate, including but not limited to a decree enjoining Player from any further breach or violation of the SPA or the Football Administration Manual (as the case may be) or any other agreement or commitment to provide exclusive rights or services to the Alliance or Alliance Properties, including from

playing football for any other person, firm, corporation or organization during the Contract Period, all without the Alliance posting a bond or other security or proving actual damages.

        9.       <u>Teams as Alliance Agents</u>. Instructions given or requests made by the Alliance to Player pursuant to the SPA or the Football Administration Manual may be made by the team to which Player has been allocated by the Alliance and for such purposes such Alliance team shall be acting as an authorized agent of the Alliance, acting through its General Manager or Head Coach or their designees. The scope of the authority of teams to act as agent of the Alliance shall be as set forth in the Alliance's rules, policies and regulations governing the relationship between the Alliance teams and the Alliance. In relation to those instructions and/or requests specifically contemplated by the SPA or the Football Administration Manual to be directed to Player by a team, Player shall be entitled to assume that the team has the authority to act on the Alliance's behalf.

        10.      <u>Injury</u>. If Player is injured in the performance of his services under the SPA and promptly reports such injury to an Alliance or Alliance team physician, then Player will receive such medical and hospital care during the Contract Period as an Alliance physician may deem necessary and, if during the regular season Player is physically unable to perform the services required of him by the SPA because of such football-related injury, as determined by the Alliance or Alliance team physician in such physician's sole and absolute professional judgment, Player will continue to receive his Base Compensation for the period he is physically unable to perform during the season of injury only and for no subsequent period covered by the SPA. If Player's injury in the performance of his services under the SPA results in his death, the unpaid balance of his Base Compensation for the season of injury only will be paid to his stated beneficiary or, in the absence of a stated beneficiary, to his estate.

        11.      <u>Workers' Compensation</u>. Any compensation paid to Player under the SPA, for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial or permanent partial disability will be deemed an advance payment of workers' compensation benefits due to Player and the Alliance will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

        12.      <u>General Provisions</u>.

        (a)      <u>Interpretation of Terms</u>. The terms of the SPA and the Football Administration Manual shall be interpreted to give maximum effect to the Alliance's intent (and Player's acknowledgment thereof) to establish, through the SPA, the Football Administration Manual and other rules, regulations, policies and practices applicable to Player and players, a framework within which to manage effectively and administer a professional sports league. The language of the SPA shall be construed neutrally and without regard for which party drafted such language. If any provision of the SPA is determined to be invalid or unenforceable, the remaining provisions of the SPA, as applicable, shall be enforced in accordance with their terms. Player acknowledges that by executing the SPA, he understands that he is bound by the terms of the SPA, the Football Administration Manual and such other player-related policies as may be adopted and implemented from time to time by the Alliance, all of which shall be adopted with notice to Player and made available to Player on the Alliance website or by any other digital storage that is accessible to Player.

        (b)      <u>Termination</u>. The rights of termination set forth in the SPA and/ or the Football Administration Manual will be in addition to any other rights of termination

allowed either party by law.  Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under the SPA, will automatically terminate the SPA.

(c)     <u>Rules</u>.  Player will comply with and be bound by all Alliance rules, regulations, policies and employment practices applicable to Player and players in the Alliance in effect (or as amended) during the Contract Period.

(d)     <u>Integrity of Game</u>.  Player recognizes the detriment to the Alliance and professional football that would result from impairment of public confidence in the integrity of the game, in the honest and orderly conduct of Alliance games, or in the integrity and good character of the Alliance players.  Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix any Alliance game; fails to promptly report a bribe offer or an attempt to throw or fix any Alliance game; bets on any Alliance game; knowingly associates with gamblers or unauthorized gambling activity; or is guilty of any other form of conduct judged by the Alliance to be detrimental to the best interests of the Alliance, to the public's confidence in the integrity of the game, or the best interest of the game of professional football in general, then, subject to the Alliance's sole and absolute discretion, the Alliance shall have the right to issue appropriate discipline including banning Player from playing in the Alliance indefinitely and to terminate the SPA.

(e)     <u>Extension</u>.  If Player becomes a member of the Armed Forces of the United States or any other country, accepts a contractual offer to join a non-Alliance team with the Alliance's prior written consent, retires from professional football as an active player or otherwise fails or refuses to perform his services under the SPA, then the SPA will be tolled between the date of Player's induction into the Armed Forces, his acceptance of a non-Alliance contract, his retirement or his failure or refusal to perform and the later date of his return to professional football with the Alliance.  During the period the SPA is tolled, Player will not be entitled to any compensation or benefits.  On Player's return to professional football with the Alliance, the Contract Period will be extended for a period equal to the number of seasons (or portion of a season) remaining at the time the SPA was tolled.  The Alliance's right of renewal, if any, contained in the SPA will remain in effect until the end of any such extension of the Contract Period.

(f)     <u>Assignment</u>.  The Alliance may assign the SPA and Player's services thereunder to any successor to the Alliance or to any other team in the Alliance.  Player will report to his assigned Alliance team promptly upon being informed of any such assignment and will faithfully perform his services under the SPA.  Player may not assign the SPA without the prior written consent of the Alliance.

(g)     <u>Notice</u>.  Any notice, request, approval or consent under the SPA or the Football Administration Manual will be sufficiently given if in writing and delivered in person, emailed or mailed (certified or first class) by one party to the other at the addresses set forth on the signature page to the SPA or to such other address as the recipient may subsequently have furnished in writing to the sender.

(h)     <u>Other Agreements</u>.  The SPA, and the Authorized Alternative League Release, set forth the entire agreements between the parties regarding the subject matter of this Agreement and cannot be modified or supplemented orally.

(i)     <u>Law</u>.  The SPA is made under and shall be governed by the laws of the State of Delaware.

*[Remainder of Page Intentionally Left Blank]*



**ALLIANCE**
**OF AMERICAN FOOTBALL**

### STANDARD COMMERCIAL LICENSE AGREEMENT

**THIS LICENSE AGREEMENT** is made and entered into by and between Alliance Properties, LLC, a Delaware limited liability company ("<u>Alliance Properties</u>"), and Colton Schmidt ("<u>Player</u>") (the "<u>Agreement</u>") with regard to the use by Alliance Properties of Player's Likeness on, and in connection with, the Commercial License (as such terms are defined below).

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in this Agreement, the parties agree as follows:

1.     <u>Term, Termination and Extension</u>.

(a)     <u>Term</u>.  Subject to the termination provision(s) of this Agreement, the term of this Agreement shall commence on the last date set forth on the signature page below (the "<u>Effective Date</u>") and shall continue for three (3) years from the Effective Date (the "<u>Term</u>").

(b)     <u>Termination</u>.  Notwithstanding the foregoing, if Player's Standard Player Agreement with AAF Players, LLC (the "<u>Alliance</u>") (the "<u>SPA</u>") is terminated due to a Skill Termination or a Morality Termination (as those terms are defined in Player's SPA), this Agreement may be terminated by Alliance Properties, at which time, subject to Section 2 of this Agreement, Player shall have no further rights with respect to the Player Participation Pool (as defined below). The rights of termination set forth in this Agreement will be in addition to any other rights of termination allowed to either party by law.  Termination will be effective upon the giving of written notice, except that Player's death will automatically terminate this Agreement.

(c)     <u>Extension</u>.  The Term shall be extended for another three (3) years upon execution by Player of a new SPA during the Term of this Agreement.  If Player's SPA is terminated due to Player's acceptance of a contract with an Authorized Alternative League (as defined in Player's SPA) (an "<u>Authorized Alternative League Termination</u>"), the remaining Term of this Agreement shall be extended to include the conclusion of the next subsequent Alliance League Year (as defined in the Football Administration Manual) immediately following the date on which the Term of this Agreement would have otherwise expired.

2.     <u>Grant of Commercial Licensing Rights</u>.  Player hereby grants to Alliance Properties worldwide, exclusive rights in and to Player's Likeness pursuant to the terms set forth herein (the grant of the worldwide, exclusive rights in and to Player's Likeness as set

forth herein, the "Commercial License"). Player acknowledges that this grant of the worldwide, exclusive rights in and to Player's Likeness is essential to the formation of the Player Participation Pool, a new potential source of compensation for all players in the Alliance, and commercial programs associated therewith. Player hereby acknowledges that the rights he is granting to Alliance Properties under the Commercial License shall include, but are not limited to, the irrevocable and exclusive worldwide right, in any and all media now or hereafter known, including, but not limited to, newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other media or formats whether analog, digital or other, now known or hereafter developed, including, but not limited to, print, tape, disc, computer file, radio, television, motion pictures, other audio-visual and audio works, Internet, broadband platforms, mobile platforms, applications, and other distribution platforms, to use, assign or license the Likeness (including the right to use or license Player's Likeness in connection with the Likenesses of other players, former players and other persons affiliated with the Alliance of American Football (the "League")) in combination with the use of any or all League team names, logos, trademarks, trade dress, uniforms or other form of intellectual property, for any commercial purpose, including but not limited to: (1) in any form of trade or consumer promotion; in the sale, distribution, promotion, marketing or advertising of any good, of any consumer product, or of any service; such rights shall also include the use of Player's Likeness in all collateral materials, point of sale materials, and/or packaging associated with the rights set forth herein, (2) in any form of, or in connection with, products licensed by Alliance Properties, and (3) on and in connection with any sponsorship or endorsement of the League by third parties. Player understands and agrees that at the conclusion of the Contract Period (as set forth in Player's SPA), Alliance Properties shall continue to have the right to use the Commercial License, subject to Player's continuing eligibility to participate in the Player Participation Pool (as defined below). Player acknowledges that Alliance Properties may grant, sub-license or assign the Commercial License without Player's further approval or consent. Player also understands and agrees that this Commercial License authorizes Alliance Properties to use his Likeness in connection with corporate sponsorships and Alliance Properties shall have the right to represent Player and commit Player, subject to Player's reasonable availability and approval, to make appearances and provide other personal services on behalf of Alliance Properties and in connection with corporate sponsorships and the general promotion of the Alliance, provided that Player shall be eligible to receive additional compensation for such appearances and other personal services through the Player Participation Pool.

3.      Embodiments. During the Term, Alliance Properties shall have the right to create or have created Embodiments, individually and/or as part of a group, at or in connection with any training, games (including Player features for game broadcasts or other publication regardless of platform or format). Player shall be available during the Term, individually or with other players, to have Embodiments created at such reasonable times and places as the Alliance shall designate. All rights, including, but not limited to, copyright, in any such Embodiments, shall belong to Alliance Properties throughout the world and Player assigns such rights to Alliance Properties together with all causes of action and enforcement mechanisms, rights and procedures. All rights in the Embodiments shall be exclusive and irrevocable, and survive the termination of the Term.

4.      Exception to Grant Commercial Licensing Rights to Authorized Alternative League. Notwithstanding anything herein to the contrary, upon Player's written request, Alliance Properties may grant Player written permission to grant use of Player's Likeness to an Authorized Alternative League, provided: (1) such Authorized Alternative League has teams playing in no fewer than 25 professional football markets; and (2) Player presents

Alliance Properties with suitable evidence of a contract offer from a team in such Authorized Alternative League and, within three (3) days of its complete execution, Player provides Alliance Properties with a copy of the fully executed contract to play in such Authorized Alternative League.

5.     <u>Restriction from Granting Commercial Licensing Rights to Competitive Alternative League</u>.  Player shall not:

(a)     permit a professional football league (or any person or entity associated therewith) that plays its regular season games primarily in or between the months of February through July ("<u>Competitive Alternative League</u>") to use Player's Likeness for any reason during the Term of this Agreement and for the duration of the next subsequent Alliance League Year following the Term of this Agreement, or

(b)     provide any personal services to a Competitive Alternative League during the Term of this Agreement and for the duration of the next subsequent Alliance League Year following the Term of this Agreement.

6.     <u>Player Participation Pool and Commercial Advances</u>.  As consideration for Player's grant of the Commercial License, if Player is added to the regular season roster of a League team, Player will be eligible to receive a fractional share of the Player Participation Pool in proportion to use of Player's Likeness to the total overall usage of all players' Likenesses in all programs, promotional activities, sales and licenses that are subject to the Player Participation Pool.  As additional consideration for the grant of the Commercial License, Player shall receive, as an advance against all payments that Player may earn or which may otherwise become due to Player under the Player Participation Pool:  (i) One Hundred Dollars ($100.00) if Player is added to the training camp roster of the League or a League team ("<u>Training Camp Commercial Advance</u>") and (ii), as an advance against all payments that Player may earn or which may otherwise become due to Player under the Player Participation Pool, an additional Nine Hundred Dollars ($900.00) if Player is added to the regular season roster of a League team ("<u>Regular Season Commercial Advance</u>").  Notwithstanding the foregoing, in the event that Player is not on a regular season roster and has not earned an amount equal to or greater than the Training Camp Commercial Advance and/or the Regular Season Commercial Advance, as applicable, Alliance Properties will not seek to recoup any unearned portion of the Training Camp Commercial Advance or the Regular Season Commercial Advance, as applicable.

(a)     <u>Standard Player Agreement</u>.  Player understands that nothing in Player's grant of the Commercial License above negates any of the Alliance's rights under the SPA or in the Football Administration Manual.

(b)     <u>Protection and Enforcement of Commercial License</u>.  Player hereby authorizes Alliance Properties to take all actions necessary to protect and enforce rights granted in the Commercial License.  Player further consents to Alliance Properties joining him as a party in any proceeding to prosecute or defend any claims relating to the Commercial License so long as Alliance Properties pays for the reasonable costs (including reasonable attorney's fees) of prosecuting and/or defending Player's interests in such an action; <u>*provided*</u>, <u>*however*</u>, that Alliance Properties shall not be required to pay such costs (including reasonable attorney's fees) if such joinder is in connection with Player's obligation (set forth in Section 6(e)) to indemnify Alliance Properties.

(c)     <u>Further Assurances</u>.  Player shall take such additional steps as Alliance Properties may reasonably request in connection with the Commercial License, including but not limited to the execution of additional documents that may be necessary for Alliance Properties to implement, confirm or enforce its rights under the Commercial License.

(d)     <u>Acknowledgments</u>.  Player acknowledges that the consideration stated herein, including the Training Camp Commercial Advance, the Regular Season Commercial Advance and payments from the Player Participation Pool, if earned, constitutes the entire and adequate consideration for the Commercial License.  Player further acknowledges that nothing in the Commercial License is intended to confer upon him any rights in the Embodiments created by or on behalf of Alliance Properties or its sponsors or licensees and nothing in the Commercial License is intended to obligate Alliance Properties, or its respective sponsors or licensees, to use Player's Likeness for any purpose.  For purposes of clarity, Player acknowledges that Alliance Properties has established, as and for additional consideration for the Commercial License, a pool of funds to compensate Player and players for the Commercial License and for participating in commercial, endorsement, and fan engagement activities, and such consideration shall be paid in accordance with Alliance Properties' policies (the "<u>Player Participation Pool</u>"), which may be amended from time to time to effectuate its intent to encourage Player and players to participate in commercial, promotional endorsement, and fan engagement activities.

(e)     <u>Indemnification</u>.  Player represents and warrants that he has not entered into any other agreements concerning his Likeness that would in any way conflict with Alliance Properties' rights (or those of its licensees or assignees) under the Commercial License.  Player shall indemnify and hold Alliance Properties (and its affiliates, licensees, and assignees) harmless from any claims, actions, demands, losses, costs, liabilities, penalties and damages arising out of his entering into agreements that conflict or interfere with the rights granted to Alliance Properties (or its respective licensees or assignees) under the Commercial License or his breach of this Agreement.

7.     <u>Covenants</u>.  Player shall:

(a)     not use the name or logo of any League team or Alliance Properties or any related entity for any purpose unless he shall have received the prior written consent and approval of Alliance Properties (which may be withheld in Alliance Properties' sole and absolute discretion);

(b)     not use or make any endorsements or commercial appearances, sponsor any products or consent to any third party using Player's name, picture or Likeness in which (1) he appears, either alone or with others, in any League team uniform, in any attire which closely resembles or is substantially similar to any League team uniform, is likely to confuse the public as to the affiliation of Alliance Properties or any League teams or in any attire bearing or displaying the marks and/or logos of any League teams; (2) he appears together with two (2) or more players or former players in the League in which Player and the other players, either directly or indirectly, identify themselves as players or former players in the League, regardless of their attire; or (3) he either directly or indirectly identifies himself as a player or former player in the League, unless he has received the prior written consent and approval of Alliance Properties (which may be withheld in Alliance Properties' sole and absolute discretion);

(c)     at all League team games, practices, training camps, clinics or other

events sponsored or arranged by Alliance Properties or any League teams and at all Player appearances, wear and/or display only such footwear, clothing, equipment and other items as are endorsed by Alliance Properties or the team to which Player is allocated by the League (and shall promptly obey and comply with any and all other guidelines and directives hereinafter issued by Alliance Properties regarding apparel and/or equipment, permitted or not permitted to be worn or utilized by players for such League team); and

(d)     not display any logo upon or endorse, or agree to display any logo upon or endorse, any item of on-field equipment which is not produced by an official equipment supplier of the League.

8.     <u>Definitions</u>. For purposes of this Agreement and such other League rules, regulations and policies applicable to Player, the definitions set forth below apply.

(a)     "<u>Embodiment</u>" means any communication or depiction of any Likeness of Player, alone or together with other players' Likenesses, which is recognizable or identifiable, whether live, or fixed in any tangible form, reproduced or simulated, still or moving, in audio, visual, audiovisual and other forms of media and no matter how stored, transmitted, distributed or otherwise communicated to others, by any means or media now or hereafter known.

(b)     "<u>Likeness</u>" means a player's:

(i)     picture, image, photograph, portrait or performance (whether such picture, image, photograph, portrait or performance is still, motion, video, digital, high definition or any other medium now known or hereafter developed);

(ii)     name or nickname;

(iii)     signature or facsimile thereof;

(iv)     voice;

(v)     identifiable attributes or any colorable imitation or adaptation thereof;

(vi)     to the extent that he has rights therein, biometric data, regardless of how such biometric data is collected, transmitted, obtained or stored; and

(vii)     to the extent that he has rights therein, biographical information.

9.     <u>General Provisions</u>.

(a)     <u>Interpretation of Terms</u>. The language of this Agreement shall be construed neutrally and without regard for which party drafted such language. If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement, as applicable, shall be enforced in accordance with their terms.

(b)     <u>Assignment</u>. Alliance Properties may assign this Agreement and Player's obligations thereunder to any successor to Alliance Properties. Player may not assign this Agreement without the prior written consent of Alliance Properties.

(c)     <u>Notice</u>. Any notice, request, approval or consent under this Agreement will be sufficiently given if in writing and delivered in person, emailed or mailed (certified or first class) by one party to the other at the addresses set forth on the signature page to this Agreement or to such other address as the recipient may subsequently have furnished in writing to the sender.

(d)     <u>Other Agreements</u>. This Agreement, sets forth the entire agreement between Player and Alliance Properties and cannot be modified or supplemented orally. Player and Alliance Properties each represent that no other agreement, oral or written, except as specifically incorporated in this Agreement, exists between them.

(e)     <u>Amendment and Modification</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

(f)     <u>Disputes</u>.

(i)     <u>Injunctive Relief</u>. Player acknowledges that this grant of the worldwide, exclusive rights in and to Player's Likeness is essential to the formation of the Player Participation Pool, a new potential source of compensation for all players in the League, and commercial programs associated with the Player Participation Pool. Player acknowledges that his grant of the Commercial License in and to Player's Likeness is unique and has significant intangible and intrinsic value to Alliance Properties. Player acknowledges that Player's breach of the provisions of this Agreement will irreparably harm Alliance Properties and substantially interfere with and impair the effective administration of the Player Participation Pool and the commercial programs associated therewith to the substantial detriment to Alliance Properties and, among other things, other players who participate in the Player Participation Pool, and that any injury suffered by Alliance Properties as a result of Player's breach of the terms and conditions of this Commercial License cannot be adequately remedied with monetary damages. Accordingly, Player and Alliance Properties agree that irreparable damage would occur from any breach or threatened breach of any provision of this Agreement and that to prevent any breach or threatened breach of any provision of this Agreement, Player and Alliance Properties shall be entitled to equitable relief, including a temporary restraining order, preliminary injunction and such other injunctive or equitable relief, including specific performance, in addition to any other remedy to which they are entitled at law or in equity, all without Alliance Properties posting a bond or other security or proving actual damages.

(ii)     <u>Other Disputes</u>. Except as otherwise provided herein with respect to injunctive relief in Section 9(f)(i), all other disputes arising out of, relating to and in connection with this Agreement shall be resolved exclusively and solely through the Grievance Procedures set forth in the League's Football Administration Manual.

(A)     All decisions issued pursuant to the Grievance Procedures shall be final, unappealable and binding on the parties and may be immediately entered as a judgment in any court of competent jurisdiction.

(B)     Player and Alliance Properties understand that once a decision has been rendered pursuant to the Grievance Procedures set forth in the Football Administration Manual, such decision may be immediately taken to any court having jurisdiction for the purpose of confirming a judgment and seeking appropriate enforcement and relief, including obtaining such equitable relief as may be appropriate, including but not

limited to a decree enjoining Player from any further breach or violation of this Agreement, all without Alliance Properties posting a bond or other security or proving actual damages.

(g)     Law.  This Agreement is made under and shall be governed by the laws of the State of Delaware.

(h)     Counterparts.  This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart).  Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from or be represented by persons of his own selection.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned have executed this Standard Commercial License Agreement as of the last date set forth below.

**ALLIANCE PROPERTIES, LLC**

By: *JK McKay*

Name:  JK McKay

Its:  Head of Football Operations

**PLAYER**

Name:              Colton Schmidt

Signature:         *Colton Schmidt*

Date of Birth:     █████████

Street Address:    █████████

City, State or Province, Zip Code and Country: ██████ ██████

U.S. Social Security # or Canadian Social Insurance: ██ ██

Telephone:         ████████

Email:             ████████████

Date:              1/8/2019

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:            Derrick Fox

Street Address:      N/A

City, State or Province, Zip Code and Country: N/A

Telephone:       █████████

Email:           N/A

Date:            N/A



**ALLIANCE**
OF AMERICAN FOOTBALL

### AUTHORIZED ALTERNATIVE LEAGUE RELEASE

**THIS AGREEMENT** is made and entered into by and between AAF Players, LLC, a Delaware limited liability company, d/b/a The Alliance of American Football (the "Alliance"), and Colton Schmidt ("Player")

In consideration of the mutual promises, rights, obligations, terms and conditions set forth in this Agreement, the parties agree as follows:

Player is a party to a Standard Player Agreement ("SPA") with the Alliance and Player has requested Alliance consent to terminate his SPA to sign a contract to play in an Authorized Alternative League (i.e., a professional football league that plays all its games, except such league's championship game, in or between August through January and which has teams playing in no fewer than 25 of the top 40 Designated Market Areas in the United States of America). Player represents that he has met the conditions set forth in the SPA, and that prior to making his request for termination of his SPA, Player received a bona fide offer from the Authorized Alternative League.

Player acknowledges that the Alliance has (1) made a significant investment in Player's development; (2) provided a valuable forum for player to showcase his skills and (3) made a significant investment in the development and operation of the Alliance. Player also acknowledges that the termination of the SPA is not required of Alliance and further that Alliance has provided Player with other good and valuable consideration, the sufficiency and receipt of which is also hereby acknowledged by player.

Player agrees that, in exchange for the Alliance's termination of the SPA and for the other good and valuable consideration, receipt of which Player hereby acknowledges, he shall not, for a period of eighteen (18) months from the initial date on which he is no longer under contract with an Authorized Alternative League (the "Competitive Alternative League Exclusion"), execute a contract with, or play football for any team, professional football league, or association of teams that plays its regular season games in or between the months of

February through July ("Competitive Alternative League"), or provide any other personal services to a Competitive Alternative League. Following the expiration of the Competitive Alternative League Exclusion, Player agrees that Alliance shall have an additional thirty (30) day exclusive period to tender and sign a new SPA with Player ("Exclusive Tender and Signing Period") at the then prevailing compensation rate for Player, based on his years of service to Alliance and that during the Exclusive Tender and Signing Period, Player may not solicit or accept an offer to play football in a Competitive Alternative League.

Parties agree that irreparable damage would occur from any breach or threatened breach of any provision of this Agreement and that to prevent any breach or threatened breach of any provision of this Agreement, Player and Alliance shall be entitled to equitable relief, including a temporary restraining order, preliminary injunction and such other injunctive or equitable relief, including specific performance, in addition to any other remedy to which they are entitled at law or in equity, all without the Alliance posting a bond or other security or proving actual damages.

The language of this Agreement shall be construed neutrally and without regard for which party drafted such language. If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement, as applicable, shall be enforced in accordance with their terms.

The Alliance may assign this Agreement and Player's obligations thereunder to any successor to the Alliance. Player may not assign this Agreement without the prior written consent of the Alliance.

This Agreement, along with the SPA, sets forth the agreements between the parties regarding the subject matter of this Agreement and cannot be modified or supplemented orally.

This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

This Agreement is made under and shall be governed by the laws of the State of Delaware.

This Agreement may be executed in counterparts and by .pdf or facsimile copy, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument; provided, that no party will be bound hereto unless and until all parties have executed and delivered this Agreement (or a counterpart). Player acknowledges that before executing this Agreement, he was given the opportunity to seek advice from and be represented by persons of his own selection and acknowledges that he has read, understands, and agrees to the rights and responsibilities created by this Agreement.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed and agreed to this Authorized Alternative League Release as to form and content as of the last date set forth below.

**AAF PLAYERS, LLC**

By: *JK McKay*

Name:  JK McKay

Its:   Head of Football Operations

**PLAYER**

Name:        Colton Schmidt

Signature:   *Colton Schmidt*

Date of Birth:        ███████

Street Address:       ███████

City, State or Province, Zip Code and Country: ████████████

U.S. Social Security # or Canadian Social Insurance: ██ ██ ███

Telephone:            ███████

Email:                ██████████

Date:        1/8/2019

**AGENT OR LAWYER OF THE PLAYER (if any)**

Name:        Derrick Fox

Street Address:       N/A

City, State or Province, Zip Code and Country: N/A

Telephone:            █ ██████

Email:       N/A

Date:        N/A

████████████ ██ █████

███████████████████████████████



# EXHIBIT C

# Deposition Excerpts of Reggie Northrup

```
1                    UNITED STATES BANKRUPTCY COURT

2                  FOR THE WESTERN DISTRICT OF TEXAS

3                        SAN ANTONIO DIVISION

4        IN RE:

                                        CASE NO. 19-50900-cag

5        LEGENDARY FIELD EXHIBITIONS,

         LLC, et al.,                   CHAPTER 7

6

                    Debtors,

7        _____/

8        COLTON SCHMIDT, et al.,

9                    Plaintiffs,

10                   vs.               ADV PROC NO: 19-05053-cag

11       AAF PLAYERS, LLC, et al.,

12                   Defendants.

         _____/

13

14

15          VIDEOTAPE DEPOSITION OF REGGIE NORTHRUP

16                   Encino, California

17              Wednesday, May 12, 2021

18                      Volume I

19

20

21

22       Reported by:

23       DEBBIE RAZAVI, CSR NO. 9989

24       Job No.  4569540

25       PAGES 1 - 251
```

Page 1

1            UNITED STATES BANKRUPTCY COURT

2          FOR THE WESTERN DISTRICT OF TEXAS

3                 SAN ANTONIO DIVISION

4     IN RE:

                              CASE NO. 19-50900-cag

5     LEGENDARY FIELD EXHIBITIONS,

      LLC, et al.,                CHAPTER 7

6

              Debtors,

7     _____/

8     COLTON SCHMIDT, et al.,

9              Plaintiffs,

10             vs.          ADV PROC NO: 19-05053-cag

11    AAF PLAYERS, LLC, et al.,

12             Defendants.

      _____/

13

14

15         Videotape deposition of REGGIE NORTHRUP,

16    Volume I, taken on behalf of Defendants, at Abir Cohen

17    Treyzon Sala, LLP, 16001 Ventura Boulevard, Suite 200,

18    Encino, California, beginning at 9:47 a.m. and ending at

19    4:44 p.m. on Wednesday, May 12, 2021, before Debbie

20    Razavi, Certified Shorthand Reporter No. 9989.

21

22

23

24

25

                                          Page  2

```
 1      APPEARANCES

 2     For Plaintiffs:

 3         ABIR COHEN TREYZON SALA, LLP

 4         BY:   JONATHON S. FARAHI, ESQUIRE

 5         16001 Ventura Boulevard, Suite 200

 6         Encino, California 91436

 7         (833) 228-7529

 8         jfarahi@actslaw.com

 9         THOMPSON COBURN, LLP

10         BY: JOHN P. ATKINS, ESQUIRE

11         2100 Ross Avenue, Suite 600

12         Dallas, Texas 75201

13         (314) 552-6000

14         jatkins@thompsoncoburn.com

15         (Appearing via teleconference)

16     For Trustee Randolph N. Osherow:

17         BARRETT DAFFIN FRAPPIER TURNER & ENGEL

18         BY:   BRIAN ENGEL, ESQUIRE

19         3809 Juniper Trace, Suite 205

20         Austin, Texas 78738

21         (512) 687-2503

22         brianen@bdfgroup.com

23

24

25
```

Page 3

```
 1      APPEARANCES (Continued)

 2     For Defendant Charles Ebersol:

 3          JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP

 4          BY:  MICHAEL J. SALTZ, ESQUIRE

 5          1880 Century Park East, Suite 900

 6          Los Angeles, California 90067

 7          (310) 446-9900

 8          msaltz@jrsnd.com

 9          THOMPSON, COE, COUSINS & IRONS, LLP

10          BY:  WILLIAM N. RADFORD, ESQUIRE

11          700 North Pearl Street, Twenty-Fifth Floor

12          Dallas, Texas 75201

13          (214) 871-8200

14          wradford@thompsoncoe.com

15     For Tom Dundon:

16          BELL NUNNALLY & MARTIN, LLP

17          BY: JEFFREY S. LOWENSTEIN, ESQUIRE

18              BRENT D. HOCKADAY, ESQUIRE

19          2323 Ross Avenue, Suite 1900

20          Dallas, Texas 75201

21          (214) 740-1400

22          jlowenstein@bellnunnally.com

23          bhockaday@bellnunnally.com

24     The Videographer:  Mehran Khatchadorian

25
```

Page  4

1      Q.   October.  Okay.

2           And eventually you signed a contract with the

3      AAF.  And I have a note here -- we can get your

4      contract.  In fact, let's just go ahead and get your

5      contract.

6      A.   Yep.

7           MR. ENGEL:  Madam reporter, I'm going to hand

8      the witness what I have marked as 1 in the case, and

9      I'll hand it to you first, couple for the group.

10          I have handed you what's been marked and the

11     court reporter has what's been marked as Exhibit 1 in

12     the case.

13          If you could, I would like you to just kind of

14     flip through that and tell me if you recognize it.  And

15     I apologize, there's an extra white page between all the

16     pages which we can take out.

17          MR. LOWENSTEIN:  I was wondering why yours was

18     bigger than mine.

19          MR. ENGEL:  Remember the story I told you

20     earlier about licking my own stamps, pressing my own

21     copy button too.

22          MS. SALTZ:  It's nice you left pages for

23     notes.

24          MR. ENGEL:  Sharing is caring.  I'm sorry

25     about the white sheets in between, sir.

Page 16

1    Actually, with me they are usually not trick questions

2    because I'm not that smart.  All right.

3          Do you remember executing this contract?

4      A.   Yes, sir.

5      Q.   And you executed it by electronic means;

6    correct?

7      A.   Yes, and talking to my agent at the time.

8      Q.   But the actual --

9      A.   Yes, signature, yes.

10     Q.   Got it.

11          Did you get that, Madam reporter?

12     A.   Sorry.

13     Q.   You're doing fine.  All right.

14          If you look to the last page of that there's a

15   date that it was signed at the bottom.  Do you see that

16   there?  Is it October 18?

17     A.   Oh, wow, yeah.  Okay.  Yeah, I see that.

18     Q.   Does that refresh your recollection that you

19   signed the contract in October of 2018?  Does that sound

20   right?

21     A.   Yeah, that sounds right.

22     Q.   So the combine or mini-camp was probably a

23   little before that?

24     A.   The mini-camp had to have been after that.

25     Q.   Okay.

Page 18

1      Q.   I don't want to get off talking about Canada.

2  All right.  We will talk more about this contract later.

3           Let me ask you, and I think I know the answer

4  to this, is it fair to say you didn't talk with Charlie

5  Ebersol about this contract before you signed it;

6  correct?

7      A.   No, sir.

8      Q.   Tom Dundon wasn't in the picture; you didn't

9  talk to Tom Dundon either?

10     A.   No, sir.

11     Q.   That's in October 2018.

12          What happened after that?  Did you start

13  receiving paperwork, things to sign?  Just kind of tell

14  me what happened between October and January with

15  respect to your work for the AAF.

16     A.   I don't remember exactly what paperwork after

17  that.  I do remember the mini-camp, certain number of

18  guys were there.  They brought us in and we had to

19  perform to a certain level, they made cuts, about 20, 30

20  guys at the time at the end of it, it was like 34 days.

21  At the end of that, the next morning the guys who didn't

22  get phone calls at 6:00 a.m., they were still there so

23  they made the team.  For that part, and then, of course,

24  going into training camp to San Antonio in January they

25  made more cuts at the end of that camp.

                                        Page 21

1       Q.   Now, I'm going to jump around just a little

2    bit here because I think you played for one other team

3    after the AAF, and I just want to get that in one place

4    in our transcript.

5            After the AAF suspended its play operations,

6    you signed with an XFL team, I think?

7       A.   Yes.

8       Q.   Tell me about that.

9       A.   Yes.   Through that whole debacle when that was

10   all over with and died down, XFL was another team, you

11   know, popped up just like the AAF did and I seen it, it

12   was more -- seemed like a more for-sure opportunity so

13   took advantage of it.   A lot of those guys had -- a lot

14   of us from the Lions were on their radar already so a

15   lot of us we got invites to work out for the combine

16   showcase.

17      Q.   Were you aware about half of the staff of the

18   AAF ended up over at the XFL?

19      A.   By the season I started noticing staff of

20   other teams, all different organizations with the NFL.

21   It was expected.

22      Q.   Did you handle the negotiation of your XFL

23   contract yourself or was that Mr. Canter as well?

24      A.   Mr. Canter.

25      Q.   Same deal, he presented you with a contract

                                              Page 22

1     him and see if they match; right?

2          A.   Right.

3          Q.   All right.  That's what I wanted to talk with

4     you about, that subject, that little aside.  But let's

5     get back to your contract for a second.

6               The contract indicates -- and I'm on Page 2 --

7     that there will be base compensation.  Do you see that

8     there?

9          A.   Yes.

10         Q.   And the base compensation is per year, and it

11    will be paid during the regular season.  Is that how you

12    understood it?

13         A.   Yes, sir.

14         Q.   And so there was no expectation in your mind

15    that during the 2019 season you would start receiving

16    2020 money; correct?

17         A.   Yeah.  There was -- ask me that question one

18    more time.

19         Q.   Yeah.

20              You didn't have the view that during the 2019

21    season you could ask for and receive the money that you

22    would get in the 2020 season; right?  Those seasons are

23    separate?

24         A.   Yes.

25              MR. FARAHI:  Objection to form.

                                             Page 42

1          THE WITNESS:  Yeah.

2     BY MR. ENGEL:

3          Q.   But did you understand my question?

4          A.   I see what you are saying.

5               No, I didn't think I was going to get

6     $100,000.

7          Q.   Excellent.

8               And do you know if any other players had that

9     understanding?

10               MR. FARAHI:  Objection.  Form.

11               THE WITNESS:  I can't answer for anybody else.

12     BY MR. ENGEL:

13          Q.   Same thing as before, if I want to know I have

14     to ask them?

15          A.   Yeah.

16          Q.   If it matters in the case, I can't ask you;

17     true?

18               MR. FARAHI:  Objection to form.

19               THE WITNESS:  Yeah.

20     BY MR. ENGEL:

21          Q.   That's a "yes"?

22          A.   Yes, sir.

23          Q.   Sorry.

24               Are we going at a good pace for you?

25          A.   It's cool.

                                                    Page 43

1              MR. ENGEL:  Thank you so much.

2       Q.    Did you have a good break?

3       A.    Yeah.

4       Q.    We going at a good pace?

5       A.    Cool.

6       Q.    Am I being courteous to you?

7       A.    Yes.

8       Q.    Are we having a slight amount of fun?

9       A.    Cool.

10      Q.    Can I get you to crack one smile?  Excellent.

11   It doesn't have to be boring.

12      A.    I understand.

13      Q.    Okay.  When we last were talking before the

14   break we were talking about some statements that

15   occurred in magazines and such, and I wanted to refer

16   you to a paragraph of Exhibit 3 to help us go through

17   those.

18           Paragraph 20 is where I want you to go, if you

19   can.  It's on Page 7 at the bottom.

20           Do you understand in the case that you have

21   sued the debtors and others around this table for fraud

22   of various flavors?

23      A.    Yes.

24      Q.    Do you understand that?

25      A.    Yes.

                                        Page 59

1    Q.   Why did you sue them for fraud?

2         MR. FARAHI:  Objection.  Form.

3         THE WITNESS:  I'm not 100 percent with the

4    extent of all the different meanings of why, but one of

5    my main -- I understand why we are suing, I can tell you

6    that.

7    BY MR. ENGEL:

8    Q.   Tell me that.

9    A.   Where do I start?  You know, just

10   misinformation and misleading us, you know.

11   Q.   Okay.

12   A.   They breached the contract.  They didn't

13   fulfill the contract that we all signed at the end of

14   the day.

15   Q.   Okay.  That's two different things.  But those

16   are the two things?

17   A.   Yes.

18   Q.   You were misled and they didn't perform the

19   contract?

20   A.   Yes.

21   Q.   Is that the basic flavor?

22   A.   They didn't honor the contract.  We played

23   football.  I talked to my agent.  We signed to play

24   football for three years and gross $250 K and yet I got

25   cut short.

Page 60

1          THE WITNESS:  I felt like, yeah, we

2     understand, okay, you hearing speculation about a league

3     that's about to fold and then someone big comes in and

4     puts $250 million, you know, that's not a little bit of

5     money, if you got $250 million to put into it in a

6     starting league.  We did our research on who the guy

7     was, you know, so we felt secure at that point.

8     BY MR. ENGEL:

9          Q.  But either way you weren't going to quit; we

10    got to that point; right?

11         A.  Yeah, yeah.  I mean, well -- let's not get

12    this confused.  I'm a professional athlete and I play

13    for a fee, and at the end of the day if that wasn't

14    going to continue to have upheld, I was wasn't going to

15    keep playing football, of course not.  I don't play for

16    free.

17         Q.  Eventually you would quit if you didn't get

18    money?

19         A.  I'm not -- you understand every week we play

20    we are at risk of injuring ourselves and those injuries

21    can vary from really serious to light.

22         Q.  Let's talk about that for a second.

23         A.  That's how we make our money.

24         Q.  Let's talk about that for a second.

25             You did get injured; correct?

                                          Page 101

1    A.    Yes.

2    Q.    What happened?

3    A.    Ruptured UCL.

4    Q.    What week did that happen?

5    A.    That happened the week we played Memphis the

6    first time, so that had to be week three.

7    Q.    Okay.  And you were fully paid by that time --

8    right -- so you decided you weren't going to quit?

9    A.    Yeah, it's the football in me anyway.  Yeah, I

10   was paid so of course --

11   Q.    You're out there.

12   A.    If I'm paid and everything good, I'm going to

13   do whatever to takes to help my team.

14   Q.    Did you have to sit out with that injury?

15   A.    With my thumb I sat out the rest of that game,

16   but the next game I played they -- I would get a shot in

17   my thumb and they put a cast on.

18   Q.    Did the team doctor take a look at you and get

19   you hooked up with a medical plan where they did that?

20   A.    Uh-huh.

21        MR. LOWENSTEIN:  Is that a "yes"?

22        THE WITNESS:  Yes.  Yes.  Yes.  Yes.

23        MR. ENGEL:  Thank you.

24        Jeff, I appreciate it.  You do have my back.

25   All right.

Page 102

1                  He is telling me how much time is left on his

2      disk.

3           Q.    All right.   And you filed a claim for workers'

4      compensation benefits; correct?

5           A.    (Witness nods head.)

6           Q.    And you got paid the workers' compensation

7      benefits?

8           A.    I didn't get paid nothing.

9           Q.    The insurance company didn't pay you anything?

10          A.    I didn't get paid anything since the league --

11     I had to start over.   I walked away with whatever I made

12     and I saved my money at that time and I used that.

13          Q.    So the insurance company didn't pay your

14     medical bills?   Did you pay your medical bills out of

15     pocket?

16          A.    Oh, you're talking my medical bills?

17          Q.    Yeah.

18          A.    No, I didn't pay out of pocket, no.   While I

19     was there it got covered, got taken care of, yes.

20          Q.    And is it your understanding it got covered by

21     the workers' compensation carrier?

22          A.    I have no clue.

23          Q.    Do you know if everybody in the league had

24     workers' compensation coverage?

25          A.    No, I'm not sure.

Veritext Legal Solutions
800-336-4000

1           What I do know is it was a work comp issue at
2       the time when we was commuting, but other than that, no,
3       I have no knowledge.
4           Q.   But whatever that issue was, it didn't affect
5       you because when you were injured you got your bills
6       paid?
7           A.   Yeah.  Did it get repaired, no, but I got it
8       checked.
9           Q.   Did anybody ever issue you a form that says
10      you have obtained maximum medical recovery or something
11      like that?
12          A.   Yeah, yeah, I got cleared.
13          Q.   Okay.  So cured or not, it got as cured as it
14      was going to get.
15               And would you agree with me that as a
16      professional football player you take some of the risk
17      that things like that might happen?
18               MR. FARAHI:  Objection to form.
19               THE WITNESS:  We take -- of course we are
20      aware we take risk but we get compensated.
21      BY MR. ENGEL:
22          Q.   I get that.  But you weren't of the mind that
23      you would walk out onto the field and never suffer an
24      injury; right?
25          A.   Oh, no.

Page 104

1         Q.    Okay.  In 57, if you read it -- let me know

2     when you get there.

3         A.    Okay.

4         Q.    At the bottom of that at paragraph 57 it says

5     that "When Dundon agreed to provide the AAF with the

6     multimillion dollar line of credit, he did not intend to

7     acquire the AAF as a developmental league."

8               You don't really know anything about

9     Mr. Dundon's intentions, do you?

10        A.    No.

11        Q.    So we don't have to talk about that.  That's

12    just one of those kind of things that's an allegation

13    subject to being proved -- right -- but you can't prove

14    it, can you?

15        A.    No, I can't.

16        Q.    And you don't know who can, do you?

17        A.    I have no clue.

18              MR. ENGEL:  Are we at the end?  I'll just use

19    up this last little bit.

20        Q.    Let me ask you, you have sued a company called

21    Legendary Field Exhibitions.  Do you know that?

22              MR. FARAHI:  Objection.  Form.

23    BY MR. ENGEL:

24        Q.    Or don't you know that?

25        A.    I have heard of that.

                                            Page 108

```
 1            A.    I don't know.

 2                  MR. ENGEL:  We are at the end of the tape.

 3        Let's take a couple of minutes.

 4                  MR. FARAHI:  We are picking up lunch at

 5        so lunch will be here at 12:30 for you guys.

 6                  (Discussion amongst counsel)

 7                  THE VIDEOGRAPHER:  We are not off the record

 8        yet, sir.  One second, please.

 9                  We are going off the record.  This is the end

10        of media number one.  The time is 12:05 p.m.  Thank you.

11                  (Recess taken.)

12                  THE VIDEOGRAPHER:  We are back on the record.

13        This is the beginning of media two.  The time is

14        12:17 p.m.

15                  Counsel, you may proceed.

16        BY MR. ENGEL:

17            Q.    Thank you, sir, Madam reporter.

18                  Can I get you in Exhibit No. 3 to flip on back

19        to paragraph 71.  You're in the right paper.  You ready?

20        You there with me?

21            A.    Yes.

22            Q.    Excellent.

23                  So paragraph 71 and 70 above that reference a

24        February 19, 2019 interview that Mr. Dundon is said to

25        have given.  Do you see that there?
```

                                                    Page 110

1     A.   Yes, I see that.

2     Q.   Did you listen in on that interview?  What do

3  you remember about it if you did, or did you not?

4     A.   I didn't listen on that specific interview.

5     Q.   Did not?

6     A.   No, I did not.

7     Q.   Did you read it later?

8     A.   Yes, I did read one of those interviews.

9     Q.   When did that happen?

10    A.   The week we finally got paid.  I don't

11  remember exactly which day specifically, but the week we

12  got paid we did hear about, you know, Dundon.

13    Q.   I'm asking you a more particular question.

14  Just so I'm doing my job, let me make sure that I get

15  the answer to the question I'm asking.

16         I want to know when you read the interview, if

17  you read it.

18         MR. LOWENSTEIN:  Are you saying a transcript?

19  Can you use that term?

20         MR. ENGEL:  Let me break it down.  Thank you.

21    Q.   Did you read a transcript of the interview?

22    A.   Yes, with the "money in the bank" when he said

23  "The money is in the bank," yes.

24    Q.   Where did you get the transcript?

25    A.   I read that -- I read it on my social media.

Page 111

1   I read it on my social media account seeing it in a

2   tweet and that was it.

3       Q.   Who was the tweet from?

4       A.   I don't remember.

5       Q.   It wasn't from Mr. Dundon?

6       A.   No.

7       Q.   The February 19 call, did you ever watch the

8   interview on the Internet?

9       A.   No.

10      Q.   Would it be fair to say that you don't have a

11  particular recollection of exactly what words were used

12  in the interview or the transcript, you just kind of

13  remember the gist?

14      A.   I just remember the gist of the whole thing.

15  I don't remember which words were exactly used.  The

16  only words I do remember that stuck out to me was "money

17  in the bank."  That's the only thing that stuck out to

18  me.

19      Q.   Understand.  Let me just ask you, though, the

20  same questions we have been asking before.  If I want to

21  know whether anybody else read it, can't ask you; right?

22      A.   No, you couldn't ask me.

23      Q.   I could ask you, but you couldn't answer.

24      A.   You could.  I don't have an answer for you.

25      Q.   And if I wanted to ask you when they read it,

Page 112

1          A.    Yes.

2          Q.    That's the statement you're remembering?

3          A.    (Witness nods head.)

4          Q.    Now, if you'll go over to 79 for me, there's

5     an allegation in here that Mr. Dundon's investment and

6     post-investment comments, in particular, were widely

7     disseminated throughout the AAF by representatives and

8     agents of the AAF.  Do you see that there?

9          A.    Uh-huh.  Yes.

10          Q.    Do you know who those agents were that are

11     being referred to there?

12          A.    No, I have no clue.

13          Q.    Did you ever see any agents widely

14     disseminating information?

15               MR. FARAHI:  Objection.  Form.

16               THE WITNESS:  I don't recall.

17     BY MR. ENGEL:

18          Q.    Okay.  So you don't know one way or the other?

19          A.    Say it again.

20          Q.    You don't know one way or the other?

21          A.    I don't know.  I was focussed on football at

22     this point.

23          Q.    That's just one of those facts that alludes

24     people over time?

25          A.    Uh-huh.

Page 114

1    Q.    So you can't help us at trial understand

2    anything about those allegations; true?

3    A.    Yeah, I cannot.

4    Q.    Okay.  Look at 85 for me.

5         Just to paraphrase, paragraph 85 says that you

6    wouldn't have played if you'd known it wasn't a

7    legitimate league; right?  Am I getting that right --

8    A.    Yes.

9    Q.    -- as a paraphrase?

10        But you did believe it was a legitimate

11   league; true?

12   A.    Yes.

13   Q.    And it hired legitimate people; true?

14   A.    Yes.

15   Q.    And it held a season; true?

16   A.    Yes.

17   Q.    And it rented lots of facilities?

18   A.    Yes.

19   Q.    And it hired great players, the best as I

20   know, that were available who weren't already in the

21   NFL; right?

22   A.    Yes.

23   Q.    And you were one of those best available?

24   A.    Yes.

25   Q.    And you didn't -- I think we covered earlier,

Page 115

1  everybody was kind of concerned.  And then next week

2  starting a new week we had a team meeting.  Coach

3  Spurrier brought us in and gave us the bad news.  We

4  were in disbelief at the team meeting and he confirmed

5  it.

6        Q.    Okay.  So it came from Coach Spurrier

7  ultimately to you guys?

8        A.    (Witness nods head.)

9        Q.    That's probably the best place a man can get

10  bad news from.

11        A.    Yeah.

12        Q.    What did you do after you heard that

13  announcement?

14        A.    I was devastated, sick, you know, like thought

15  hard about bouncing around, thought I had a break,

16  finally catch my break, play football, things going

17  good, and then boom, gone, back to square one.

18        Q.    Do you recall that on April 4 the league

19  communicated to all of the players that they were free

20  to seek opportunities elsewhere with the NFL and other

21  teams?

22        A.    Yes.

23        Q.    Did you do that?

24        A.    Yes.

25        Q.    What did you do?

Page 118

1      A.    Well, I was dormant for a little bit and then

2    XFL popped up.

3      Q.    Okay.  I asked you a bad question.

4            What did you do just then?  We'll get to the

5    XFL.

6      A.    Just then at that moment?

7      Q.    Uh-huh.

8      A.    When I got the bad news?

9      Q.    Yes.

10     A.    Man, shoot, called my parents.

11     Q.    Yeah.

12     A.    Just start checking in like my personal

13   expenses and stuff that I have to do, you know, and

14   adjust, you know, to where I have to be at because it

15   was just so abruptly, it was the middle of the season.

16     Q.    Did you call your agent?

17     A.    Yes.

18     Q.    And do you know what he did to go out and try

19   to generate some interest with the NFL or other teams?

20     A.    No.  Players never really know what

21   their agent is out there doing.  We just, you know,

22   communicate with them.

23     Q.    Okay.  Did you ultimately get a look with an

24   NFL team after that April 4th announcement that you were

25   free to do it?

Page 119

```
 1        they did like a mini-draft and Tampa wanted to pick me.
 2             Q.   You ended up with is it the Vipers?
 3             A.   The Vipers, yes.
 4             Q.   Vipers, yeah.  All right.
 5                  And you signed with them in December or early
 6        January of 2020?
 7             A.   Yes.
 8             Q.   Let me ask you this, you're aware, aren't you,
 9        that the contract you had with the AAF, all other things
10        being equal, didn't allow you to sign with a league like
11        the XFL; right?
12             A.   Yes.  When they got cancelled or terminated,
13        it allowed me to.
14             Q.   So you considered your contract to be
15        terminated and you could, therefore, go to the XFL?
16             A.   On top of the notice that we got.
17             Q.   And you did go to the XFL?
18             A.   Yes.
19             Q.   Okay.  How about other players, do you know
20        what they thought about their contract or going to the
21        XFL?  Did everybody try to go?
22             A.   I don't have full knowledge, but I know a lot
23        of guys cease and desist their football careers due to
24        the league shutting down so they didn't bother trying to
25        go anywhere else.
```

                                              Page 129

1          Q.    Okay.  So there were some players after the

2     AAF who decided not to go to the XFL or try?

3          A.    Yeah, they hung up their careers.  I guess

4     they felt like that was such a bad blow that they hung

5     it up.

6          Q.    Do you know who any of those guys are by name?

7          A.    Not exactly.

8          Q.    Well, to the extent that they decided not to

9     go somewhere and you decided to go somewhere

10    inconsistent with the promises you made in this

11    contract, your situation is different than theirs';

12    right?

13               MR. FARAHI:  Objection.

14               THE WITNESS:  Ask me the question one more

15    time.

16    BY MR. ENGEL:

17         Q.    In this sense they decided not to go

18    somewhere, you tried to go somewhere?

19         A.    Yeah, yeah, I was trying to continue my

20    football career, yes.

21         Q.    So you were kind of treating this contract as

22    if it were over at that point; right?

23         A.    Yes, that's what we were told.

24         Q.    And that's what you thought?

25         A.    That's what we were told.

Page 130

```
 1        there.   Page 40.   It's near the very back.   Okay.

 2               Do you know what compensatory damages you're

 3        seeking, or do you know what "compensatory damages" are?

 4          A.    Compensation.

 5          Q.    What compensatory damages are you seeking?

 6               MR. FARAHI:   Objection to form.

 7               THE WITNESS:   Pain and suffering, breach of

 8        contract, and, you know, pain and suffering and breach

 9        of contract, you know, for the most part.

10        BY MR. ENGEL:

11          Q.    The answer is just what the answer is.

12          A.    Yeah.

13          Q.    You see in B, "Physical pain and suffering of

14        a past, present and future nature."   Did we talk about

15        all of the injuries you had that are the basis of

16        seeking that kind of damages, your thumb?

17          A.    No, we did not.

18          Q.    We didn't?

19          A.    We talked about my thumb.

20          Q.    What are your other damages?

21          A.    My thumb really was the main one, my main

22        injury.   I was in a cast for like five or six weeks.

23          Q.    Related to the thumb?

24          A.    Yes.

25          Q.    And workers' comp benefits were paid for that;
```

                                              Page 132

1    is that true?

2         A.    I'm unaware.

3         Q.    You didn't pay for it?

4         A.    I didn't pay for it.

5         Q.    No one has ever come and asked you "Hey,

6    where's our money"?

7         A.    No.

8         Q.    And so while you were in a cast for five weeks

9    you were playing football; true?

10        A.    Yes.

11        Q.    So my eight year old was in a cast recently

12   and I thought it would slow him down and it didn't slow

13   him down a bit, and you're the same kind of dude --

14   right -- it didn't slow you down a bit?

15        A.    No.

16        Q.    It says here in C "Emotional pain and

17   suffering."  Tell me about that.

18        A.    Yeah.  That's, man, just emotionally meaning

19   like -- sorry.  I can't speak for -- like I say, I don't

20   know what everybody else's personal feelings are

21   internally, but, you know, me, it hit me hard.  You

22   know, coming from my situation and I'm trying to get on

23   with these teams and, you know, things starting to go

24   good, I'm finally getting on with this team, coaches

25   like me, everything is going good, and then boom, you

                                        Page 133

1    know, the league shut down again and now I'm back to

2    square one.

3        Q.    Did you have to go seek medical help?

4        A.    I mean, just getting out -- there's

5    out-processing.

6        Q.    Psychiatric counseling?

7        A.    Psychiatric, no.

8        Q.    Did you have to go see a priest or a religious

9    counselor to deal with grief or anything like that?

10       A.    I was going through depression, but, no, I

11   never seen anybody.

12       Q.    Were you ever diagnosed with depression?

13       A.    No.

14       Q.    Do you know what the -- and this is really the

15   point of this question.

16             You're seeking these same damages for these

17   alleged absent class members that you want to represent

18   if they have them; right?

19       A.    Yes.

20       Q.    But you don't know who has them, do you?  The

21   only way I would be able to hear that out is?

22       A.    Line the 400 guys.

23       Q.    And?

24       A.    Ask them a question.

25       Q.    Same for the physical pain and suffering;

                                        Page 134

1      right?

2          A.    Yes.

3          Q.    A, we don't know if they all had physical pain

4      and suffering; true?

5          A.    Yeah.

6          Q.    You don't.   B, you don't know what it was;

7      true?

8          A.    What do you mean?

9          Q.    The nature of it.

10         A.    The nature of somebody else's pain and

11     suffering, yeah, I don't know.

12         Q.    You know yours?

13         A.    Uh-huh.

14         Q.    And only yours?

15         A.    Yes.

16         Q.    So let's talk about medical bills really

17     quickly.

18               You didn't pay any medical bills; true?

19         A.    No.

20         Q.    You're not anticipating paying any in the

21     future; true?

22         A.    No.

23         Q.    And for other players --

24         A.    The future of that time.

25         Q.    Well, it says "Medical bills and expenses of a

                                              Page 135

1    past, present and future nature."

2         A.    Future as in today future?

3         Q.    I didn't write the paragraph so I don't know.

4               Are you seeking medical -- are you expecting

5    to have medical costs in the future?

6         A.    No.  No.  No.

7         Q.    That's, I think, what I'm asking you.

8               And for any other players, you don't know what

9    their circumstances are?

10        A.    True.

11        Q.    You can't speak to that.

12              How about loss of earnings?  First of all, do

13   you know what "loss of earnings" means in the law?

14        A.    Yeah.

15        Q.    You do know what it means in the law?

16        A.    I believe I do.

17        Q.    Tell me.

18        A.    Loss of earnings meaning the prorated amount

19   that you didn't make.

20        Q.    Those are the breach of contract damages, the

21   amounts under the contract?

22        A.    Yes, the amounts under the contract, yes, for

23   sure.

24        Q.    Just trying to understand what it is.

25              And loss of earning capacity, how was your

                                        Page 136

```
 1              EXAMINATION
 2     BY MR. LOWENSTEIN:
 3          Q.   Mr. Northrup, my name is Jeff Lowenstein.  As
 4     you probably guessed by now, I represent Tom Dundon, and
 5     I want to focus most of my questions on that.
 6               When is the first time you ever heard the name
 7     Tom Dundon?
 8          A.   I first heard Tom Dundon's name when that
 9     whole debacle started up about that guy coming in to be
10     the savior of the league.
11          Q.   That was?
12          A.   Before then I have no idea who Tom Dundon was.
13          Q.   And that was according to -- if you look at
14     Exhibit 3, paragraph 70, you all said in paragraph 70
15     that this radio interview happened on February 19, 2019?
16          A.   Oh, yeah.  February 19, that's when we got
17     knowledge of him.
18          Q.   That was the first time you ever heard of Tom
19     Dundon?
20          A.   That was the first time.  Before then I never
21     heard of him.
22          Q.   So at the time you signed your contract with
23     the AAF, you didn't know anything about Tom Dundon;
24     right?
25          A.   Nothing.
```

Page 146

1     Q.    You hadn't heard him making any commitments or

2     having any interest in the AFF; right?

3     A.    That was Ebersol, whatever he had going on.

4     Q.    So your decision to sign your contract had

5     nothing to do with any statement that ever came from Tom

6     Dundon; right?

7     A.    No, I didn't because I signed it before he

8     came in the picture.

9     Q.    Do you know if anybody else, any other players

10    in the league, had ever heard of Tom Dundon before

11    February 19, 2019?

12    A.    I couldn't answer that question.  I wouldn't

13    know.

14    Q.    I think I heard all these answers but I want

15    to go back.

16          So you didn't actually hear the radio

17    interview of Mr. Dundon in North Carolina; right?

18    A.    No, it was articles I was reading.

19    Q.    Hold on.

20    A.    Sorry about that.

21    Q.    I'm just trying to get through these quickly

22    and I want you to give complete answers.  So if you can

23    finish this, go forward.  I can reask it.

24    A.    Go ahead.

25    Q.    You never heard the radio interview of

Page 147

```
 1      Mr. Dundon relating to the AAF; correct?

 2          A.   No.

 3          Q.   And there was a discussion earlier about a

 4      transcript, and I think there was a little confusion

 5      about what that means.

 6               My understanding of a transcript is kind of

 7      what the court reporter is doing today which is every

 8      single word spoken.  Is that your understanding of what

 9      a transcript is?

10          A.   Yes.

11          Q.   Did you ever see a transcript of Mr. Dundon's

12      interview meaning every word he said in that interview?

13          A.   I have seen articles.  I clicked on, like I

14      said, Instagram feed, you know, people share tweets,

15      seen the tweets, all the different tweets, they have the

16      click link on the bio, it takes you right to the source.

17      I read the words and stuff.

18          Q.   I'm going to be very clear here.  A transcript

19      is -- it would say "Mr. Dundon" and every single word

20      that actually came out of his mouth where somebody like

21      the court reporter is taking it down word for word, and

22      then what the interviewer asked and then what he asked,

23      and it was every single word just as they said it like

24      somebody listening to the audio and just writing down

25      every word.  Did you ever see anything like that?
```

Page 148

1      A.   No.

2      Q.   So you never saw a transcript of that

3 interview?

4      A.   No.

5      Q.   All you ever saw was what reporters decided to

6 put down in an article and send out; right?

7      A.   He was quoted.

8      Q.   Right.  You ever heard of a reporter getting a

9 quote wrong?

10      A.   Yeah, I understand that.

11      Q.   Do you trust reporters generally?

12      A.   Oh, man, you can't trust nobody in this world.

13      Q.   Have you ever heard of reporters getting

14 quotes wrong?

15      A.   Yeah.

16      Q.   So did you ever compare -- well, I guess you

17 couldn't have.

18           You'll agree with me that you could never

19 compare what any of the reporters wrote about what

20 Mr. Dundon said with what he actually said; right?  You

21 never did that comparison?

22      A.   No.

23      Q.   Do you know if any of the other players did

24 that comparison?

25      A.   No, I don't.

                                        Page 149

1    going to keep going, you know, for years will come.

2    That's what I got from that article.  "Money in the

3    bank" is the only thing that stuck out.

4         Q.   That was the most important thing to you?

5         A.   That was the most important thing to me.

6         Q.   Do you know if that was the most important

7    thing to any of the other players that may have read

8    that or any other articles?

9         A.   I can't speak for everybody else, but for the

10   most part those being my guys and especially my

11   defensive players, I was the middle linebacker so I was

12   the leader, everybody felt better when we read that, you

13   know, when we seen that.

14        Q.   Did any of the other players tell you the most

15   important thing in those articles was the "money in the

16   bank" comment?

17        A.   No.  No.

18        Q.   You can't speak to what the most important

19   thing about Mr. Dundon's statements were to any of the

20   other players; right?

21        A.   No.

22        Q.   Really the most important part to you was that

23   you understood that Mr. Dundon's money was going to help

24   you get paid for playing; right?  Correct?

25        A.   I understood that Mr. Dundon pledging $250

                                        Page 162

1    million to the league would allow the league to continue

2    running so there wasn't no scare of being shut down, you

3    know, just high-level football, pro football.  His

4    resume spoke for himself, looked him up when his name

5    popped up so, it was a sense of security, felt like it

6    was going to be good.

7         Q.   Was the particular amount of money he was

8    pledging matter to you?

9         A.   Not really.  But at the same time it was like,

10   okay, $250 million, we should be good.

11        Q.   Here's my question:  If Mr. Dundon had said

12   "I'm going to put in enough money so everyone will get

13   paid for the games they played and paid for the next six

14   games," would you have kept playing?

15        A.   Hell, yeah, definitely.  Excuse my French.

16        Q.   And certainly if he said -- well, okay.

17             And would you have been okay putting your

18   health at risk and getting potentially injured with the

19   assurance you were going to get -- for what you had

20   already played and the next six games?

21        A.   Yeah, that's the nature of the game in this

22   business, you know, you're going to get hurt, you know,

23   that's why you have the contracts.

24        Q.   With assurance of getting paid for what you

25   had already played and the next six weeks, you would

```
 1        his bank when he made those statements?

 2             A.   I looked him up.  I seen he was a billionaire

 3        so I assumed he had $250 million.

 4             Q.   So you don't think he was a liar for saying "I

 5        have $250 million in my bank"?

 6             A.   No.

 7             Q.   And you know that's what a fraud case is;

 8        right?  Accusing him of being a liar; right?

 9             A.   Yes.

10             Q.   What do you think Mr. Dundon lied to you

11        about?

12                  MR. FARAHI:  Objection.  Form.

13                  THE WITNESS:  I feel like he lied about

14        keeping the league open, you know, like what his plans

15        were, they weren't -- when he came on the scene, man,

16        we, you know -- the first thing, actually the first

17        thing I ever heard about Mr. Dundon is the articles that

18        was popping up about that $250 million.  So it was just

19        like, you know, okay, we are going to be good, we are

20        going to safe.  But like as far as the other stuff --

21             Q.   Let me ask a better question.  That wasn't a

22        great question.

23                  Did Mr. Dundon ever say anything to you that

24        you thought was a lie?

25             A.   No, he never spoke to me.
```

Page 178

1    Q.   Did you ever read anything that Mr. Dundon

2  said that you thought was a lie?

3          MR. FARAHI:  Objection.  Form.

4          THE WITNESS:  No.

5  BY MR. LOWENSTEIN:

6    Q.   Do you know if any of the other players heard

7  anything from Mr. Dundon that they thought was a lie?

8    A.   No.

9    Q.   Do you know how much money Mr. Dundon actually

10  put into the league?

11    A.   I don't.  I just seen the $250 million pledge.

12    Q.   Do you know if any of the other players know

13  how much money he actually put into the league?

14    A.   No, I have no clue.

15    Q.   Go to paragraph 151 on Page 29 of Exhibit 3.

16  There's a quote down there in that paragraph A.  You see

17  that?

18    A.   Yes.

19    Q.   I think this is the same quote from earlier,

20  but I assume your answer would be the same which is you

21  never heard Mr. Dundon say what was in that quote --

22  right -- with your ears?

23    A.   Yeah, with my ears, no.

24    Q.   You recall reading it somewhere; right?

25    A.   Yes.

Page 179

1       BY MR. LOWENSTEIN:

2           Q.   Weren't there players you played with that

3       didn't get injured at all during that time period?

4           A.   Yeah, yeah, yeah.

5           Q.   So if they didn't get injured at all, based on

6       the damages we talked about which you are claiming which

7       are contract damages and then damages for pain and

8       suffering, if they weren't injured at all in that way

9       then they wouldn't have the -- I mean, you wouldn't be a

10      good representative of them because they didn't have an

11      injury like you did; right?

12              MR. FARAHI:   Objection to form.

13              THE WITNESS:   I wouldn't say that.   That's --

14      man, I'm sure you all can find out information you need

15      to find out about who got hurt during that period of

16      time.   I couldn't tell you.   I know my thumb was messed

17      up.

18      BY MR. LOWENSTEIN:

19          Q.   I would have to talk to each of those people?

20          A.   Or documents you have access to.

21          Q.   Sure.

22              I guess my question is other than the contract

23      damages, which is the money you didn't get paid, if

24      somebody didn't get injured, what's their claim outside

25      of those contract damages?

Page 181

1    MR. FARAHI:  Objection.  Form.

2    THE WITNESS:  I mean, you have a contract, you

3    show up to practice, meet, you know what I'm saying.  We

4    have requirements.

5    BY MR. LOWENSTEIN:

6    Q.   But they got paid for that; right?

7    A.   I mean, yeah, they did, after.  It was late.

8    Q.   Sure.  But they got paid?

9    A.   Yeah.

10   Q.   So if they didn't get injured during that time

11   period after February 19, what injury did they suffer

12   other than what they were owed under the contract?

13   MR. FARAHI:  Objection.  Form.

14   THE WITNESS:  I have no answer.

15   BY MR. LOWENSTEIN:

16   Q.   I think that's it.

17   Did we have a good connection on questions and

18   answers?

19   A.   Okay.

20   Q.   Anything we need to repair or fix answer wise

21   that we didn't get right?

22   A.   No.

23   MR. LOWENSTEIN:  Thank you for your time.

24   MR. FARAHI:  Off the record.

25   THE VIDEOGRAPHER:  We are going off the

Page 182

```
1

2

3

4

5              I, REGGIE NORTHRUP, do hereby declare under

6      penalty of perjury that I have read the foregoing

7      transcript; that I have made any corrections as appear

8      noted, in ink, initialed by me, or attached hereto; that

9      my testimony as contained herein, as corrected, is true

10     and correct.

11             EXECUTED this _____ day of _____,

12     2021, at _____, _____.

13                  (City)                          (State)

14

15             _____

16                  REGGIE NORTHRUP

17                  VOLUME I

18

19

20

21

22

23

24

25

                                              Page 250
```

1       I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3       That the foregoing proceedings were taken before

4    me at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were placed under oath; that a verbatim

7    record of the proceedings was made by me using machine

8    shorthand which was thereafter transcribed under my

9    direction; further, that the foregoing is an accurate

10   transcription thereof.

11      Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal case,

13   before completion of the proceedings review of the

14   transcript [X] was [ ] was not required.

15      I further certify that I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or any of the parties.

18      IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20   Dated:  May 26, 2021

21

22

23            DEBBIE RAZAVI
             CSR No. 9989

24

25

                                        Page 251

# EXHIBIT D

# Deposition Excerpts of Colton Schmidt

```
 1                UNITED STATES BANKRUPTCY COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
 3    IN RE:                  ) CASE NO.:  19-50900-cag
 4    LEGENDARY FIELD         )
      EXHIBITIONS, LLC, et al,  ) CHAPTER 7
 5    DEBTORS.                )
 6    _____
 7
      COLTON SCHMIDT, et al,   )
 8    PLAINTIFFS,              )
                              ) ADV. PROC. NO. 19-05053-cag
 9                            )
      vs.                     ) JUDGE CRAIG A. GARGOTTA
10                            )
      AAF PLAYERS, LLC, et al,  )
11    DEFENDANTS.              )
12
13               ORAL VIDEOTAPED DEPOSITION
14                    COLTON SCHMIDT
15                    May 18, 2021
16
17       ORAL VIDEOTAPED DEPOSITION OF COLTON SCHMIDT,
18    produced as a witness at the instance of the
19    Defendant Thomas Dundon and duly sworn, was taken in
20    the above-styled and numbered cause on the 18th day
21    of May, 2021, from 10:33 a.m. to 5:32 p.m., before
22    Vickie G. Hildebrandt, Certified Shorthand Reporter
23    in and for the State of Texas, reported by
24    computerized stenotype machine at the offices of
25    Thompson, Coe, Cousins & Irons, L.L.P., One Riverway,
```

Page 1

1    Suite 1400, Houston, Texas, pursuant to the Federal

2    Rules of Civil Procedure and the provisions stated on

3    the record or attached hereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  2

```
 1                        APPEARANCES
 2
 3      FOR PLAINTIFFS:
 4           Jonathon S. Farahi, Esq.
             ABIR COHEN TREYZON SALA, LLP
 5           16001 Ventura Boulevard, Suite 200
             Encino, California  91436
 6           Telephone: 310.407.7888
             E-mail: jfarahi@actslaw.com
 7
 8      FOR DEFENDANT THOMAS DUNDON:
 9           Jeffrey S. Lowenstein, Esq.
             Brent D. Hockaday, Esq.
10           BELL NUNNALLY & MARTIN LLP
             2323 Ross Avenue, Suite 1900
11           Dallas, Texas  75201
             Telephone: 214.740.1400
12           E-mail: jlowenstein@bellnunnally.com
                     bhockaday@bellnunnally.com
13
14      FOR DEFENDANT CHARLES EBERSOL:
15           William N. Radford, Esq.
             THOMPSON, COE, COUSINS & IRONS, L.L.P.
16           700 N. Pearl Street, 25th Floor
             Dallas, Texas  75201
17           Telephone: 214.871.8212
             E-mail: wradford@thompsoncoe.com
18
             Michael J. Saltz, Esq.
19           JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP
             1880 Century Park East, Suite 900
20           Los Angeles, California  90067
             Telephone: 310.446.9900
21           E-mail: msaltz@jrsnd.com
22
23
24
25

                                            Page  3
```

```
 1
 2    FOR TRUSTEE RANDOLPH N. OSHEROW:
 3         Brian S. Engel, Esq.
           BARRETT DAFFIN FRAPPIER TURNER & ENGEL
 4         3809 Juniper Trace, Suite 205
           Austin, Texas  78738
 5         Telephone: 512.687.2503
           E-mail: brianen@bdfgroup.com
 6
 7    ALSO PRESENT:
 8         Ben Harwood, Videographer
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1       A.    Yes.

2       Q.    Okay.  And I don't want to put words in your

3   mouth except these words, morality and skill are not

4   exclusive?

5                 MR. FARAHI:  Objection, form.

6       Q.    True?

7       A.    Yeah.

8       Q.    Yeah.

9                 Okay.  Now, when do you say that the

10  AAF first terminated your agreement?

11                MR. FARAHI:  Objection, form.

12      A.    I'm not aware of the termination.  Again, it

13  was just more so of everything being closed down and

14  then the bankruptcy letter.

15      Q.    When did you start treating the agreement as

16  terminated?

17      A.    Probably April 2nd, but not so much

18  terminated, more -- more breached in that regard.

19      Q.    Okay.  Well, when did you first start acting

20  like the agreement didn't exist anymore?

21                MR. FARAHI:  Objection, form.

22      A.    After -- after the -- the closure of the

23  League and we had to leave the hotels and everything.

24      Q.    Okay.  In fact, you were prohibited by this

25  agreement, if it was in force, from playing football

                                        Page 76

1          MR. FARAHI:  Objection, form.

2     A.   At that point, yes.

3     Q.   Yeah.

4          Okay.  And at that point, Mr. Ebersol

5     wasn't saying anything to you, correct?

6     A.   Not to me personally, no.

7     Q.   Right.

8          And so same for Mr. Ebersol, did you

9     read some articles, things like that, is there

10    anything Mr. Ebersol said around February that you

11    felt was important?

12          If it helps you, there's nothing in

13    your complaint.

14    A.   Yeah, I don't think so specifically.

15    Q.   Okay.  All right.  Were you injured while you

16    were in the AAF?

17    A.   I was not.

18    Q.   Okay.  Do you know players who were injured?

19    A.   Yes.

20    Q.   Okay.  And Mr. Northrup told us about an injury

21    he had.  What other injuries -- injured players do you

22    know about?

23    A.   I know of at least three on my team alone.

24    Q.   Tell me 'em.  Tell me 'em?

25          Please -- please identify them, those

                                        Page 115

1      A.   No.  You'd have to ask them.

2      Q.   Right.

3           I was going to say you're not an

4 expert but you are a psychology major so you're not

5 without knowledge on the subject.  That's not a cut.

6 I'm just saying --

7      A.   I'm not -- I'm not licensed so I can't.

8      Q.   Usually that question is easy because you're

9 asking a truck driver, but you're not an expert doctor

10 or a psychotherapist or --

11      A.   Correct.

12      Q.   Yeah.

13           Okay.  And so if they claim emotional

14 trauma, there's nothing you can do to help us

15 understand that trauma, true?

16      A.   No.

17      Q.   Right.

18           And you didn't have any emotional

19 trauma, true?

20      A.   Not true.  I did have emotional trauma.

21      Q.   I see.

22           Did you go see a priest?

23      A.   Priest, no.

24      Q.   Did you go see a doctor?

25      A.   I had -- at that time, I was still working

                                    Page 129

1    with the -- the therapist from Buffalo.

2        Q.    Okay.  So what was it that caused your

3    emotional trauma, getting cut from Buffalo or the AAF

4    imploding?

5        A.    Well, I was seeing him prior to being cut

6    from Buffalo as well.

7        Q.    Got it.

8              All right.  And was that a sports

9    performance type of psychologist or some other type

10   of psychologist?

11       A.    I believe he's a hypnotherapist, so I first

12   started using him for sports enhancement.

13       Q.    Sports enhancement.  Okay.  And you continued

14   to do that?

15       A.    Yes.

16       Q.    All right.  And I wasn't being flip, actually,

17   when I said did you have to go consult with a priest or

18   religious official.  Did you?

19       A.    I did not.

20       Q.    Okay.  And your daily life, other than that you

21   weren't working in the AAF, wasn't affected in any

22   material way, you could still get up and move around the

23   country and look for jobs and that sort of thing,

24   correct?

25              MR. FARAHI:  Objection, form.

Page 130

1    A.    In that sense, yes.

2    Q.    Yeah.

3          And you found a job with the XFL?

4    A.    Yes.

5    Q.    Yeah.

6          And now maybe you'll find another one

7    through your opportunities that are coming here --

8    A.    Yeah.

9    Q.    -- which would be great.

10         MR. ENGEL:  Can you guys give me

11   two minutes?  In fact, I'll tell you what, if you

12   guys will let me look at my stuff and if I have a few

13   more --

14         MR. FARAHI:  Yeah, let's take five.

15   Let's take five.  Does that work?

16         MR. ENGEL:  I was going to say I'll

17   look at them while these guys are asking if you'll

18   let me circle back around.

19         MR. HOCKADAY:  Let's go ahead and

20   break.

21         MR. FARAHI:  Yeah, let's just break.

22         MR. ENGEL:  All right.  Let's do that.

23   Let's take five.  I may be done.

24         THE VIDEOGRAPHER:  Off the record at

25   1:36 p.m.

Page 131

```
 1    hits me with a stick.
 2        A.   Yeah, I don't know -- yeah, so no one in
 3    particular because there was several.
 4        Q.   All right.  And, in fact, once that payment was
 5    made -- and that would have been right around the
 6    19th, right?
 7        A.   When we got the payment, yes --
 8        Q.   Uh-huh.
 9        A.   -- yes.
10        Q.   Yeah.
11             Once that payment was made, nothing
12    Mr. Dundon said or didn't say could have possibly
13    mattered because nobody could walk away, true?
14             MR. FARAHI:  Objection, form.
15        A.   No, it mattered because it -- again, it
16    further reinforced the narrative we were being told.
17        Q.   Nothing that Mr. Dundon said could have
18    authorized them to quit or not under the contract
19    because the contract was being fully performed at that
20    moment, true?
21             MR. FARAHI:  Objection, form.
22        A.   Yeah, I suppose at that moment, yeah.
23        Q.   Right.
24             And don't suppose, you need to agree
25    with me because that's absolutely true, right?
```

Page 136

1    A.    Yeah.

2              So I'm just saying that in -- in the

3    totality of all the funding, you know, we -- to our

4    knowledge at the time, there were hundreds of

5    millions of dollars invested in the League that

6    provided physical stability for our pay.

7    Q.    Okay.  All right.  And you don't, in fact, know

8    whether that was true or not, right?

9    A.    No, I didn't see the financial transactions.

10   Q.    To this day, as you sit here, you don't

11   actually know why the AAF folded, do you?

12   A.    I guess not --

13   Q.    Right.

14   A.    -- specifically.

15   Q.    You don't know whose decision it was, true?

16   A.    Not specifically.

17   Q.    You don't know how that decision was made?

18   A.    I do not.

19   Q.    You don't know who Reggie Fowler is, true?

20   A.    Not personally, no.

21   Q.    Okay.  You know he used to own a piece of the

22   Vikings, right?

23   A.    Not -- not that -- I didn't know that.

24   Q.    Did you know him to be an investor in the AAF?

25   A.    Yes.

                                        Page 140

```
 1        A.   Yes.

 2        Q.   Okay.  Who all was present?

 3        A.   The -- the players and the coaches.

 4        Q.   Okay.  Real quick on the Twitter piece.  We

 5   found on Twitter an @schmidtykicker --

 6        A.   Yes.

 7        Q.   -- handle.  Is that you?

 8        A.   Yes.

 9        Q.   Okay.  It shows joined in August of 2014.

10             Does that sound about right?

11        A.   Yes.

12        Q.   And you have a locked account?

13        A.   Yes.

14        Q.   Protected?

15        A.   I -- well, I didn't deactivate my account

16   but I deleted, like, the app and I didn't use it for

17   several years.

18        Q.   Okay.  All right.  So pivoting back, so

19   Joseph Pendry comes to the team meeting.  You're in

20   which one room specifically?

21        A.   The team meeting room.

22        Q.   The team meeting room.  How big is it?

23        A.   Maybe about twice the size of this room.

24        Q.   Okay.

25        A.   From -- from here, the width.  It wasn't
```

                                        Page 162

1    very large.

2         Q.    Okay.  And who were all the people present in

3    that room at the time?

4         A.    The players, coaching staff, Mr. Pendry and

5    I believe Trey Brown.

6         Q.    What players?

7                    MR. FARAHI:  Bless you.

8         A.    To my knowledge, all of them that were on

9    the roster.

10        Q.    Okay.  The coaching staff --

11        A.    Yes.

12        Q.    -- and then Mr. Brown?

13        A.    Yeah, Mr. Pendry and Mr. Brown.

14        Q.    And Trey Brown was the general manager of the

15   Birmingham Iron at the time?

16        A.    The assistant.

17        Q.    The assistant general manager?

18        A.    Mr. Pendry was the general manager.

19        Q.    Mr. Pendry was general manager.

20                    Okay.  What did Mr. Pendry --

21   Mr. Pendry say specifically?

22        A.    I don't recall specifically what he said but

23   the gist of what it was was that there was a new

24   investor, we didn't have to worry about things going

25   forward financially.

Page 163

1     Q.   Okay.  So Nick Novak, what did you -- when did

2     you first discuss with Nick Novak anything -- well,

3     let's back up.  Strike that.

4          Have you ever heard the radio

5     interview of Tom Dundon that took place in Raleigh,

6     North Carolina around February 2019?

7          A.   I did not listen to that, no.

8          Q.   Okay.  Have you ever even, to this day, heard

9     that radio interview?

10         A.   No.

11         Q.   Have you ever seen a video of that radio

12    interview?

13         A.   No, I just know it exists.

14         Q.   Okay.  Have you ever read a transcript of what

15    was asked and what was answered in that interview?

16         A.   No, just the quotes and articles.

17         Q.   Okay.  So fair to say you don't know what the

18    questions that Mr. Dundon was asked are?

19         A.   Yeah.

20         Q.   Okay.  Fair to say you don't know the context

21    of what Mr. Dundon answered the questions in -- is?

22         A.   Not in regards to the radio, no.

23         Q.   The radio interview?

24         A.   The radio interview, yeah.

25         Q.   Okay.  Other than that radio interview

Page 169

```
 1                    MR. FARAHI:  Objection, form.
 2        Q.   You can answer.
 3        A.   I don't think that's fair to say because I
 4   don't -- I don't recall specifically.
 5        Q.   Okay.  But as of May 18th, 2021, you cannot
 6   recall having any specific conversation with any AAF
 7   player about any interview of Mr. Tom Dundon on the
 8   radio?
 9                    MR. FARAHI:  Objection, form.
10                    You can answer.
11        A.   No, because we talked about so many things
12   so it's hard to remember specifically what it was.
13        Q.   Right.
14                    So my question is you don't remember,
15   as of today, ever discussing a radio interview of
16   Tom Dundon at any point in time with any other AAF
17   players; is that true?
18                    MR. FARAHI:  Objection, form.
19        A.   Yes.
20        Q.   After the -- after Mr. Pendry's announcement to
21   your -- to the team, did Mr. Pendry ever talk about
22   Tom Dundon ever again, to your recollection?
23        A.   Not to my recollection, no.
24                    MR. FARAHI:  Can we take a 90-second?
25                    MR. HOCKADAY:  Oh, yeah.
```

Page 182

```
 1                    MR. FARAHI:  Objection, form.

 2        A.   Can you clarify a little, please?

 3        Q.   I'm going to ask -- I was going to get you to

 4   clarify it for me.

 5        A.   Okay.  I meant more so on the compensatory.

 6        Q.   I'm sorry?

 7        A.   Is that in -- I'm just having a little

 8   confusion right now in terms of what part the

 9   compensatory means.

10        Q.   Well, let me back up and ask it this way:  Do

11   you think you have damages that you're entitled to

12   recover?

13                    MR. FARAHI:  Objection, form.

14        A.   Yes.

15        Q.   Okay.  What -- what do you believe those

16   damages to be, sir?

17        A.   The -- the contracts that we signed.

18        Q.   Okay.  I'm going to need something more

19   specific than that.

20        A.   The base salary for 2019, 2020 and 2021.

21        Q.   Okay.  And we saw that there's only two, I

22   guess, installments that would have been due on 2 --

23   2019, right?

24        A.   For 2019, yes.

25        Q.   But you're claiming 2020 and 2021 also, right?
```

Page 242

1          A.    Yes.

2          Q.    Okay.  Any other damages that you're claiming

3     that you're entitled to recover?

4                     MR. FARAHI:  Objection, form.

5          A.    I don't believe so at this time.

6          Q.    Okay.  Are you seeking to recover for any

7     physical pain and suffering?

8          A.    No.

9          Q.    Are you seeking recovery for any emotional pain

10    and suffering?

11                    MR. FARAHI:  Objection, form.

12         Q.    And, again, all these questions are for you

13    personally.

14         A.    To me personally --

15         Q.    Yes.

16         A.    -- yeah, yeah, emotional pain, yeah.

17         Q.    Okay.  Tell me what emotional pain and

18    suffering you're claiming -- seeking to recover.

19                    MR. FARAHI:  Objection, form.

20         A.    In terms of?

21         Q.    In terms of your terms, sir.

22         A.    I'm not sure at this moment.

23                    Are you talking about the value or --

24         Q.    Well, let's start -- start off by finding out

25    what, what has caused emotional pain and suffering to

Page  243

1   you, and then describe for me what emotional pain and

2   suffering you claim to have had.

3        A.   Just the -- all the trauma from the closure

4   of the League and moving -- moving costs and

5   everything else.

6        Q.   Well, tell me -- tell me what damage you think

7   you -- you've had or what trauma you've had from the

8   closing of the League.

9        A.   The trauma of not continuing to play

10  football for the AAF.

11       Q.   Well, has that caused you to not sleep at

12  night?

13       A.   It was very stressful at that time, yeah.

14       Q.   Drink too much coffee or too much alcohol?

15       A.   No.

16       Q.   Do other things, other bad things?

17       A.   No.

18       Q.   It would be fair to say, wouldn't it, sir, that

19  different players in the League took the closing of

20  the -- the League differently?

21            MR. FARAHI:   Objection, form.

22       A.   You have to ask them directly.

23       Q.   Okay.  But you don't -- you wouldn't claim that

24  you had the same emotional trauma and suffering as

25  somebody else had, would you?

Page  244

```
 1                      MR. FARAHI:   Objection, form.
 2          A.   I can't speak on behalf of how they
 3     quantified their trauma.   I do know the fact that
 4     there were a lot of players that were traumatized by
 5     the events that took place.
 6          Q.   Okay.   But we'd have to talk to each one of
 7     those to find out the extent of their trauma, correct?
 8          A.   To find out the extent, yes.
 9          Q.   And the -- and the kind of trauma they're
10     claiming to have?
11          A.   Yes.
12          Q.   Did you have any medical bills or expenses that
13     you're seeking recovery of?
14          A.   Medical bills, no.
15          Q.   Any loss of earnings?
16          A.   Just the contract losses.
17          Q.   Any loss of earning capacity?
18                      MR. FARAHI:   Objection, form.
19          A.   Not to my knowledge, no.
20          Q.   Any loss of -- has -- has anything happened
21     that would prevent you from going on to a successful
22     career after getting your Ph.D.?
23                      MR. FARAHI:   Objection, form.
24          A.   Not to my knowledge, no.
25          Q.   On all of these things we've just -- we've just
```

Page  245

1    looked at there, the compensatory damages, the physical

2    and emotional pain and suffering and so forth, loss of

3    earnings and earning capacity, we'd have to actually

4    talk to each one of the players in the League to find

5    out what kind of damages they claim to have, right?

6                    MR. FARAHI:  Objection, form.

7         A.   Yes, aside from the contracts, yeah.

8         Q.   Yes, sir.

9         A.   Yeah.

10        Q.   All right.  Give me just a second to get back

11   to my cheat sheet.

12                   MR. SALTZ:  Take five minutes?

13                   MR. RADFORD:  I'm close to being --

14   close to being done.

15                   MR. FARAHI:  I've got about ten,

16   15 minutes.

17                   MR. ENGEL:  Ready, set, go.

18                   MR. LOWENSTEIN:  Are you done?

19                   MR. RADFORD:  I'm going to pass the

20   witness.

21                   MR. FARAHI:  You guys want to go?

22                   MR. LOWENSTEN:  I'd love to go.  I

23   kind of want you to go so I can properly deal with

24   it.

25                   MR. FARAHI:  It's up to you but then

Page 246

1      Q.    Okay.  Who spoke during that Monday meeting

2    following Week 2?

3      A.    It would have been Coach Lewis.

4      Q.    Did he address the missed payments?

5      A.    I don't recall if he did in that meeting or

6    not.

7      Q.    Okay.  And then the following day, was there

8    another team meeting?

9      A.    Yes.

10     Q.    And who spoke at that team meeting?

11     A.    That would have been when Mr. Pendry

12   addressed us and when we -- first time we were told

13   from management that there was a new investor

14   involved.

15     Q.    Okay.  And how did Mr. Dundon's statement

16   factor in your decision to play in Week 3?

17                MR. LOWENSTEIN:   Objection, form.

18     A.    It -- it -- it reassured us that there was

19   enough money to fund our contracts and provided

20   further reassurance that -- that they would make

21   payroll and we'd be able to keep playing as the terms

22   laid out.

23     Q.    So in my -- your decision to play Week 3 was

24   not solely related to receiving the payment that was

25   missed?

Page 255

1          MR. LOWENSTEIN:  Objection, leading.

2      A.   No, it was not the sole reason.

3      Q.   What were the reasons that you decided to play

4  in that Week 3 game?

5      A.   Because of all the circumstances -- or all

6  the knowledge that was presented to us in the past,

7  it provided reinforcement to the narrative that we

8  were being told such as the payroll glitch, there was

9  adequate funding because up until that time, what we

10  were being told, everything had seemed fine, again,

11  the -- the payroll glitch and then we got paid when

12  they said they did after the glitch so Mr. Dundon's

13  involvement further reinforced the narrative that

14  they were telling us in terms of the pay and

15  continuation of the League.

16      Q.   When was the last time a player in the AAF

17  discussed this case with you?

18      A.   The last time would have been a handful

19  of days ago.

20      Q.   And can you describe that conversation?

21      A.   One of my current teammates in the

22  Spring League reached out to me because he was aware

23  of my involvement in the AAF and this claim and he

24  expressed his -- his personal interest in being a

25  part of the -- this suit.

1    how much money he was obligated to put in?

2              MR. FARAHI:  Objection, form.

3         A.   I'm not even aware if that's public

4    knowledge.

5         Q.   Okay.

6         A.   No.

7         Q.   And you got paid for everything you did for the

8    League up until the League shut down, right?

9              MR. FARAHI:  Objection, form.

10        A.   No, not necessarily.

11        Q.   What didn't you get paid for?

12        A.   We didn't receive the ten equal payments for

13   2019.

14        Q.   Okay.  You got paid -- you got -- gained --

15   strike that.

16              You got the weekly checks for every

17   game you played up until the League shut down, right?

18              MR. FARAHI:  Objection, form.

19        A.   Yes, but they weren't -- we weren't getting

20   paid per game, though, it was just when the money was

21   being sent out.

22        Q.   I understand.  You got paid all the way through

23   the time the League shut down?

24        A.   Yes.

25        Q.   So how are you hurt -- well, strike that.

                                        Page 265

```
 1                   Do you remember earlier -- well, first
 2      of all, let me talk about this $250 million to
 3      Mr. Dundon.  As I just heard what you said, you
 4      believe that had Mr. Dundon -- and I'm not saying
 5      whether this is true or not true -- but had he
 6      invested $250 million in the League, the League would
 7      have continued to perform and, therefore, the League
 8      would have paid your contract, right?
 9           A.   Yes.
10           Q.   So it's not your contention that Mr. Dundon
11      made a promise to pay your contract?
12                     MR. FARAHI:   Objection, form.
13           A.   Not specifically in that manner, no.
14           Q.   Okay.  And Mr. Dundon, in fact, didn't have a
15      contract with you?
16           A.   Not specifically.
17           Q.   And so where I'm headed to with that is what
18      you are complaining about is that you think Mr. Dundon
19      somehow misled the League, right, and that caused you
20      derivative harm?
21                     MR. LOWENSTEIN:   Object to form.
22           A.   In some ways, yes.
23           Q.   Well, that is the way, right?
24           A.   Yes.
25           Q.   So I think Mr. Lowenstein asked you if
```

                                          Page 272

1   Mr. Dundon did anything to -- that was directed to hurt

2   you personally, directly and individually, and I think

3   we just discovered that the answer to that is no?

4       A.    Yes, not -- not personally.

5       Q.    Okay.  Let me ask you a couple of questions

6   about this contract.

7                   Now, I think we talked about earlier

8   that Mr. Fox, Derrick Fox, was the primary person who

9   negotiated, to the extent it was done, this contract,

10  right?

11      A.    Yes.

12      Q.    And you -- did you even read it before you

13  signed it?

14      A.    I did.

15      Q.    Okay.  And you inquired with Mr. Fox and he

16  advised you to sign it?

17      A.    Yes.

18      Q.    And you did sign it?

19      A.    Yes.

20      Q.    And that happened on either the 8th or 9th,

21  depending on which dates we believe on the --

22      A.    Yes.

23      Q.    -- the agreement.  Okay.  Got it.

24                  And so when you read this contract,

25  you thought you were going to play the 2019 season

Page  273

1       I declare under penalty of perjury that the

2    foregoing is true and correct.

3

4

5                        COLTON SCHMIDT

6

7

8       SUBSCRIBED AND SWORN TO BEFORE ME, the

9    undersigned authority, by the witness, COLTON

10   SCHMIDT, on this the      day of                     ,

11          .

12

13

14                        NOTARY PUBLIC IN AND FOR

15                        THE STATE OF

16

17   My Commission Expires:

18

19

20

21

22

23

24

25      Job No. TX4588736

                                        Page 308

1   STATE OF TEXAS

2   COUNTY OF HARRIS

3

4                   REPORTER'S CERTIFICATE

5          ORAL VIDEOTAPED DEPOSITION OF COLTON SCHMIDT

6                       May 18, 2021

7        I, the undersigned Certified Shorthand Reporter

8   in and for the State of Texas, certify that the facts

9   stated in the foregoing pages are true and correct.

10       I further certify that I am neither attorney or

11  counsel for, related to, nor employed by any parties

12  to the action in which this testimony is taken and,

13  further, that I am not a relative or employee of any

14  counsel employed by the parties hereto or financially

15  interested in the action.

16       SUBSCRIBED AND SWORN TO under my hand and seal

17  of office on this the 7th day of June, 2021.

18

19

20

21                      Vickie G. Hildebrandt, CSR
                        Texas CSR 1363

22                      Expiration:  06/30/22
                        Veritext Legal Solutions

23                      Firm Registration No. 571
                        300 Throckmorton, Suite 1600

24                      Fort Worth, Texas  76102
                        817-336-3042

25

                              Page 309